# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Fernando Palma-Jimenez, et al. | ) | Case No.   25-932M(NJ) |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___March 2023 through the Present___ in the county of ___Milwaukee___ in the

___Eastern___ District of ___Wisconsin & elsewhere___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 841(b)(1)(B), 846, & 843(b) | Distribution of, and Possession with Intent to Distribute, Controlled Substances; Attempt and Conspiracy to commit violations of Controlled Substances Offenses, including to Distribute and Possess with Intent to Distribute Controlled Substances; Use of Communications Facilities to Facilitate Controlled Substance Felonies; and Aiding and Abetting the same |
| 18 U.S.C. § 2(a) | |
| 8 U.S.C. § 1326 | Reentry of Removed Aliens |

This criminal complaint is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

LUKE HEPP (Affiliate)   Digitally signed by LUKE HEPP (Affiliate)
Date: 2025.05.23 12:42:59 -05'00'

*Complainant's signature*

Luke Hepp, DEA Task Force Officer

*Printed name and title*

Sworn to before me and signed in my presence.

Date:  5/28/2025

*Judge's signature*

City and state:        Milwaukee, Wisconsin

Honorable Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

<u>**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**</u>
<u>**AND SEARCH WARRANTS**</u>

I, Luke Hepp, being duly sworn, do depose and state as follows:

**I.      INTRODUCTION AND AGENT BACKGROUND**

1.      I am a Special Agent (SA) with the Wisconsin Department of Justice, Division of Criminal Investigation (DCI), and have been a sworn law enforcement officer for more than 18 years. I am currently assigned to the North Central High Intensity Drug Trafficking Areas (HIDTA) Opioid Initiative. HIDTA is composed of law enforcement officers from federal, state, and local law enforcement agencies. I am deputized as a federal task force officer with the United States Department of Justice, Drug Enforcement Administration (DEA). As such, I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

2.      I have received training in the area of controlled substances investigations, money laundering, financial investigations, and various methods that drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises. I have participated in numerous investigations involving violations of state and federal controlled substances laws. I have participated or assisted in numerous federal and state search warrants for narcotic related offenses that have resulted in the seizure of United States currency, vehicles, real estate, and jewelry from individuals involved in narcotics trafficking.

3.      3. I have authored and/or aided in investigations that have led to the issuance of numerous search warrants involving violations of both state and federal narcotic laws. These warrants involved the search of locations including: residences of targets, their associates and relatives, "stash houses" (houses used as drug/money storage locations), storage facilities, bank

1

safe deposit boxes, cellular/camera phones, and computers. Evidence searched for and recovered in these locations has included controlled substances, records pertaining to the expenditures and profits realized therefrom, monetary instruments, and various assets that were purchased with the proceeds of the drug trafficking.

4.       4. Through training, experience, and discussions with other experienced agents:

a.       I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin as well as in other areas of the United States;

b.       I am familiar with the coded language used over the telephone to discuss drug trafficking and know that the language is often limited, guarded and coded. I also know the various code names used to describe controlled substances;

c.       I know large-scale drug traffickers often purchase and/or title their assets in fictitious names, aliases, or the names of relatives, associates, or business entities to avoid detection of these assets by government agencies. I know that even though these assets are in the names other than the drug traffickers, the drug traffickers actually own, use and exercise dominion and control over these assets;

d.       I know large-scale drug traffickers must maintain on-hand, large amounts of U.S. currency to maintain and finance their ongoing drug business;

e.       Drug traffickers frequently possess firearms and ammunition to protect their illegal product;

f.       I know it is common for persons involved in large-scale drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, passbooks, letters of credit, bank drafts, cashier's checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by the traffickers within residences, businesses, vehicles, or other locations over which they maintain dominion and control;

g.       I know it is common for drug traffickers to maintain books, records, receipts, notes ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds and other papers relating

2

to the transportation, ordering, sale and distribution of controlled substances. That the aforementioned book, records, receipts, notes, ledger, etc., are maintained where the traffickers have ready access to them;

h.    It is common practice for individuals who are involved in business activities of any nature to maintain books and records of such business activities for lengthy periods of time. It is also common practice for individuals who maintain these records to keep them in places that are secure but easily accessible such as in their businesses, offices, or personal residence.

i.    It is also common that individuals who are attempting to conceal their true income from the IRS will maintain records that will establish their true ownership of assets or other expenditures in a secret manner. These records have included bank records, automobile titles, property deeds, cashier's check receipts, money order receipts, wire transfer receipts, documents pertaining to storage facilities or safe deposit boxes, documents or agreements detailing the true ownership of assets, photographs of the true owners with the concealed assets, or other items such as sales receipts, purchase orders, or shipping invoices.

j.    I know large-scale drug traffickers often use electronic equipment such as telephones, pagers, computers, telex machines, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, record, and/or store the information described in the items above, as well as conduct drug trafficking activities;

k.    I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers use the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts and otherwise legitimate businesses that may generate large quantities of currency. To this end, I am also familiar with the analysis of financial documents;

l.    I know drug traffickers commonly maintain addresses or telephones numbers in books or papers that reflect names, addresses and/or telephone numbers of their associates in the trafficking organization; and

m.    I am familiar with computers, cellular telephones, pagers and their uses by drug traffickers to communicate with suppliers, customers, and fellow traffickers and by those engaged in money laundering activities to communicate with their associates and financial institutions; That drug traffickers use these devices to record their transactions and aspects of their lifestyle related to drug dealing, whether in the form of voicemail, email,

3

text messages, video and audio clips, floppy disks, hard disk drives, flash drives, CD's, DVD's, optical disks, Zip disks, flash memory cards, Smart media and any data contained within such computers or cellular telephones, electronic storage media and other settings particular to such devices; I know that such devices automatically record aspects of such communications, such as lists of calls and communications, and any particularized identification assigned to those source numbers or email addresses by the owner of the devices;

n.  Specifically, I know the following information can be retrieved to show evidence of use of the computer to further the drug trade and/or money laundering activities; Computer systems and cellular telephones, including but not limited to system components, input devices, output devices, data storage devices, data transmission devices, and network devices and any data contained within such systems; and computer media and any data contained within such media and other material relating to computer systems and the internet including but not limited to, documentation, operating system software, application or access program disks, manuals, books, brochures, or notes; and computer access codes, user names, log files, configuration files, and passwords, screen names, email addresses, IP addresses and cellular / wireless telephones, SIM cards, any removable storage devices for telephones, and any data contained therein, including but not limited to stored telephone numbers, recently called numbers list, text messages, digital audio and/or video recordings, pictures, settings, and any other user defined settings and/or data.

5.  In addition, during the course of such residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

6.  Pursuant to my official duties, I am submitting this Affidavit in support of an application for a criminal complaint, arrest warrants, and search warrants for property described in Attachment A, for violations of federal law, including violations of Title 21, United States Code, Sections 841(a)(1) (Distribution and Possession with Intent to Distribute Controlled Substances),

4

846 (Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances), and 843(b) (Use of Communications Facilities to Facilitate Controlled Substance Felonies); Title 18, United States Code, Section 2(a) (Aiding and Abetting the Aforementioned Offenses), and Title 8, United States Code § 1326 (Reentry of Removed Aliens), collectively referred to as the Target Offenses.

7.     I am personally involved in the investigation of the offenses discussed in this affidavit and I am familiar with all aspects of this investigation. The statements contained in this Affidavit are based on my knowledge and, in part, information provided by LEOs, including (a) my personal knowledge and observations derived from participation in this investigation; (b) review of oral and written reports that I have received directly or indirectly from other LEOs about this and other drug-trafficking investigations; (c) discussions I personally had concerning this investigation with other experienced drug-trafficking investigators; (d) physical surveillance by the DEA, Homeland Security Investigations (HSI), and local law enforcement agencies, the results of which have been reported to me directly or indirectly; (e) public records; (f) review of telephone toll records, pen register and trap and trace information, and telephone subscriber information; (g) information provided by confidential sources working for the DEA, HSI, and North Central HIDTA; (h) consensually-recorded phone calls between confidential sources; (i) controlled purchases of fentanyl, and cocaine; (j) review of driver's license and automobile registration records; (k) records obtained from law enforcement databases; (l) my training and experience as a DEA TFO; and (m) the training and experience of other LEOs involved in this investigation; (n) United States Postal service records; (o) and wire and electronic communication interceptions that were intercepted over TARGET TELEPHONES pursuant to court order that have been translated from Spanish to English.

5

8.     The statements in this Affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts. Throughout this Affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation. Because this Affidavit is being submitted for the limited purpose of securing search warrants and a criminal complaint, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are necessary to establish probable cause to believe that evidence of violations set forth above occurred and that probable cause exists to believe that the property described in Attachment A, incorporated herein by reference, contain the items that are described in Attachment B.

## II.   PURPOSE OF AFFIDAVIT

### A.   Individuals for Whom a Criminal Complaint are Sought

|    | Name | Date of Birth |
|----|------|---------------|
| 1  | Fernando PALMA-JIMENEZ | █/1975 |
| 2  | Luis QUINONEZ-HERNANDEZ | █/1989 |
| 3  | Carlos PEREZ-SANTANA | █/1992 |
| 4  | Jesus MEDINA-RODRIGUEZ | █/1977 |
| 5  | Daniel MORALEZ | █/1988 |
| 6  | Reynaldo SANCHEZ-GONZALEZ | █/1977 |
| 7  | Equiel MARTINEZ | █/1985 |
| 8  | Hector RODRIGUEZ-VILLALOBOS | █/1990 |
| 9  | Joseph MARINCIC | █/1984 |
| 10 | Gerardo OSORIO- JARAMILLO | █/1977 |
| 11 | Andrea ROA | █/1994 |
| 12 | Osmar VENEJAS-MEJIA | █/1990 |
| 13 | Carmelo HERNANDEZ-RAMIREZ | █/1984, █/1985 |
| 14 | Erik RODRIGUEZ | █/1991 |

6

## III.    PROPERTIES FOR WHICH SEARCH WARRANTS ARE SOUGHT

9.    For the reasons discussed herein, there is probable cause to believe that located at and in the following properties, more fully described in Attachment A and collectively referred to as "SUBJECT PREMISES," are items that constitute evidence of the Target Offenses.

a.    36██ W. Branting Lane, Milwaukee, Wisconsin ("SUBJECT PREMISES 1") **[Fernando PALMA-JIMENEZ Residence];**

b.    25██ S. 29th Street, Milwaukee, Wisconsin ("SUBJECT PREMISES 2") **[MORALEZ and ROA Residence];**

c.    58██ W. Capitol Drive, Milwaukee, Wisconsin ("SUBJECT PREMISES 3") **[MORALEZ Capitol Drive Shop];**

d.    15██ S. 90th Street, West Allis, Wisconsin ("SUBJECT PREMESIS 4") **[Carlos PEREZ-SANTANA Residence];**

e.    22██ S. 58th Street, West Allis, Wisconsin ("SUBJECT PREMISES 5") **[Jesus MEDINA-RODRIGUEZ Residence];**

f.    20██ S. 31st Street, Milwaukee, Wisconsin ("SUBJECT PREMISES 6") **[Reynaldo SANCHEZ-GONZALEZ Residence];**

g.    50██ S. 14th Street, Apartment #█, Milwaukee, Wisconsin ("SUBJECT PREMISES 7") **[OSMAR VENEGAS-MEJIA Residence];**

h.    N91████ Center Oak Road, Hartland Wisconsin ("SUBJECT PREMISES 8") **[Joseph MARINCIC Residence]**; and

i.    101██ West Forest Home Avenue, Apartment # ██, Hales Corners, Wisconsin ("SUBJECT PREMISES 9") **[Gerardo OSORIO-JARAMILLO Residence]**.

## IV. SUMMARY OF PROBABLE CAUSE

### A. Background and Summary of Investigation

10.     In March 2023, members of North Central High Intensity Drug Trafficking Area (HIDTA), Homeland Security Investigations, and the Drug Enforcement Administration received information from Confidential Informant (CI-1) about a large drug trafficking organization affiliated with Sinaloa, Mexico, being operated in Milwaukee, Wisconsin. CI-1 indicated Fernando PALMA-JIMENEZ operated a body shop on the north side of Milwaukee and had been involved in drug trafficking for approximately 20 years. CI-1 stated the Milwaukee-based Money Laundering Drug/Trafficking Organization (MLDTO) receives 30-50 kilograms of narcotics, which are transported by vehicle from Arizona, on a monthly and sometimes bi-monthly basis. CI-1 stated the narcotics are concealed in after-market compartments within the "load vehicles" and driven to the body shop operated by PALMA-JIMENEZ. CI-1 provided cellular telephone number (414) 326-███ (subsequently identified as TARGET TELEPHONE-1), for PALMA-JIMENEZ.

11.     CI-1 has provided law enforcement agents information and statements against CI-1's penal interests for at least the past ten years. Law enforcement has corroborated much of this information through independent investigations, and CI-1 has conducted controlled buys of narcotics for law enforcement. CI-1 has no criminal history convictions. In May 2024, CI-1 received a Municipal Citation for Operating While Intoxicated (1st Offense), which is a Municipal Violation and not considered a criminal offense. CI-1 is cooperating in exchange for immigration benefits, including Deferred Action and Employment Authorization status. Within the context of the information detailed and relied upon for purposes of this Affidavit, case agents believe CI-1 is credible and CI-1's information is reliable.

12.     As the investigation progressed, Daniel MORALEZ was identified as a narcotics distributor in the Milwaukee area. MORALEZ and PALMA-JIMINEZ subsequently distributed a kilogram quantity of cocaine to CI-1.  Intercepted communications of MORALEZ (i.e., TARGET TELEPHONE-2), identified a California based narcotics distributor named Luis QUINONEZ-HERNANDEZ. QUINONEZ-HERNANDEZ operated with Equiel MARTINEZ and others to distribute or attempt to distribute cocaine to locations including Australia, and the Eastern District of Wisconsin.

13.     Intercepted communications of QUINONEZ-HERNANDEZ (TARGET TELEPHONE-3 and TARGET TELEPHONE-5) revealed other Milwaukee based, high level narcotics distributors operating in the Eastern District of Wisconsin. These individuals included Reynaldo SANCHEZ-GONALEZ (TARGET TELEPHONE-4), Carlos PEREZ-SANTANA (TARGET TELEPHONE-6), Jesus MEDINA-RODRIGUEZ, and others outlined in this Affidavit.

**June 24, 2023, Narcotics Seizure in Milwaukee, Wisconsin**

14.     On June 24, 2023, HSI in Milwaukee received information that a white Ford F-450 bearing Illinois registration 14███, had traveled through the interior of the United States and was located at the Hilton Garden Inn Hotel, 58█ South Howell Avenue, Milwaukee, Wisconsin. Based upon the investigation, the white Ford F-450 was suspected of containing an unknown amount and type of narcotics. HSI Milwaukee special agents located the Ford F-450 that same day in the parking lot of the Hilton Garden Inn at approximately 6:45 a.m.  At approximately 8:30 a.m., a drug detection canine alerted to the presence of narcotics at the front passenger door area of the Ford F-450.

15.     At approximately 12:50 p.m., HSI agents observed an individual enter the Ford F-450.  Agents encountered the subject, hereinafter "Source of Information-1" (SOI-1), who stated

in an audio-recorded post-*Miranda* interview that the white Ford F-450 contained concealed narcotics. SOI-1 provided agents verbal and written consent to search the Ford F-450, which resulted in the seizure of approximately 26 individually wrapped brick-sized objects from a spare fuel tank in the front of the truck bed, totaling approximately 25.8 kilograms of cocaine based on certified laboratory testing.

16.     SOI-1 stated SOI-1 was instructed to meet unknown individuals in the morning of June 25, 2023. SOI-1 was instructed to leave the keys in the vehicle and two, unidentified Hispanic males would take the vehicle to an unknown location and remove the narcotics. SOI-1 was not aware of where the white Ford F-450 was to be taken to offload the narcotics.

17.     SOI-1 provided information to law enforcement agents beginning on June 24, 2023. The information SOI-1 provided was substantially against SOI-1's penal interests. The information provided by SOI-1 has also been corroborated by agents through a consent search, surveillance, the seizure of physical evidence, review of WhatsApp text conversations and consensually monitored WhatsApp audio conversations with an Arizona-based coordinator SOI-1 only identified as "Luis," and independent investigation. SOI-1 does not have a prior criminal history. SOI-1 is cooperating in exchange for consideration relating to the June 24, 2023, seizure of approximately 26 kilograms of cocaine. Within the context of the information detailed and relied upon for purposes of this Affidavit, case agents believe SOI-1 is credible and SOI-1's information reliable.

18.     In the early morning hours of June 25, 2023, at approximately 7:43 a.m., SOI-1 received a WhatsApp message from "Luis," which was an image of a map location, asking SOI-1 how long until SOI-1 would arrive. The location was a McDonald's in Milwaukee.

10

19.     On June 25, 2023, at approximately 8:20 a.m., the white Ford F-450 arrived at the McDonald's located at 617 W. Oklahoma Avenue in Milwaukee, Wisconsin.  At approximately 8:22 a.m., a Hispanic male, later identified as Julio MELENDREZ-ORTEGA entered the Ford F-450 and departed the area.  A silver Jeep followed the Ford F-450 to the detached garage in the alley between South 8th and South 9th Streets, located at 30█ S. 8th Street in Milwaukee, Wisconsin.  Based on case agents' training and experience, case agents are aware drug traffickers and transporters often use additional vehicles to follow the narcotics-laden vehicle to provide counter-surveillance of law enforcement and/or to facilitate the movement of narcotics.

20.     At approximately 8:24 a.m., MELENDREZ-ORTEGA backed the Ford F-450 in the garage located at 30█ South 8th Street, and the garage door of this residence remained open. The aforementioned silver jeep parked in the alley in front of a garage that is next to the detached garage for the 8th Street residence.  Additionally, a Chevrolet Silverado arrived at the residence and was believed to have deliberately parked in front of Ford F-450 in the garage.  At approximately 8:30 a.m., law enforcement approached the garage towards the open roll-up door of the 8th Street residence and encountered MELENDREZ-ORTEGA, and three other individuals later identified as M.V.H., Jesus LOZANO-VILLARREAL, and Jesus PEREZ-ROMAN, who were subsequently arrested.[1]

21.     A search warrant [23-M-407 (SCD)] was obtained for and executed at the residence.  During the execution of this warrant, law enforcement located a backpack in the garage that contained at least 23 bundles of U.S. currency totaling $459,600.  Based on their training and

---

[1] MELENDREZ-ORTEGA, LOZANO-VILLARREAL, and PEREZ-ROMAN were subsequently charged with and pled guilty to attempted possession with intent to distribute controlled substances, namely cocaine, stemming from this incident. *See United States v. Julio Melendrez Ortega*, et al., 23-CR-133, Eastern District of Wisconsin.

experience, and familiarity with this investigation case agents believe that the bulk U.S. currency located in the backpack in the garage constitutes drug proceeds.

22.     A court-authorized search warrant [23-M-415 (SCD)] for eight cellular telephones seized on this day reflected approximately 157 contacts between the TARGET TELEPHONE-1 and the phones seized from PEREZ-ROMAN between May 1, 2023, and June 25, 2023, including 106 contacts between June 24, 2023, and June 25, 2023. Based on their training, experience, and familiarity with the investigation, case agents believe that the contacts between the TARGET TELEPHONE-1 and PEREZ-ROMAN on June 24 and June 25, 2023, were related to the 26 kilograms of cocaine that were seized on June 25, 2023.

### B.     Court-Authorized Interceptions

23.     Identification of callers, phone numbers, and addresses referenced herein have been established over the course of the investigation through the investigative means, including many conversations of intercepted communications over several months, phone records, information from confidential sources, public records searches, and electronic and personal surveillance. The intercepted calls detailed below are provided solely as a sample of what case agents believe are numerous inculpatory interceptions with the identified below targets. Furthermore, the significance and meaning attributed to the intercepted communications are based on case agents' training, experience, and knowledge thus far derived from this investigation.

24.     In the course of this investigation, the United States District Court for the Eastern District of Wisconsin authorized the following interceptions pursuant to 18 U.S.C. § 2518:

25.     On September 11, 2024, the Honorable United States District Court Judge, J.P. Stadtmueller, Eastern District of Wisconsin, authorized the initial wire and electronic interceptions over (414) 326-███ (TARGET TELEPHONE-1) used by PALMA-JIMENEZ for a period of 30

days. *See* Application No. 24-AP-11. Wire and electronic interceptions expired on October 10, 2024. The Affidavit in support of wire and electronic interceptions over TARGET TELEPHONE-1 in Application No. 24-AP-11 is hereby incorporated into this Affidavit.[2]

26.    On November 13, 2024, the Honorable United States District Court Judge, J.P. Stadtmueller, Eastern District of Wisconsin, authorized the initial wire interceptions over (414) 736-███ (TARGET TELEPHONE-2) used by MORALEZ for a period of 30 days. *See* Application No. 24-AP-11. Wire interceptions were set to expire on December 13, 2024, but were extended as detailed below. The Affidavit in support of wire interceptions over TARGET TELEPHONE-2 in Application No. 24-AP-11 is hereby incorporated into this Affidavit.

27.    On December 13, 2024, the Honorable United States District Court Judge, J.P. Stadtmueller, Eastern District of Wisconsin, authorized the continued interception of wire communications and the initial interception of electronic communications over (414) 736-███ (TARGET TELEPHONE-2) used by MORALEZ for a period of 30 days. *See* Application No. 24-AP-11. Wire and electronic interceptions were set to expire on January 11, 2025, but were extended as detailed below. The Affidavits in support of wire and electronic interceptions over TARGET TELEPHONE-2 in Application No. 24-AP-11 are hereby incorporated into this Affidavit.

28.    On January 10, 2025, the Honorable United States District Court Judge, Lynn Adelman, Eastern District of Wisconsin, authorized the continued wire and electronic interceptions over (414) 736-███ (TARGET TELEPHONE-2) used by MORALEZ, and the initial wire and

---

[2]The majority of the conversations intercepted pursuant to the referenced court orders occurred in Spanish. These communications were translated into English by certified monitors who are fluent in both Spanish and English. Furthermore, the significance and meaning attributed to those intercepted communications are based on your Affiant's training, experience, and knowledge thus far derived from this investigation.

electronic interceptions over (747) 724-███ (TARGET TELEPHONE-3) used by QUINONEZ-HERNANDEZ for a period of 30 days. The Affidavits in support of wire and electronic interceptions over TARGET TELEPHONE-2 and TARGET TELEPHONE-3 in Application No. 24-AP-11 are hereby incorporated into this Affidavit. Wire and electronic interceptions over TARGET TELEPHONE-2 expired February 8, 2025. Wire and electronic interceptions over TARGET TELEPHONE-3 were set to expire February 8, 2025, but were extended as explained below.

29.    On February 7, 2025, the Honorable United States District Court Judge, Brett H. Ludwig, Eastern District of Wisconsin, authorized the continued interception of wire and electronic communications over (747) 724-███ (TARGET TELEPHONE-3), used by QUINONEZ-HERNANDEZ, the initial interception of wire and electronic communications over (414) 213-███ (TARGET TELEPHONE-4), used by SANCHEZ-GONZALEZ, and the initial interception of wire communications over (818) 478-███ (TARGET TELEPHONE-5), used by QUINONEZ-HERNANDEZ for a period of 30 days. *See* Application No. 24-AP-11. Wire and electronic interceptions expired March 8, 2025, at approximately 11:59 p.m.

30.    On March 21, 2025, the Honorable United States District Court Judge, J.P. Stadtmueller, Eastern District of Wisconsin, authorized the continued interception of wire and electronic communications over (747) 724-███ (TARGET TELEPHONE-3), used by QUINONEZ-HERNANDEZ, the continued interception of wire communications over (414) 213-███ (TARGET TELEPHONE-4), used by SANCHEZ-GONZALEZ, the continued interception of wire communications over (818) 478-███ (TARGET TELEPHONE-5), used by QUINONEZ-HERNANDEZ, and the initial interception of wire and electronic communications over (414) 210-███ (TARGET TELEPHONE-6), used by PEREZ-SANTANA for a period of 30 days. *See*

14

Application No. 24-AP-11. Wire and electronic interceptions expired April 19, 2025, at approximately 11:59 p.m. The Affidavits in support of wire and/or electronic interceptions over TARGET TELEPHONE-3, TARGET TELEPHONE-4, TARGET TELEPHONE-5, and TARGET TELEPHONE-6 in Application No. 24-AP-11 are hereby incorporated into this Affidavit.

31. On April 22, 2025, the Honorable United States District Court Judge, J.P. Stadtmueller, Eastern District of Wisconsin, authorized the continued interception of electronic communications over (414) 213-■■■ (TARGET TELEPHONE-4), used by SANCHEZ-GONZALEZ, and the continued interception of wire and electronic communications over (414) 210-■■■ (TARGET TELEPHONE-6), used by PEREZ-SANTANA, for a period of 30 days. *See* Application No. 24-AP-11. Wire and electronic interceptions expired May 22, 2025, at approximately 11:59 p.m. The Affidavits in support of wire and/or electronic interceptions over TARGET TELEPHONE-4, and TARGET TELEPHONE-6 in Application No. 24-AP-11 are hereby incorporated into this Affidavit.

## C. Details Relating to Targets and Search Locations

**Fernando PALMA-JIMENEZ (TARGET TELEPHONE-1) and Erik RODRIGUEZ**

32. Fernando Israel PALMA-JIMENEZ, also known as Israel PANTOJA-JIMENEZ, "Chapito," "Negro," and "Patillas," is a Hispanic male born in Mexico on ■■■■■, 1975. PALMA-JIMENEZ is a citizen and national of Mexico with no current lawful documentation to reside in the United States. PALMA-JIMENEZ's primary residence is 36■ W. Branting Lane, Milwaukee, Wisconsin. According to confidential source(s), PALMA-JIMENEZ received shipments of cocaine and fentanyl from unknown sources-of-supply for further distribution in Milwaukee, Wisconsin, and beyond. PALMA-JIMENEZ operated a car shop located at 39■ W.

15

Rohr Avenue, Milwaukee, Wisconsin (Rohr Avenue Shop), which was later moved in approximately February 2024 to 3002 W. Burleigh Street, Milwaukee, Wisconsin (Burleigh Street Shop). PALMA-JIMENEZ is the user of TARGET TELEPHONE-1. On May 7, 2025, case agents conducted surveillance at or near 36█ W. Branting Lane. Case agents observed PALMA-JIMENEZ exit the door to 36█ W. Branting Lane and walk to the silver Jeep Patriot bearing Wisconsin license plate AWR-███. PALMA-JIMENEZ opened the front passenger door and then closed it, and walked back to the door leading to 36█, and used a key to enter. A short time later, PALMA-JIMENEZ exited the door at 36█, returned to the Jeep Patriot and drove away.

33.     In July 2023, CI-1 informed case agents that CI-1 had recently been with PALMA-JIMENEZ before the June 25, 2023, event (i.e., the seizure of 26 kilograms of cocaine). CI-1 said PALMA-JIMENEZ was accompanied by an individual described as being from the Sinaloa Cartel. CI-1 was shown several photographs and identified Jesus PEREZ-ROMAN as the subject who accompanied PALMA-JIMENEZ.

34.     In July 2023, CI-1 informed case agents that CI-1 was with PALMA-JIMENEZ when he (PALMA-JIMENEZ) received a phone call from someone in Mexico who told PALMA-JIMENEZ that the subjects were arrested and instructed PALMA-JIMENEZ to go to a stash house in Milwaukee and remove a large amount of money and several kilograms of heroin. According to CI-1, PALMA-JIMENEZ retrieved several kilograms of narcotics and $100,000 in bulk cash from the stash house. CI-1 stated that PALMA-JIMENEZ was also instructed to retrieve $60,000 from the silver jeep Patriot, previously identified as being driven by PEREZ-ROMAN, which was concealed in an after-market compartment. CI-1 further stated PALMA-JIMENEZ was instructed to re-register the silver jeep Patriot and maintain control of the vehicle. According to CI-1, the

16

individual from Mexico who called PALMA-JIMENEZ told him (PALMA-JIMENEZ) that he was to take over drug trafficking activities in Milwaukee.

**July 2023[3] Controlled Purchase of Fentanyl from Fernando PALMA-JIMENEZ**

35.     On July 25, 2023, CI-1 contacted PALMA-JIMENEZ, which was not recorded but verified by phone toll information and began negotiating the price for 100 grams of heroin[4]. PALMA-JIMENEZ and CI-1 negotiated the final price at $5,000.  PALMA-JIMENEZ agreed that CI-1 would pay $4,000 at the initial transaction, which would take place the following day at the Rohr Avenue Shop, and the last payment of $1,000 to be paid at a later date.

36.     On July 26, 2023, CI-1 placed a recorded call to PALMA-JIMENEZ at TARGET TELEPHONE-1, which was verified by phone toll information.  PALMA-JIMENEZ answered the call, and CI-1 asked if PALMA-JIMENEZ was at the garage.  CI-1 then advised PALMA-JIMENEZ that CI-1 would be arriving in about 15 minutes and, "to have that ready."  Case agents understood CI-1 to have advised PALMA-JIMENEZ to have the heroin ready upon CI-1's arrival ("to have that ready").

37.     Case agents established surveillance near the Rohr Avenue Shop.  Case agents observed PALMA-JIMENEZ opening the west gate, allowing CI-1 to pull CI-1's vehicle into the

---

[3] Based upon my training and experience, I know that a "controlled buy" (and/or controlled contact) is a law enforcement operation in which an informant purchases drugs from a target.  The operation is conducted using surveillance, usually audio and video recording equipment, and pre-recorded purchase money.  When an informant is used, he/she is searched for contraband, weapons, and money before the operation.  The informant also uses covert recording and monitoring devices.  When the transaction is completed, the informant meets case agents at a pre-determined location and gives the purchased drugs and the recording/monitoring equipment to the case agents.  The informant is again searched for contraband, weapons, and money.  Additionally, telephone calls made by the informant while under the direction and control of case agents are recorded.

[4] All conversations between CI-1 and PALMA-JIMENEZ occurred in Spanish and have been translated to English.

gated lot. PALMA-JIMENEZ closed the gate and walked back into the garage. CI-1 exited the vehicle and entered the garage.

38. After the controlled buy, CI-1 was followed to a pre-determined meet location. Upon arrival, CI-1 provided the suspected drugs to investigators. The drugs were subsequently sent to the North Central DEA Lab for analysis. DEA Lab analysis determined PALMA-JIMENEZ provided CI-1 with approximately 102.5 grams of a mixture of Fentanyl, Cocaine, and Xylazine.

39. During a debriefing after the controlled purchase, CI-1 stated that during the controlled buy, PALMA-JIMENEZ walked to a vehicle that was covered with a tarp, opened the trunk of a red Volkswagen Jetta, and pulled out what appeared to be one-half kilogram of narcotics from the trunk of the car. PALMA-JIMENEZ then broke off a chunk of suspected heroin from the one-half kilogram with a knife, measured it on a scale and wrapped it in plastic Reynolds wrap. PALMA-JIMENEZ handed the suspected heroin to CI-1, and CI-1 handed the $4,000 to PALMA-JIMENEZ. During that time, CI-1 observed approximately three additional kilograms of narcotics in the trunk of the Jetta with a Bugatti car logo on them.

40. On August 18, 2023, CI-1 called PALMA-JIMENEZ numerous times, each call going to voicemail. A couple minutes later, PALMA-JIMENEZ returned CI-1's call and asked in Spanish, "What's up?" CI-1 asked, "Are you already at the garage?" Case agents are aware that the garage was a reference to the Rohr Avenue Shop. PALMA-JIMENEZ replied, "Yes, Guey." The Spanish translation for "Guey" is Dude. CI-1 said, "I'm here with my buddy. He settled with what was pending." PALMA-JIMENEZ asked, "With what?" CI-1 replied, "He fixed what was pending, Guey." PALMA-JIMENEZ stated, "Okay then." CI-1 replied, "I'm here, I'll see you

18

there." These calls were verified by phone toll information.  During this phone call, CI-1 arranged to pay the remaining $1,000 from the July 26, 2023, controlled purchases to PALMA JIMENEZ.

41.     Case agents observed CI-1 pulling up to the west gate of the Rohr Avenue Shop. PALMA-JIMENEZ opened the gate for CI-1, and CI-1 pulled into the gated lot, entered the garage, and thereafter exited.  During a debriefing, CI-1 stated that when CI-1 was inside the garage, CI-1 handed $1,000 to PALMA-JIMENEZ, which was the remaining payment for the narcotics supplied by PALMA-JIMENEZ to CI-1 on July 26, 2023.

**September 2023 – Controlled Purchase of Fentanyl from PALMA-JIMENEZ**

42.     On September 11, 2023, CI-1 met with case agents and informed agents that CI-1 met with PALMA-JIMENEZ over the weekend. PALMA-JIMENEZ told CI-1 he has been providing "samples" of heroin to potential kilogram-level heroin dealers and that PALMA-JIMENEZ believed one of the dealers may be interested in purchasing one kilogram of heroin. When CI-1 met with case agents, case agents instructed CI-1 to arrange a 150-gram purchase of heroin for $7,500 from PALMA-JIMENEZ. Later that day, CI-1 informed case agents that CI-1 and PALMA-JIMENEZ met in person and PALMA-JIMENEZ agreed to the purchase price of $7,500. PALMA-JIMENEZ and CI-1 agreed to meet on September 14, 2023, at PALMA-JIMENEZ's Rohr Avenue Shop.

43.     On September 14, 2023, CI-1 called case agents to inform them that PALMA-JIMENEZ wanted CI-1 to pick him up at his residence and take him to the Rohr Avenue Shop to conduct the drug transaction.  Case agents instructed CI-1 to meet with case agents at a pre-determined location after he dropped off PALMA-JIMENEZ at the Rohr Avenue Shop.

44.     Later that day, case agents observed CI-1 pull up to the gate of the Rohr Avenue Shop.  PALMA-JIMENEZ was observed exiting the front passenger side of CI-1's vehicle.

19

PALMA-JIMENEZ walked to the gate, unlocked it, entered the gated lot, locked the gate, and walked to the autobody shop. CI-1 was observed driving off.

45. CI-1 met with case agents at a pre-determined location. Case agents provided CI-1 with $7,500 buy money and an audio/video recording device. Case agents followed CI-1 to PALMA-JIMENEZ's Rohr Avenue Shop and established surveillance near the shop. Case agents observed CI-1's vehicle pull up to the west gate of the body shop, at which time CI-1 called TARGET TELEPHONE-1 to inform PALMA-JIMENEZ to open the gate, which call was verified by phone toll information.

46. PALMA-JIMENEZ subsequently opened the gate, allowing CI-1 to pull into the gated lot and enter the service garage door on foot. Shortly thereafter, CI-1 exited the garage and left the area, and PALMA-JIMENEZ remained at the Rohr Avenue Shop.

47. After the controlled buy, CI-1 was followed to a pre-determined meet location. DEA Lab analysis determined PALMA-JIMENEZ provided CI-1 with approximately 167.74 grams of Fentanyl.

*October 2023 – PALMA-JIMENEZ Received Suspected Drug Shipments*

48. On October 18, 2023, at approximately 12:47 p.m., CI-1 called case agents to inform them that CI-1 called PALMA-JIMENEZ at TARGET TELEPHONE-1, at which time PALMA-JIMENEZ told CI-1 that he was "receiving a truck." Case agents believed that to mean PALMA-JIMENEZ was expecting a truck with narcotics. Investigators examined telephone toll data for TARGET TELEPHONE-1 and confirmed telephonic contact between CI-1 and TARGET TELEPHONE-1 earlier that day.

49. Based on court-authorized location information for TARGET TELEPHONE-1, which demonstrated it was traveling in the direction of the Rohr Avenue Shop, case agents

responded to the autobody shop to attempt physical surveillance. Case agents also conducted electronic surveillance at this time.

50.     At 1:29 p.m., case agents observed the silver jeep arrive at the Rohr Avenue Shop. A Hispanic male known to case agents as "███" exited the driver side of the silver jeep, walked up to the gate, unlocked the gate with a key, and opened the gate, allowing a white Nissan Murano believed to be driven by PALMA-JIMENEZ (no registration plates) to enter the gated lot.

51.     At 8:25 p.m., PALMA-JIMENEZ was observed on electronic surveillance walking up to the south gate. PALMA-JIMENEZ opened the gate, allowing the Jeep Patriot to pull out of the gated lot. PALMA-JIMENEZ locked the gates and entered the passenger side of the silver jeep and left.

52.     Based on their training, experience, and familiarity with this investigation, case agents believe that this activity is consistent with PALMA-JIMENEZ receiving narcotics at his Rohr Avenue Shop.

### December 2023 – Controlled Purchase of Fentanyl from PALMA-JIMENEZ

53.     On November 14, 2023, CI-1 placed a recorded call to PALMA-JIMENEZ at TARGET TELEPHONE-1, which was verified by phone toll information. During the recorded call, CI-1 asked PALMA-JIMENEZ if he had any for the "nose," meaning cocaine. PALMA-JIMENEZ replied that he did not have any. CI-1 told PALMA-JIMENEZ that "my buddy" (CI-1's "buddy") wants a "whole one" (one kilogram of cocaine), and CI-1 asked if PALMA-JIMENEZ would be able to get it. PALMA-JIMENEZ replied he would not know how much (meaning he did not know the price for the kilogram). CI-1 then told PALMA-JIMENEZ that "they" (CI-1 and CI's "buddy") wanted 100 grams, meaning 100 grams of heroin. PALMA-

21

JIMENEZ responded, "okay." PALMA-JIMENEZ agreed to let CI-1 know when the cocaine was next available and the price for the cocaine.

54. In December 2023, case agents instructed CI-1 to arrange a 150-gram purchase of heroin for $7,500 from PALMA-JIMENEZ. PALMA-JIMENEZ and CI-1 agreed to meet on December 15, 2023, at the Rohr Avenue Shop.

55. On December 15, 2023, CI-1, under the direction of and control of case agents, placed a recorded call to PALMA-JIMENEZ at TARGET TELEPHONE-1, which was verified by phone toll information. During the call, the parties greeted, and CI-1 asked if PALMA-JIMENEZ was "there yet," meaning whether PALMA-JIMENEZ was at the Rohr Avenue Shop yet. PALMA-JIMENEZ confirmed, "yes," and CI-1 advised that CI-1 would be arriving soon and that "the check is ready," meaning that CI-1 had the money for the narcotics transaction. CI-1 further stated, "hundred and fifty," confirming that CI-1 would be obtaining 150 grams of heroin. PALMA-JIMENEZ confirmed the transaction by stating, "okay then."

56. Case agents established surveillance near and followed CI-1 to the Rohr Avenue shop. Case agents observed CI-1 exit the vehicle and walk to the south gate/fence of the autobody shop. A subject, later confirmed to be PALMA-JIMENEZ, met with CI-1, at which time a hand-to-hand exchange occurred at the gate of the Rohr Avenue Shop. PALMA-JIMENEZ walked back to the shop, out of agents' view. CI-1 re-entered CI-1's vehicle and drove away.

57. After the controlled buy, CI-1 was followed to a pre-determined meet location. DEA Lab analysis determined PALMA-JIMENEZ provided CI-1 with approximately 155 grams of a fentanyl and cocaine mixture.

**February 2024 – Controlled Purchase of Fentanyl from PALMA-JIMENEZ**

58.     On February 12, 2024, CI-1 reported to case agents that CI-1 met with PALMA-JIMENEZ on February 10, 2024, at which time PALMA-JIMENEZ agreed to sell CI-1 50 grams of heroin for $2,500. The transaction was planned for February 14, 2024, at PALMA-JIMENEZ's new autobody shop, the Burleigh Street Shop.

59.     On February 14, 2024, CI-1, under the direction and control of case agents, placed a recorded call to PALMA-JIMENEZ at TARGET TELEPHONE-1, which was verified by phone toll information. PALMA-JIMENEZ answered the call, and CI-1 told PALMA-JIMENEZ that CI-1 has the check, meaning CI-1 had the buy money. PALMA-JIMENEZ responded that it was ready.

60.     CI-1 was provided with $2,500 in buy money and an audio/video recording device. Case agents followed CI-1 to the Burleigh Street Shop. Case agents observed CI-1 enter the garage, exit the garage a short time later, and drive away from the area.

61.     After the controlled buy, CI-1 was followed to a pre-determined meet location. Upon arrival, CI-1 provided investigators with approximately 50.8 grams of fentanyl, based on field testing.

62.     During a debriefing after the controlled purchase, CI-1 advised that upon arriving at the Burleigh Street Shop, CI-1 called TARGET TELEPHONE-1 to advise PALMA-JIMENEZ that CI-1 had arrived. As CI-1 walked into the garage, PALMA-JIMENEZ told CI-1 to move CI-1's vehicle because he was expecting other people. CI-1 told PALMA-JIMENEZ that CI-1 needed to use the bathroom and was in a hurry. After exiting the bathroom, CI-1 handed $2,500 in buy money to PALMA-JIMENEZ. PALMA-JIMENEZ reached inside the front side passenger

window of his red Volkswagen Jetta, removed the suspected heroin, and handed it to CI-1. PALMA-JIMENEZ instructed CI-1 to sell more of the heroin.

**June 2024 – Controlled Purchase of Fentanyl from PALMA-JIMENEZ**

63.     On June 11, 2024, CI-1 contacted investigators and informed them that CI-1 had met with PALMA-JIMENEZ to discuss prices for the purchase of fentanyl.  PALMA-JIMENEZ offered CI-1 100 grams of fentanyl at $50 per gram; however, PALMA-JIMENEZ was willing to sell a half kilogram of fentanyl at a discounted price of $40 per gram (or 500 grams for $20,000). CI-1 and PALMA-JIMENEZ agreed to meet on June 13, 2024, to conduct the drug transaction at the Burleigh Street Shop.

*June 13, 2024, Recorded Call Between PALMA-JIMENEZ, CI-1, and Referencing Erik RODRIGUEZ in Furtherance of the Drug Transaction.*

64.     ERIK RODRIGUEZ, also known as "Niñote," is a Hispanic male born on ███ 1991, in the United States. RODRIGUEZ previously worked with PALMA-JIMENEZ distributing fentanyl and cocaine in Milwaukee. RODRIGUEZ previously worked at one of PALMA-JIMENEZ's shops.

65.     On June 13, 2024, at approximately 9:53 a.m., CI-1, under the direction and control of case agents, placed a recorded telephone call to PALMA-JIMENEZ at TARGET TELEPHONE-1, which was verified by phone toll information. During the recorded call, PALMA-JIMENEZ answered and said, "hello."  CI-1 replied, "Are you already there?" PALMA-JIMENEZ asked, "where?"  CI-1 replied, "Well, at the garage…no?"  PALMA-JIMENEZ said, "No asshole, I'm at my house."  CI-1 stated, "Well start leaving, asshole."  PALMA-JIMENEZ replied, "I don't have keys, asshole."  CI-1 asked, "Then is Niñote [Erik RODRIGUEZ] there?" PALMA-JIMENEZ answered, "No, I don't think so, why?"  CI-1 asked, "What?"  PALMA-

JIMENEZ asked, "For what?"  CI-1 said, "Is there, do you…to complete a hundred…for a hundred."  PALMA-JIMENEZ responded, "I only have the trays you asked me about." CI-1 said, "Oh, well, let me see later, until what time could you?"  PALMA-JIMENEZ replied, "Until fuckin' eleven."  CI-1 replied, "Until eleven?  No mames. Not earlier?"  PALMA-JIMENEZ said, "Let me talk to this dude to see if he's leaving."  CI-1 said, "Dial him, dude, quickly because I need to make it to a fuckin' appointment.  Did I not tell you?"  PALMA-JIMENEZ responded, "Let me call him then!"  CI-1 said, "Dial him, dude.  If he could do you the favor and he can give it to me." PALMA-JIMENEZ responded, "Let me call him!"  CI-1 said, "Okay."  Based on their training and experience, case agents believe that during the recorded call, CI-1 asked if PALMA-JIMENEZ was at the garage. PALMA-JIMENEZ answered, "no" and informed CI-1 that he (PALMA-JIMENEZ) was at home. PALMA-JIMENEZ asked if "El Niñote" (Erik RODRIGUEZ) was at the garage (Burleigh Street Shop).  CI-1 indicated CI-1 did not know, and CI-1 confirmed that CI-1 wanted "hundred," referring to purchasing 100 grams of fentanyl.  PALMA-JIMENEZ replied that he only had "trays," referring to half kilogram or kilogram quantities of fentanyl, that CI-1 in the past inquired about.  PALMA-JIMENEZ informed CI-1 that he would place a call to RODRIGUEZ to inquire if RODRIGUEZ was at the Burleigh Street Shop to provide narcotics to CI-1.

66.    Phone toll analysis over TARGET TELEPHONE-1 revealed TARGET TELEPHONE-1 called Erik RODRIGUEZ's phone number (414) 544-███ at 9:56 a.m. Case agents believe based on their training, experience, and familiarity with this investigation, that PALMA-JIMENEZ called RODRIGUEZ to ask whether RODRIGUEZ was at the Burleigh Street Shop so that RODRIGUEZ could provide the narcotics to CI-1 ("If he could do you the favor and he can give it to me").

67. At approximately 10:08 a.m., PALMA-JIMENEZ, using TARGET TELEPHONE-1, called CI-1, which was recorded and verified by toll data over TARGET TELEPHONE-1. During the recorded call, CI-1 answered saying, "What's up?" PALMA-JIMENEZ explained, "He isn't answering me, dude." CI-1 replied, "Well, are you going to start heading over there?" PALMA-JIMENEZ said, "How am I going to get in, asshole? Do you not understand!" CI-1 replied, "Ohh, well, how many do you complete there with you?" PALMA-JIMENEZ said, "The other trays. Didn't you tell…" CI-1 replied, "Well how many exactly?" PALMA-JIMENEZ replied, "Only three of twenty." CI-1 said, "Oh, okay. Well let me tell, let me tell…if for the moment with that." PALMA-JIMENEZ responded, "Well, yes. If they want the fuckin' trays, I can order those." CI-1 replied, "Okay." During this call, case agents believe that PALMA-JIMENEZ told CI-1 that RODRIGUEZ was not answering his phone. CI-1 asked PALMA-JIMENEZ whether PALMA-JIMENEZ was going to drive to the Burleigh Street Shop, and PALMA-JIMENEZ replied by implying that he was unable to get into the shop. PALMA-JIMENEZ informed CI-1 that only three bags for $20.00 for each bag were available for immediate purchase at PALMA-JIMINEZ's residence ("Only three of twenty."). Furthermore, PALMA-JIMENEZ and the CI-1 discussed CI-1's previous inquiry about how much a kilogram of cocaine ("tray") would cost for people CI-1 represented were interested in purchasing still wanted to buy a whole kilogram, and PALMA-JIMENEZ told CI-1 if they wanted kilos, PALMA-JIMENEZ could order them. ("If they want the fuckin' trays, I can order those.").

68. At approximately 10:15 a.m., CI-1 sent a text message to TARGET TELEPHONE-1, witnessed by case agents, stating, "Asshole, dial him again because we are going to wait." Case agents believe that in this text message, CI-1 instructed PALMA-JIMENEZ to call RODRIGUEZ again to retrieve the keys for the Burleigh Street Shop. At approximately 10:15 a.m., CI-1 again

26

texted TARGET TELEPHONE-1 saying, "Don't take long dude because I have my appointment." Case agents instructed CI-1 to report when PALMA-JIMENEZ made contact with CI-1 to establish a time and location to conduct the transaction. At approximately 10:21 and 10:26 a.m., RODRIGUEZ, using (414) 544-███, called PALMA-JIMENEZ at TARGET TELEPHONE-1. At approximately 10:28 a.m., PALMA-JIMENEZ, using TARGET TELEPHONE-1, called CI-1, which call was verified by phone toll information but not recorded because CI-1 was not in the presence of case agents. Shortly thereafter, CI-1 conveyed to case agents that PALMA-JIMENEZ instructed CI-1 to go straight to the Burleigh Street Shop. Based on CI-1's statement and the sequence of calls between TARGET TELEPHONE-1, RODRIGUEZ, and CI-1, case agents believe that PALMA-JIMENEZ confirmed via calls with RODRIGUEZ that PALMA-JIMENEZ was able to access the keys to enter the Burleigh Street Shop and thereafter communicated with CI-1 to go to the Burleigh Street Shop to complete the narcotics transaction.

69.     Case agents established electronic surveillance at the Burleigh Street Shop. At 10:33 a.m., a red Dodge Charger driven by RODRIGUEZ was observed pulling into the parking lot of the Burleigh Street Shop. RODRIGUEZ exited the vehicle and was observed near an RV (recreational vehicle/camper), which was parked in the lot. RODRIGUEZ then walked toward the garage, turned around, re-entered the Charger, and drove from the area.

70.     At approximately 10:42 a.m., case agents observed PALMA-JIMENEZ, operating the silver Jeep Patriot, drive into the Burleigh Street Shop parking lot. PALMA-JIMENEZ parked the vehicle behind the RV situated in the lot. PALMA-JIMENEZ exited the silver jeep Patriot and parked the vehicle inside of the shop/garage bay. Based on case agents' experience and knowledge of the investigation, case agents beleive that RODRIGUEZ responded to the Burleigh Street Shop

to drop off keys, which were a short time later retrieved by PALMA-JIMENEZ to gain entry into the shop.

71. CI-1 was provided with $5,000 in buy money and an audio/video recording device. Case agents followed CI-1 to the Burleigh Street Shop. Case agents observed CI-1 enter the garage, exit the garage a short time later, and drive away from the area.

72. After the controlled buy, CI-1 was followed to a pre-determined meet location. Upon arrival, CI-1 provided investigators with approximately 101.1 grams of suspected fentanyl. U.S. Customs and Border Protection (CBP) Laboratories and Scientific Services Directorate (LSSD) analysis determined PALMA-JIMENEZ provided CI-1 with approximately 100.1 grams of a fentanyl and cocaine mixture.

73. During a debriefing after the controlled purchase, CI-1 advised that upon arriving at the Burleigh Street Shop, CI-1 called TARGET TELEPHONE-1 to advise PALMA-JIMENEZ that CI-1 had arrived and to open the door. CI-1 entered the shop and handed $5,000 in buy money to PALMA-JIMENEZ. CI-1 told PALMA-JIMENEZ that CI-1 needed to use the bathroom. After exiting the bathroom, PALMA-JIMENEZ handed the suspected fentanyl to CI-1. CI-1 asked PALMA-JIMENEZ for a bag, which PALMA-JIMENEZ provided to CI-1. CI-1 asked PALMA-JIMENEZ for the price of one kilogram of cocaine, and PALMA-JIMENEZ advised the price would be $24,000. CI-1 asked if "Niñote," (RODRIGUEZ) could obtain the cocaine for a cheaper price, and PALMA-JIMENEZ advised that he would ask RODRIGUEZ. U.S. Customs and Border Protection (CBP) Laboratories and Scientific Services Directorate (LSSD) analysis determined PALMA-JIMENEZ provided CI-1 with approximately 100.1 grams of a fentanyl and cocaine mixture.

*Intercepted Text Messages on September 20, 2024, Regarding a Suspected Drug Transaction between PALMA-JIMENEZ and Unknown Male (UM■■■)*[5]

74.     On September 12, 2024, at approximately 1:52 p.m. TARGET TELEPHONE-1 received a text message from (414) 295-■■■, used by an unknown Hispanic male (UM), asking in Spanish, "Hey, Fernando are you going to be there today (The Burleigh Street Shop)?" Several seconds later, TARGET TELEPHONE-1 received a second text message from the same number, stating "So I can go get the three tires, bro." At approximately 3:24 p.m., TARGET TELPHONE-1 sent a text message to (414) 295-■■■ stating, "I'm here." At approximately 3:25 p.m., TARGET TELEPHONE-1 received a text message from (414) 295-■■■ stating, "ok." Investigators believe the UM picked up narcotics from PALMA-JIMENEZ.

75.     Case agents conducted electronic surveillance of the Burleigh Street Shop. At approximately 3:21 p.m., PALMA-JIMENEZ was observed arriving at the Burleigh Street Shop, driving a Jeep Patriot. On September 12, 2024, at approximately 3:27 p.m., GPS data over TARGET TELEPHONE-1 placed TARGET TELEPHONE-1 in the area of the Burleigh Street Shop with a radius of approximately 232 meters. GPS data for the silver jeep Patriot indicated the vehicle was at the Burleigh Street Shop.

76.     At approximately 3:24 p.m., case agents observed a maroon Chevrolet GMC pickup truck with chrome rims, unknown registration plate, drive into the parking lot of the Burleigh Street Shop. The GMC stopped in front of the overhead garage door. Case agents observed a male figure standing by the passenger side of the pickup truck. At approximately 3:25 p.m., case agents observed the truck backing out and driving off. Surveillance was then terminated.

---

[5] "UM" followed by four digits represents an unidentified male specifically designated by the last four digits of the phone number the unidentified male used to place the call to the TARGET TELEPHONE (i.e., UM■■■).

77.     Based on case agents' training and experience, and knowledge of the investigation, case agents believe that the UM picked up an unknown quantity of narcotics ("three tires") from PALMA-JIMENEZ.  During electronic surveillance, agents observed the pickup truck had a bed cover, commonly known as a tonneau cover, which was never opened, and investigators believe it unlikely that three vehicle tires could have been loaded into the passenger compartment of the GMC pickup truck in the short duration the GMC pickup truck was at the Burleigh Street Shop, which was approximately one minute in duration.  Furthermore, during a subsequent conversation with CI-1, CI-1 indicated he/she was unaware of PALMA-JIMENEZ selling tires from the Burleigh Street Shop, and that PALMA-JIMENEZ is only known to perform auto body work.

*CI-1 Provides Information to Investigators Regarding the Conflict Between PALMA-JIMENEZ and RODRIGUEZ Related to RODRIGUEZ's Drug Abuse.*

78.     CI-1 previously told investigators that although Erik RODRIGUEZ was distributing fentanyl on behalf of PALMA-JIMENEZ, most recently PALMA-JIMENEZ expressed frustration with RODRIGUEZ's increased use of drugs. CI-1 told investigators that PALMA-JIMENEZ confided to CI-1 that RODRIGUEZ was bringing "too much heat" to the Burleigh Street Shop.  PALMA-JIMENEZ further explained to CI-1 that on one occasion, unknown armed males arrived at the Burleigh Street Shop looking for RODRIGUEZ.  CI-1 told investigators that RODRIGUEZ perhaps shorted drugs RODRIGUEZ previously distributed to the unknown males, thus owing the unknown males the difference of the money paid for those drugs.[6]

**Daniel MORALEZ (TARGET TELEPHONE- 2) and Andrea ROA**

79.     Daniel MORALEZ, also known as, "Dany," is a Hispanic male born in the United States on ▓▓▓▓▓, 1988.  Andrea ROA is a Hispanic female born in Mexico on ▓▓▓▓▓

---

[6] Court authorized interceptions of TARGET TELEPHONE-1 revealed that during the period of interception PALMA-JIMENEZ's father was diagnosed with a serious illness and PALMA-JIMENEZ was generally focused on navigating this family crisis.

1994. ROA is present in the United States without status and entered without inspection. MORALEZ and Andrea ROA's primary residence is 25██ S. 29th Street, Milwaukee, Wisconsin. According to Wisconsin Electric (WE) Energies utilities records, the listed account holder for the 25██ S. 29th Street address is Andrea ROA Romero. MORALEZ is also associated with 12██ S. 19th Street, Milwaukee, Wisconsin, which is known to be the residence of MORALEZ's parents. MORALEZ is the user of TARGET TELEPHONE-2. According to confidential source(s), and court-authorized interceptions over TARGET TELEPHONE-2, MORALEZ is a Milwaukee-based drug distributor. Andrea ROA is MORALEZ's live-in romantic partner and assists MORALEZ with his drug trafficking activities. Andrea ROA is the account holder for Wisconsin Electric Energies (WE Energies) at 25██ S. 29th Street, Milwaukee, Wisconsin. Throughout the course of the investigation, case agents have observed MORALEZ, ROA and their black Cadillac Escalade at both 25██ S. 29th Street and the Capitol Drive Shop. On May 21, 2025, at approximately 1:30 p.m., electronic surveillance at the Capitol Drive Shop captured ROA parking the Cadillac Escalade at this location.

### October 11, 2024, Controlled Purchase of a Kilogram of Cocaine involving PALMA-JIMENEZ, MORALEZ, and RODRIGUEZ

80. On September 30, 2024, case agents instructed CI-1 to arrange the purchase of one kilogram of cocaine with PALMA-JIMENEZ. At 1:40 p.m. and at 2:16 p.m., CI-1 attempted to call TARGET TELEPHONE-1, used by Fernando PALMA-JIMENEZ. PALMA-JIMENEZ did not answer. At 2:16 p.m., CI-1 sent PALMA-JIMENEZ a text message (intercepted) in Spanish, saying, "Call me when you can." At 4:17 p.m., PALMA-JIMENEZ, using TARGET TELEPHONE-1, called CI-1. During the intercepted conversation, CI-1 asked, "When can I meet you, because I need you to get me a notebook." CI-1 continued, "The check is ready, dude." PALMA-JIMENEZ responded, "Nah, well, with whom dude?" CI-1 asked, "Didn't you

31

say you had something [cocaine] there with El Profe?" PALMA-JIMENEZ responded, "Nah, well, that's the one who fucked me over on my money real bad. I'm telling you." CI-1 said, "You're kidding." PALMA-JIMENEZ continued, I'm telling you. Just now, I just called him to see if…what's going on with my money." CI-1 asked, "Yeah. What did the dude say?" PALMA-JIMENEZ responded, "Well, he didn't answer." Later in the same conversation, PALMA-JIMENEZ said, "Nah dude. I don't want to know anything now, dude. Fuck it, dude. I don't want to keep playing with them at all dude." CI-1 replied, "Yeah." PALMA-JIMENEZ asked, "What do you think?" CI-1 stated, No, well, that's fine." Later in the same intercepted conversation CI-1 said, "Yeah, well, the check was already ready, dude." PALMA-JIMENEZ stated, "Well, yeah, dude, but no, dude, because well…it's too much of a fucking pain, dude. Yeah. No." PALMA-JIMENEZ later said, "I don't have that on my mind right now." CI-1 asked, "Yeah, how's your dad doing?"

81.    Based on my knowledge of the investigation, I believe that during this call, CI-1 asked when PALMA-JIMENEZ could meet to provide CI-1 with a kilogram of cocaine ("a notebook"). CI-1 further told PALMA-JIMENEZ that the money was ready to purchase a kilogram of cocaine ("The check is ready, dude"). PALMA-JIMENEZ explained that a third-party ["El Profe"] owed PALMA-JIMENEZ money for a drug debt, ("I'm telling you. Just now, I just called him to see if…what's going on with my money."), but the third-party was not answering telephone calls from PALMA-JIMENEZ. PALMA-JIMENEZ indicated that PALMA-JIMENEZ was more focused on his ailing father's health than on dealing drugs at that time. Which is the reason PALMA-JIMENEZ did not have a kilogram of cocaine in his (PALMA-JIMENEZ) possession to sell to CI-1.

32

82.     On October 5, 2024, at 2:01 p.m., CI-1 called TARGET TELEPHONE-1, used by PALMA-JIMENEZ at case agents' direction to arrange a time and date to purchase the kilogram of cocaine; however, PALMA-JIMENEZ did not answer (call verified by phone toll information). CI-1 was then instructed to meet with PALMA-JIMENEZ in person. At 5:03 p.m., case agents conducted electronic surveillance and observed CI-1 arrive at the Burleigh Street Shop. At 5:04 p.m., CI-1 was observed exiting CI-1's vehicle and entering the Burleigh Street Shop. At 5:21 p.m., PALMA-JIMENEZ, using TARGET TELEPHONE-1, called (414) 522-███, a number identified to be used by MORALEZ. The call went to voicemail and PALMA-JIMENEZ did not leave a voicemail. At 5:31 p.m., case agents observed CI-1 pulling out of the parking lot of the Burleigh Street Shop. CI-1 then contacted case agents and advised that PALMA-JIMENEZ provided two cellular numbers of contacts from whom CI-1 could potentially purchase cocaine. One of those numbers, (414) 522-███, is the cellular number MORALEZ listed as a primary contact phone number on his (MORALEZ's) Application for a U.S. Passport. Cellular number (414) 522-███ is also listed as an additional phone number on MORALEZ's U.S. Passport Application and associated with Moralez Towing. Pen Register and Trap and Trace information over the Facebook account used by PALMA-JIMENEZ show Facebook messaging contacts between PALMA-JIMENEZ and MORALEZ on October 5, 2024, at 5:22 p.m. CI-1 stated PALMA-JIMENEZ attempted to call MORALEZ; however, MORALEZ did not answer. CI-1 requested PALMA-JIMENEZ call both numbers on behalf of CI-1. PALMA-JIMENEZ told CI-1 that the kilogram of cocaine will cost $24,000 if PALMA-JIMENEZ facilitated the transaction for CI-1.

83.     On October 6, 2024, at 3:14 p.m., CI-1 sent PALMA-JIMENEZ (TARGET TELEPHONE-1) a text message. During the intercepted text conversation over TARGET

TELEPHONE-1 between CI-1 and PALMA-JIMENEZ, CI-1 asked in Spanish, "Negrito, did you check with Dany to see if he has the car part that I told you about?" PALMA-JIMENEZ replied shortly after, stating, "Yes, but he didn't tell me anything."

84.     Based on my familiarity with this investigation and the intercepted text message exchange between CI-1 and PALMA-JIMENEZ over TARGET TELEPHONE-1, I believe that CI-1 asked PALMA-JIMENEZ if PALMA-JIMENEZ had spoken with MORALEZ ("Dany") regarding the purchase of a kilogram of cocaine ("car part") [code for cocaine]. PALMA-JIMENEZ told CI-1 that he had attempted to contact MORALEZ, but MORALEZ did not respond.

85.     On October 7, 2024, at 2:06 p.m., CI-1 sent PALMA-JIMENEZ (TARGET TELEPHONE-1) two intercepted text messages over TARGET TELEPHONE-1 stating, "Well, ask Dany (MORALEZ) what's up, dude, the papers are there ready and we'll…" Based on my experience and familiarity with this investigation, I believe that CI-1 told PALMA-JIMENEZ to tell MORALEZ the money to purchase cocaine from MORALEZ is ready. The second text message stated, "…earn something, dude." I believe that in this text, CI-1 told PALMA-JIMENEZ that PALMA-JIMENEZ could earn money from the drug transaction. PALMA-JIMENEZ did not respond to CI-1's text messages.

86.     On October 8, 2024, at 3:46 p.m., PALMA-JIMENEZ, using TARGET TELEPHONE-1, called CI-1. During the intercepted conversation over TARGET TELEPHONE-1, PALMA-JIMENEZ said, "I talked to that guy [MORALEZ]." CI-1 responded, "Yes." PALMA-JIMENEZ replied, "For the rims" [cocaine]. CI-1 asked, "Yes. What did he [MORALEZ] tell you?" PALMA-JIMENEZ responded, "Well, that for twenty-three [$23,000], dude." CI-1 stated, "You're kidding." PALMA-JIMENEZ replied, "Ah, well, yes, fucker. I don't know how much you offered it for." CI-1 responded, "No well, the most they pay…and I called and the most is

34

twenty-four [$24,000]. PALMA-JIMENEZ replied, "Oh. I asked him [MORALEZ] for the best price. But, well, uh…I'll show you the screenshot so you can see that I am not…." CI-1 said, "No. No, no, well, [U/I]." PALMA-JIMENEZ stated, "That I am not lying." CI-1 replied, "Well ask him [MORALEZ] and see if he can go lower it[U/I], dude." Trap and trace data from Facebook reflected approximately 18 communications between PALMA-JIMENEZ's account and an account believed to be used by MORALEZ, between the times of approximately 2:54 p.m. to 4:04 p.m. on that same day. Based on my familiarity with this investigation, I believe PALMA-JIMENEZ conveyed to CI-1 that PALMA-JIMENEZ communicated with MORALEZ. PALMA-JIMENEZ and CI-1 then discussed the price for the kilogram of cocaine. CI-1 instructed PALMA-JIMENEZ to ask MORALEZ if MORALEZ would reduce the price of the kilogram of cocaine.

87.     Later that day, at 3:53 p.m., PALMA-JIMENEZ, using TARGET TELEPHONE-1, called CI-1. During the intercepted conversation, PALMA-JIMENEZ said, "Uh…well. The lowest is, uh, twenty-two [$22,000], dude." CI-1 replied, "Okay." PALMA-JIMENEZ responded, "But that if it is going to be done, it has to be done well and quickly." CI-1 asked, "But he [MORALEZ] has it already?" PALMA-JIMENEZ replied, "Whenever you want it…we need to take the, the paper. He's not going to front it to me." CI-1 asked, "Do you think that you, you and I can both go? I mean, I'm saying that [U/I] we need to go pick it up." PALMA-JIMENEZ stated, "Well, yes dude. Well, I would go. You give me the paper [money to purchase the drugs], I'll go and pick it up, and then I'll give it to you…But if it's going to be done, it has to be done well and quickly, fucker…if not, that stuff will be gone, that is going to get broken up, and then it will be fucked up for us dude. We will be left like idiots…" Based on my training, experience, and familiarity with this investigation, I believe that during this call, PALMA-JIMENEZ and CI-1 discussed the price for a kilogram of cocaine and the logistics of the transaction.

88. On October 9, 2024, at 6:29 p.m., MORALEZ, using TARGET TELEPHONE-2, called TARGET TELEPHONE-1, used by PALMA-JIMENEZ. During the intercepted conversation, PALMA-JIMENEZ asked, "What's up, Dany?" MORALEZ replied, "Just chilling out bro." PALMA-JIMENEZ said, "Oh, alright, that's good." MORALEZ replied, "Yes, I have here…I have the paint sample here." PALMA-JIMENEZ responded, "Well, the thing is, dude, that…these guys wanted to buy it like that right? And well, they would check it…it over there." MORALEZ replied, "Oh, okay!" PALMA-JIMENEZ asked, "What do you think?" MORALEZ said, "Oh, shit, the thing is that these guys don't do returns." PALMA-JIMENEZ replied, "Uh-huh." MORALEZ said, "And, well, that's why I like to…uh…for them to check the paint [cocaine] first to see if it's the same color." PALMA-JIMENEZ replied, "Oh, let's see…well, do you think I can go by to pick it up?" MORALEZ said, "Sure!"

89. Based on my training, experience, and familiarity with this investigation, I believe that MORALEZ explained to PALMA-JIMENEZ that a sample of the intended drugs to be sold to CI-1 ("paint sample") had to be provided ahead of the kilogram sale because a third-party (unknown source of supply) does not accept refunds or the return of drugs. MORALEZ and PALMA-JIMENEZ agreed to meet at a later time so MORALEZ could provide a sample of the drugs to PALMA-JIMENEZ, who would in turn provide it to CI-1. I further believe that the term "paint" is a code word for cocaine.

90. On October 10, 2024, beginning at 1:03 p.m., MORALEZ, using TARGET TELEPHONE-2, and PALMA-JIMENEZ, using TARGET TELEPHONE-1, engaged in a series of intercepted text messages. Beginning at 1:03 p.m., MORALEZ, using TARGET TELEPHONE-2, texted asking, "What's up?" and "Is it going to happen?" At 1:04 p.m., PALMA-JIMENEZ (TARGET TELEPHONE-1) sent a series of text messages and replied, "Yes, call me whenever

36

you can." He also wrote, "Please," and "to see if it will be done tomorrow." At 1:13 p.m., MORALEZ, using TARGET TELEPHONE-2, replied, "Yes, you just say for when, for how much, blah, blah, blah." PALMA-JIMENEZ (TARGET TELEPHONE-1) replied, "For tomorrow before 10:30 and you tell me where."  MORALEZ (TARGET TELEPHONE-2) then replied, "Stop by here at 5811 W Capital de"[Drive]. Based on my training, experience, and familiarity with this investigation, I believe that during these messages, PALMA-JIMENEZ and MORALEZ confirmed the location and time for the narcotics transaction the following day.

91.    On October 10, 2024, CI-1 agreed to meet with PALMA-JIMENEZ at a grocery store to pick up the sample of drugs from PALMA-JIMENEZ. After receiving the sample, CI-1 gave the sample to law enforcement. A field test of the drug sample tested positive for the properties of cocaine. At the direction of investigators, CI-1 told PALMA-JIMENEZ that the "buyers" were interested in continuing with the purchase of narcotics.

92.    On October 10, 2024, at approximately 12:32 p.m., CI-1 called PALMA-JIMENEZ, using TARGET TELEPHONE-1.  During the intercepted conversation, CI-1 stated, "The paint [sample of drugs] passed the test dude." PALMA-JIMENEZ responded, "Oh yes…alright." CI-1 said, "Uh, well, just that, like I told you, it has to be before, by eleven (11:00 a.m.), at the latest, negrito, if it can be done at ten (10:00 a.m.), even better…so you can tell this guy. And, well, there at, at your shop, right?" PALMA-JIMENEZ replied, "I'll let you know soon, soon." CI-1 responded, "Preferably dude. Tell him it's because now, tell him, that guy doesn't want to be looking around for a new place, dude…because I don't want to be looking around for another fucking place with the money, dude." During this call, I believe CI-1 confirmed that the quality of the narcotics was suitable for the pending purchase with PALMA-JIMENEZ and

37

MORALEZ and that the transaction needed to occur the next day by 11:00 a.m. because "the customer" did not want to keep looking for a new cocaine source.

93.    On October 10, 2024, at approximately 3:15 p.m., CI-1 called TARGET TELPHONE-1, used by PALMA-JIMENEZ. During the intercepted conversation, the two parties greeted each other, and PALMA-JIMENEZ advised, "No, well, already dude." CI-1 asked, "Is it done already?" PALMA-JIMENEZ advised, "Yes, tomorrow at ten-thirty (10:30 a.m.)," referring to the time the narcotics transaction would take place. PALMA-JIMENEZ confirmed that the narcotics purchase would occur at MORALEZ's shop (Capitol Drive Shop). CI-1 asked, "Well, send me the fucking address to see if... to see if…," at which time PALMA-JIMENZ advised, "You come here to my shop, and I'll go to his workplace, dude." CI-1 replied, "and then I…Then I will just go… I will follow you, ugh, I will wait for you there nearby." PALMA-JIMENEZ confirmed, "Whatever you want."   CI-1 stated, "Yes, well, no, you tell him that we will drop by at around ten-thirty (10:30 a.m.), at the latest." PALMA-JIMENEZ advised CI-1, "No, you will have to be here at fucking ten (10:00 a.m.)," referring to the time CI-1 would meet PALMA-JIMENEZ at the Burleigh Street Shop before leaving for MORALEZ's shop. CI-1 inquired about the location of MORALEZ's shop, and PALMA-JIMENEZ replied, "On Capitol, fucker, and fifty-something." Both parties then agreed to the specified date, time, and location (Burleigh Street Shop).

94.    On October 11, 2024, CI-1 met with case agents. While briefing CI-1, PALMA-JIMENEZ, using TARGET TELEPHONE-1, called CI-1 and stated that he is at the dentist and would be heading out soon. CI-1 asked what time PALMA-JIMENEZ would be at the shop. PALMA-JIMENEZ replied, "At 10:30 a.m." This call was recorded.[7] At 10:04 a.m., PALMA-

_____

[7] Interceptions over TARGET TELEPHONE-1 ended at 11:59 p.m. on October 10, 2024.

JIMENEZ (TARGET TELEPHONE-1), called CI-1 a second time; however, CI-1 did not answer the call on time. CI-1 then placed a recorded call to TARGET TELEPHONE-1 (PALMA-JIMENEZ). PALMA-JIMENEZ answered the call and informed CI-1 that he (PALMA-JIMENEZ) was on his way to the shop, and he'll see CI-1 there. These calls were verified by toll records for TARGET TELEPHONE-1.

95.    Case agents searched CI-1 and CI-1's vehicle for any drugs, money, weapons, or any other contraband and did not locate any. CI-1 was provided with $24,000 in pre-recorded currency. CI-1 placed the money inside a plastic grocery bag. Case agents followed CI-1 to a predetermined meet location and agents provided CI-1 with an audio/video recording device. Case agents then followed CI-1 to the Burleigh Street Shop.

96.    Case agents established surveillance near the Burleigh Street Shop. At 10:24 a.m., agent(s) observed PALMA-JIMENEZ pull into the shop, operating the Jeep Patriot. At 10:42 a.m., agents observed CI-1 arriving at the shop and exiting his/her vehicle. PALMA-JIMENEZ exited his vehicle and walked over to CI-1. Agents observed CI-1 hand the grocery bag, containing the $24,000 in pre-recorded currency, to PALMA-JIMENEZ. PALMA-JIMENEZ then walked to his vehicle (Jeep Patriot) with the plastic bag. PALMA-JIMENEZ was observed entering the driver's side of the JEEP. CI-1 then entered the driver side of his/her vehicle. At 10:45 a.m., PALMA-JIMENEZ drove from the area, followed by CI-1.

97.    Agents maintained surveillance on PALMA-JIMENEZ and CI-1, who subsequently drove to the Capitol Drive Shop. CI-1 parked across the street from the Capitol Drive Shop. Agents observed PALMA-JIMENEZ drive into the parking lot of the Capitol Drive Shop. Case agents observed PALMA-JIMENEZ exit out of the jeep and enter the business (Capitol Drive Shop). PALMA-JIMENEZ remained at the business, and agents observed that PALMA-

39

JIMENEZ was on his cellular device. PALMA-JIMENEZ (TARGET TELEPHONE-1) subsequently placed a call to CI-1 (overheard by case agents during the recording of the controlled buy and confirmed by phone toll data) and advised CI-1 that the person (MORALEZ) left because they took too long to arrive and that he (MORALEZ) would be back within 10 minutes. A toll analysis of TARGET TELEPHONE-2 revealed that TARGET TELEPHONE-1 sent two text messages to TARGET TELEPHONE-2 around that time period; the first text message occurred at approximately 10:50 a.m., and the second text message occurred at approximately 10:56 a.m. Based on my training, experience, and familiarity with this investigation, I believe that these two text messages between TARGET TELEPHONES 1 and 2 were related to the anticipated drug transaction.

98.     At 11:16 a.m., agents observed PALAMA-JIMENEZ on the phone. Toll data from TARGET TELEPHONE-1 showed that PALMA-JIMENZ called MORALEZ (TARGET TELEPHONE-2) at 11:17 a.m., which was approximately fifteen seconds in duration. Then, at 11:20 a.m., CI-1 contacted case agents and informed case agents that PALMA-JIMENEZ (TARGET TELEPHONE-1) texted CI-1 and said that "Danny" should be there shortly and that PALMA-JIMENEZ is at the shop waiting with "Danny's" girlfriend. During surveillance activities, agents observed PALMA-JIMENEZ standing outside of business with an unknown female. Based on what PALMA-JIMENEZ told CI-1, I believe that during the 11:17 a.m. call between PALMA-JIMENEZ and MORALEZ, MORALEZ told PALMA-JIMENEZ that he (MORALEZ) would arrive at the shop to complete the cocaine transaction soon.

99.     At 11:22 a.m., agents observed a tow truck back into the parking lot of the Capitol Drive Shop. Agents observed MORALEZ exit the tow truck and enter the business. Case agents observed that the tow truck displayed the words "Moralez Towing" on the side. PALMA-

JIMENEZ (TARGET TELEPHONE-1) placed a call to CI-1 and advised CI-1 that it would be another 30 minutes (overheard by case agents during the recording of the controlled buy). During this time, agents observed PALMA-JIMENEZ talking with MORALEZ. Agents then observed MORALEZ inside the driver's side of a tow truck, at which time the tow truck drove from the area. Agents maintained surveillance on the tow truck and observed RODRIGUEZ, operating a silver Honda, following directly behind the tow truck (operated by MORALEZ). During surveillance, agents observed MORALEZ driving at a high rate of speed and going through red lights with RODIGUEZ following directly behind him in the Honda Civic. Because of this, agents were unable to maintain surveillance on MORALEZ and RODRIGUEZ. Based on my training, experience, and familiarity with this investigation, I believe RODRIGUEZ conducted counter surveillance and/or security for MORALEZ as they traversed through a high crime area that is also heavily patrolled by law enforcement.[8]

100.    At 11:38 a.m., agents observed PALMA-JIMENEZ drive from the Capitol Drive Shop, subsequently driving to the location of CI-1. The audio recording captured PALMA-JIMENEZ telling CI-1 that he (PALMA-JIMENEZ) believed that MORALEZ would have had the cocaine with him. PALMA-JIMENEZ further indicated that MORALEZ had to go pay for the cocaine. At 11:49 a.m., PALAMA-JIMENEZ was observed in the McDonalds drive through and he subsequently drove the Jeep back to the Capitol Drive Shop.

101.    At 12:27 p.m., agents observed MORALEZ operating the tow truck and return to the parking lot of the Capitol Drive Shop. MORALEZ exited the driver's side of tow truck, holding

---

[8] On September 11, 2024, case agents learned through intercepted conversations over TARGET TELEPHONE-1, that PALMA-JIMENEZ wanted to discontinue working with RODRIGUEZ because RODRIGUEZ was abusing drugs. Case agents were unaware until October 11, 2024, that RODRIGUEZ had again started working with and facilitating drug transactions with MORALEZ.

41

a bag, and subsequently walked to PALMA-JIMENEZ. At 12:28 p.m., agents observed PALMA-JIMENEZ walk back towards the Jeep and subsequently drive from the area.

102.    At 12:29 p.m., agents observed PALMA-JIMENEZ pull next to CI-1. PALMA-JIMENEZ was heard on the recording talking with CI-1. PALMA-JIMNEZ informed CI-1 that the suspected kilogram of cocaine was opened to reassure it was the same as the other (i.e., the sample of cocaine). PALMA-JIMENEZ then drove from the area, terminating the undercover contact between CI-1 and PALMA-JIMENEZ.

103.    Agents followed CI-1 to a pre-determined meet location. Upon arrival, CI-1 gave agents the suspected cocaine and undercover recording devices. The suspected cocaine was found to be inside a paper McDonalds bag, which was inside a red grocery bag that contained a white substance of suspected cocaine. Case agents subsequently searched CI-1 and the CI-1's vehicle for any drugs, money, weapons, or other contraband and did not locate any.   CBP lab analysis determined MORALEZ and PALMA-JIMENEZ provided CI-1 with approximately 1.21 kilograms of cocaine.

### Osmar VENEJAS-MEJIA

*Drug Transaction Involving MORALEZ, VENEJAS-MEJIA, and S.S. on November 14, 2024*

104.    On November 13, 2024, the Honorable United States District Court Judge, J.P. Stadtmueller, Eastern District of Wisconsin, authorized the initial wire interceptions over (414) 736-███ (TARGET TELEPHONE-2) used by Daniel MORALEZ for a period of 30 days.  *See* Application No. 24-AP-11.   During the intercepted period, case agents learned MORALEZ conducted drug transactions with Osmar VENEJAS-MEJIA (a/k/a "Copetes"), S.S., and Hector HERNANDEZ-RAMIREZ (a/k/a "Monkey") assisted MORALEZ in the distribution of drugs on behalf of MORALEZ.

42

105.    OSMAR VENEGAS-MEJIA is a Hispanic male born in Mexico on ███
1990.  VENEJAS-Mejia's resides at 50██ S. 14th Street, Apartment #█, Milwaukee, Wisconsin.
On September 4, 2012, Immigration Judge Carlos Cuevas, Chicago Illinois, ordered VANEGAS-
MEJIA removed from the United States to Mexico.  On or about November 20, 2020, VANEGAS-
MEJIA was removed from the United States to Mexico.  VANEGAS-MEJIA re-entered the United
States after deportation on an unknown date, time, and location.  VANEGAS-MEJIA has been
observed in Milwaukee, Wisconsin as recently as May 14, 2025.  Between May 14 and May 16,
2025, electronic surveillance at 50██ S. 14th Street, Apartment #██ Milwaukee, Wisconsin,
captured VANEGAS-MEJIA entering and exiting Apartment #█ multiple times.  VANEGAS-
MEJIA does not have any legal documentation or authorized to lawfully be present in the United
States in violation of Title 8 United States Code § 1326 (Reentry of Removed Aliens).   According
to law enforcement records, VENEGAS-MEIJIA is an admitted and documented gang member of
the Mexican Posse pursuant to a 2010 Milwaukee Police Department Gang Unit Investigation.

106.    On November 14, 2024, at approximately 10:47 a.m., TARGET TELEPHONE-2,
used by MORALEZ, placed a call to (414) 324-███, used by S.S.  During the intercepted call,
S.S. asked, "Hey, man, what's up?"  MORALEZ responded, "Hey.  What's up, man?"  S.S. asked,
"You got that eight ball?"  MORALEZ replied, "Uh…in little ones."  S.S. stated, "Nah, fuck that."
MORALEZ said, "Alright.  Yeah.  Uh, uh…give me a couple hours…[MUMBLES]…to pick it
up."  S.S. asked, "You got it, you got it, or…you have to get it yet?"  MORALEZ said, "Yeah.
No, people are still sleeping.  I haven't got 'em in yet."  S.S. replied, "Oh, okay.  Alright, well…"
[Voices Overla] MORALEZ said, "Yeah, but if you want…yeah, if you want to go – if you want
to come for the little ones, they're here."   S.S. answered, "No, man."   MORALEZ replied,
"Alright."  [Voices Overlap] S.S. said, "I don't, I don't want them."  [Voices Overlap] MORALEZ

said, "Give me, give me a couple hours. I'll call you right back." S.S. replied, "Alright, sounds good." MORALEZ said, "Alright." S.S. ended the call saying, "Okay, bye."

107. On November 14, 2024, at approximately 11:09 a.m., TARGET TELEPHONE-2, used by MORALEZ, received a call from (414) 324-███, used by S.S. During the intercepted call, MORALEZ answered, "Hello." S.S. said, "Hey, I'm gonna come…" [Voices Overlap] MORALEZ said, "Hello, what's up, man?" S.S. continued, "I'm gonna come with you to fifty, if that's alright?" MORALEZ replied, "Uh…fuck. I'm not going to be at the shop [Capitol Drive Shop]. Just…" [Voices Overlap] S.S. asked, "Where you at?" [Voices Overlap] MORALEZ said, "…just come back in t- come back in two hours, please." S.S. replied, "Yeah. I can do it, and, uh…" [Voices Overlap] MORALEZ said, "Yeah. Yeah." S.S. asked, "…You gonna have the whole, whole shit?" MORALEZ replied, "Yeah, I got – I got the whole…yeah." [Voices Overlap] S.S. asked, "You'll have the whole thing [U/I]?" MORALEZ said, "Yeah, I just…I just gotta go to….I gotta go to Sheboygan [PH] real quick. I'll be back in two hours." S.S. said, "Alright." MORALEZ confirmed, "Alright." S.S. ended the call saying, "See you then."

108. On November 14, 2024, at approximately 11:43 a.m., 12:32 p.m., and 12:55 p.m., TARGET TELEPHONE-2, used by MORALEZ, placed and received several intercepted calls to and from (414) 531-███, used by VENEGAS-MEJIA. During the intercepted calls, MORALEZ and VENEGAS-MEJIA arranged to meet at the Monterrey Supermarket in Milwaukee, Wisconsin.

109. On November 14, 2024, at approximately 12:15 p.m., case agents established surveillance at the Monterrey Supermarket, located at 30██ S. 13th Street in Milwaukee. Investigators observed a black GMC pick-up truck bearing Wisconsin license plate UX-███, which was occupied by a Hispanic male. The GMC pick-up truck was parked on the east side of South 13th Street, approximately one business south of the Monterrey Supermarket. At

44

approximately 12:53 p.m., the GMC pick-up truck was seen relocating and parking in front of 1206 W. Euclid Avenue. At approximately 12:54 p.m., investigators observed MORALEZ's black Cadillac Escalade, bearing Wisconsin license plate ANJ-███, arrive at the Monterrey Supermarket. At approximately 12:57 p.m., investigators observed the GMC pick-up truck park near the black Cadillac, in the north lot of the Monterrey Supermarket. At approximately the same time, investigators observed MORALEZ and ROA enter the Monterrey Supermarket.

110. On November 14, 2024, at approximately 12:59 p.m., TARGET TELEPHONE-2, used by MORALEZ, received a call from (414) 531-███, used by VENEGAS-MEJIA. During the intercepted call, MORALEZ said, "Hello." VENEGAS-MEJIA asked, "Where you at?" MORALEZ said, "Yeah. I'm coming right out. I'm in Monterrey [Supermarket]." VENEGAS-MEJIA replied, "Alright, man." MORALEZ ended the call saying, "Alright."

111. At approximately 1:01 p.m., MORALEZ exited the Monterrey Supermarket and approached the driver's side of the GMC pick-up truck. Approximately one minute later, investigators observed the GMC pick-up truck drive away. Shortly after, the Cadillac also drove away occupied by MORALEZ and Andrea ROA, MORALEZ's partner.

112. On November 14, 2024, at approximately 1:37 p.m., TARGET TELEPHONE-2, used by MORALEZ, received a call from (414) 324-███, used by S.S. During the intercepted call, MORALEZ said, "Hey, what's up, man." S.S. asked, "Hey, what's going on? Did you get it?" MORALEZ replied, "Yeah, I'm here in the alley." S.S. asked, "No, did you get it?" MORALEZ replied, "Oh, yeah, yeah, yeah. I thought you were in the alley already." S.S. answered, "No. No." MORALEZ stated, "Alright." S.S. asked, "You got the big one." [Voices overlap] MORALEZ said, "Yeah, alright." [Voices Overlap] S.S. responded, "Alright, give me,

45

like, a half-hour…twenty minutes." [Voices Overlap] MORALEZ said, "Yeah, I'll be there all day." S.S. confirmed, "Alright, sounds good."

113. On November 14, 2024, at approximately 2:04 p.m. TARGET TELEPHONE-2, used by MORALEZ, received a call from (414) 324-███, used by S.S. During the intercepted call, MORALEZ said, "Hello." S.S. said, "Hey, I'm here in the alley." MORALEZ replied, "Oh, okay. I'm pulling up." S.S. said, "Alright, thanks."

114. Based on your affiant's training, experience, and knowledge of the investigation, I believe S.S. requested drugs from MORALEZ [S.S. asked, "You got that eight ball?"] and MORALEZ responded he [MORALEZ] only had a smaller quantity [MORALEZ replied, "Uh…in little ones." S.S. did not want the smaller quantity [S.S. replied, "Nah, fuck that."]. MORALEZ spoke with VANEGAS-MEJIA and arranged to meet MORALEZ at the Monterrey Supermarket that same day. I believe VANEGAS-MEJIA provided a larger quantity of drugs to MORALEZ at the Monterrey Supermarket. Later that same day, MORALEZ called S.S. who asked if MORALEZ obtained the larger quantity of drugs S.S. originally requested from MORALEZ [S.S. asked, "Hey, what's going on? Did you get it?"]. MORALEZ confirmed he [MORALEZ] did get the larger quantity of drugs. Later that same day, MORALEZ provided the drugs to S.S. in an alley [S.S. said, "Hey, I'm here in the alley." MORALEZ replied, "Oh, okay. I'm pulling up."]. Based upon your affiant's knowledge, training, and experience, I believe MORALEZ sold an "8-ball" (3.5 grams) of cocaine. Furthermore, E911/GPS data over TARGET TELEPHONE-2 at approximately 2:01 p.m. showed TARGET TELEPHONE-2 in the general area of the Capitol Drive Shop. Given the proximity of TARGET TELEPHONE-2 to the Capitol Drive shop, and that both S.S. and MORALEZ confirmed they were at the alley, case agents believe MORALEZ sold drugs to S.S in the alley next to the Capitol Drive Shop.

*MORALEZ and VANEGAS-MEJIA Discuss a Drug Transaction on November 29, 2024*

115.    On November 29, 2024, at approximately 2:46 p.m., TARGET TELEPHONE-2, used by MORALEZ, called (414) 531-████ used by VANEGAS-MEJIA.  During the intercepted conversation, the parties greeted and MORALEZ said, "We don't have enough for nine, bro, fucking shit.  Can you just do a split?"  VANEGAS-MEJIA responded, "Yes, bro.  But it's going to be almost the same, bro."  MORALEZ asked, "How much, how much is that."  [Voices Overlap]  VANEGAS-MEJIA said, "Let me…let me ask him.  Uh, I'm going to send you the number, and you tell me what's up."  MORALEZ replied, "Alright."

116.    Based on  your affiant's training, experience, and knowledge of the investigation, I believed MORALEZ called VANEGAS-MEJIA and explained that MORALEZ did not have enough money to purchase a quarter-kilogram of drugs ["We don't have enough for nine, bro." (nine ounces is a quarter-kilogram)] and asked VANEGAS-MEJIA if he [VANEGAS-MEJIA] would split the amount in half, meaning provide MORALEZ with 4 ½ ounces of drugs.  MORALEZ inquired about the price for 4 ½ ounces and VANEGAS-MEJIA implied that he [VANEGAS-MEJIA] needed to contact a third-party to find out the price for 4 ½ ounces of drugs.

117.    On November 29, 2024, at approximately 2:52 p.m., TARGET TELEPHONE-2, used by MORALEZ, called (414) 531-████ used by VANEGAS-MEJIA.  During the intercepted conversation, the parties greeted, and VANEGAS-MEJIA said, "Oh. Were you gonna be ready now, or what?"  MORALEZ asked, "What number did he tell you?"  VANEGAS-MEJIA replied, "No, the same, man.  Just break it in half."  MORALEZ asked, "Huh?"  VANEGAS-MEJIA said, "The same, man.  Just divide it, man."  MORALEZ asked, "How much is it? [Stammers] Because it's no, not [Mumbles]."  VANEGAS-MEJIA replied, "Twenty-six."  MORALEZ asked, "Twenty-six?"  VANEGAS-MEJIA said, "Yep."  MORALEZ said, [Background: UF: (U/I).] [Aside: He

47

has it? No, well, just plug – plug the booster on the cables. Uh-huh.] MORALEZ continued, "And, uh…oh, well, look, uh, um…well, come, come over here to the shop, bro." VANEGAS-MEJIA replied, "Uh, let me see if he could go over there, man. I'll call you back, man." MORALEZ said, "Alright, then." VANEGAS-MEJIA asked, "Are you ready, though?" MORALEZ said, "No, well, I'm going to tell my cousin now to come." VANEGAS-MEJIA said, "Yeah, because if…well, it's not mine, bro. I gotta…he's gonna come with me, bro." [Voices Overlap] MORALEZ said, "Yeah, no, no, no. I'm saying, so you won't have to wait." VANEGAS-MEJIA replied, "Yeah, 'cause he's gonna come with me." MORALEZ replied, "Oh, alright, then." VANEGAS-MEJIA ended the call, saying, "Alright, bro." Based on my training, experience and knowledge of the investigation, I believe VANEGAS-MEJIA contacted a third-party on behalf of MORALEZ to ask for the price for ounce quantities of an unknown type of drugs [MORALEZ asked, "How much is it? [Stammers] Because it's no, not [Mumbles]." VANEGAS-MEJIA replied, "Twenty-six."]. MORALEZ told VANEGAS-MEJIA that he [MORALEZ] was going to send his [MORALEZ's] cousin to retrieve the drugs and VANEGAS-MEJIA said that the cousin would have to go with VANEGAS-MEJIA to obtain the drugs. [MORALEZ said, "No, well, I'm going to tell my cousin now to come." VANEGAS-MEJIA said, "Yeah, because if…well, it's not mine, bro. I gotta…he's gonna come with me, bro."].

### Hector RODRIGUEZ-VILLALOBOS

#### *MORALEZ and Hector RODRIGUEZ-VILLALOBOS Discuss MORALEZ Traveling to Chicago to Obtain Drugs for RODRIGUEZ-VILLALOBOS on November 20, 2024*

118.    Hector RODRIGUEZ-VILLALOBOS is a Hispanic male born in Mexico on ███████ 1990. On August 26, 2011, an Immigration Judge, Chicago Illinois, ordered RODRIGUEZ-VILLALOBOS removed from the United States to Mexico. On or about September 2, 2011, RODRIGUEZ-VILLALOBOS was removed from the United States to

48

Mexico. RODRIGUEZ-VILLALOBOS re-entered the United States after deportation on an unknown date, time, and location. According to law enforcement records from 2009, RODRIGUEZ-VILLALOBOS is a documented and self-admitted gang member of the Mexican Posse. RODRIGUEZ-VILLALOBOS is a Milwaukee-based drug distributor. RODRIGUEZ-VILLALOBOS was last seen in Milwaukee in January 2025. RODRIGUEZ-VILLALOBOS was identified as the user of (414) 531-██.

119. On November 20, 2024, at approximately 6:11 p.m., RODRIGUEZ-VILLALOBOS, using (414) 531-██, placed a call to TARGET TELEPHONE-2, used by MORALEZ. During the call, MORALEZ stated, "Yes, I have to go over there to-- to-- over there to "Los Vientos" [literally, "The Winds"] to get your errand." MORALEZ added, "Nobody has anything over here." MORALEZ continued, "Yeah, but if somebody calls me back, uh... I'll call you back." RODRIGUEZ-VILLALOBOS replied, "Alright, then."

120. Based on your affiant's training, experience, and knowledge of the investigation, RODRIGUEZ-VILLALOBOS contacted MORALEZ for narcotics. MORALEZ advised there were no narcotics to be had locally, and that MORALEZ would have to go to Chicago ("the winds) to obtain drugs.

*RODRIGUEZ-VILLALOBOS Seeks Two Pounds of Methamphetamine from MORALEZ in January 2025.*

121. On January 24, 2025, DEA Special Agent Tyler Owenby was contacted by an ATF Undercover Special Agent (UC). The UC had been acting in an undercover (UC) capacity and had been in communication with telephone number (414) 531-██, used by RODRIGUEZ-VILLALOBOS, regarding purchasing two pounds of methamphetamine.

122. During a recorded telephone call on January 24, 2025, between RODRIGUEZ-VILLALOBOS and the UC, RODRIGUEZ-VILLALOBOS stated, "The store is full and I'm gonna

49

save two for you." The UC understood this to mean that RODRIGUEZ-VILLALOBOS currently had access to a large quantity of methamphetamine and was going to save two pounds for the UC. The UC and RODRIGUEZ-VILLALOBOS did not decide on a specific date to make this transaction during this telephone call.

123.    On January 24, 2025, at approximately 6:40 p.m., RODRIGUEZ-VILLALOBOS, using (414) 531-███, placed a call to TARGET TELEPHONE-2, used by MORALEZ. During the call, MORALEZ asked, "What's new my Yogi?" After a brief conversation, RODRIGUEZ-VILLALOBOS stated, "The thing is... I'm telling you, [Stammers] since that time... since I told you that two (2) were needed, well..." MORALEZ responded, "Yeah," and RODRIGUEZ-VILLALOBOS continued, "Well, look. Uh, [Stammers] That guy I was talking about... [Stammers] that guy is a good client. Every—every week, the man." MORALEZ asked, "Oh, really?" RODRIGUEZ-VILLALOBOS answered, "Yeah, really. He's one that does each and every week. But they are not coming through for me over here, man. I wanted to see if I could do it with you and see what's up. If you want."

124.    MORALEZ answered, "Well, yes. That's fine." RODRIGUEZ-VILLALOBOS explained, "Look. If you want, we can go... we can go. And not until I make the money that I need to get... he just needs to give me some money, but I don't want to disappoint that guy." MORALEZ replied, "Yeah. Well, yes, Yogi. [U/I], Yogi. I throw you one hundred (100), two hundred (200) bucks." RODRIGUEZ-VILLALOBOS stated, Yeah. Well, look. I'll send you a text right now." MORALEZ stated, "Yes, that's fine. You just tell me how things are, and we'll go!" RODRIGUEZ-VILLALOBOS advised, "Yes. Well, I mean, what I want is work. Because from that, I'm going to make some profit, and I also want you to make some. If not... what I wanted from there... If not, I'll pass that shit along to you, or we'll pass it... even if I get the business on the phone over here.

And... and, so you can do me the favor with the truck, man." MORALEZ replied, "Yes. Well, yes. You want to fix the... what's wrong with it?" RODRIGUEZ-VILLALOBOS replied, "It was rear-ended."

125.    As the conversation continued, RODRIGUEZ-VILLALOBOS stated, "That's why I'm telling you, man! Look. That's why I'm telling you, man. I mean, you had already told me of a price for that shit, man!" MORALEZ replied, "Yeah," and RODRIGUEZ-VILLALOBOS continued, "[Stammers] and I'm in agreement with it. So then, I'm going to give it to him at a price... so then I can pass along to you that clientele, and you're going to make [Mumbles]... off of each one, you're going to make a profit of more than a thousand (1,000), man!" MORALEZ responded, "Yeah. Yes, you just tell me when."

126.    RODRIGUEZ-VILLALOBOS explained, "So all I wanted—all I wanted was to talk to you, man. So, I can feel more assured, man, that yes, the product is there, man. So, I can give a, 'Yes.'" MORALEZ stated, "Yes. Well... [Stammers] There is some right now. Uh, I have a bit less than one (1) right now. But..." RODRIGUEZ-VILLALOBOS-VILLALOBOS continued, "But—but... man, just imagine that you... like if you get it by another... like me, right now, man, I don't have... how should I say it? I don't have anything to back it up for that, man. You understand me? I mean, like the money..." MORALEZ replied, "Yes," and RODRIGUEZ-VILLALOBOS explained, "... and say, "Okay." I don't have it, man. That's why I'm—I'm telling you. And I right now I'm... like, I'll pass that shit to you, you make all the profit, man, and you just give me a hundred (100) or whatever, man. Or something for the soft drink, man. You make all the profits, man, that the guy is going to give you. And, um... and I will pass it to you, for that time, man. And you fix my truck." MORALEZ agreed, "Yes. It's doable. Yes, yeah.

127.     On January 29, 2025, the UC and RODRIGUEZ-VILLALOBOS talked again by telephone. During the recorded call RODRIGUEZ-VILLALOBOS told the UC, "I got that shit ready." Based on previous contacts with RODRIGUEZ-VILLALOBOS, the UC believed RODRIGUEZ-VILLALOBOS related that he currently had the two (2) pounds of methamphetamine on him. The UC communicated to RODRIGUEZ-VILLALOBOS that the following day, January 30, 2025, the UC would be ready to make the transaction. RODRIGUEZ-VILLALOBOS instructed the UC to be on the south side of Milwaukee around 4:20 p.m. and further stated to the UC that "I get off of work at 4:00."

128.     On January 29, 2025, at approximately 2:12 p.m., RODRIGUEZ-VILLALOBOS, using (414) 531-███, sent a text message in Spanish to TARGET TELEPHONE-2, used by MORALEZ stating, "You have the 2 "windows"?" Then, at 2:14p.m., MORALEZ (TARGET TELEPHONE-2) sent a response message in Spanish stating, "Yeah."

129.     Based on your affiant's training, experience, and knowledge of the investigation, I believe RODRIGUEZ-VILLALOBOS proposed sending narcotics customers (i.e., the UC) to MORALEZ, in exchange for MORALEZ fixing RODRIGUEZ-VILLALOBOS's truck, and MORALEZ providing RODRIGUEZ-VILLALOBOS with a small portion of the drug proceeds. RODRIGUEZ-VILLALOBOS advised that "guy comes by every week, man. There is no problem." Based on my training, experience and familiarity with the investigation, I believe this is in reference to the UC, whom RODRIGUEZ-VILLALOBOS believes will be a regular drug customer that RODRIGUEZ-VILLALOBOS wanted to send to MORALEZ for profit. In the subsequent text message, RODRIGUEZ-VILLALOBOS asked if MORALEZ had "2 windows," referring to two (2) pounds of methamphetamine.

130.    On January 29, 2025, at approximately 4:35 p.m., RODRIGUEZ-VILLALOBOS, using (414) 531-███, received a call from TARGET TELEPHONE-2, used by MORALEZ. During the call, MORALEZ stated, "All right. All right. Whenever you want, the food is here, ready." RODRIGUEZ-VILLALOBOS replied, "Okay. So everything is--so, let me call the guys and... right now... [Stammers] It's going to be done tomorrow, man, but, I'll call them right now. After this... time. I think like around... around four (4:00), five (5:00). Around--no, like at five (5:00), man. Five-thirty (5:30)." MORALEZ asked, "Oh my. Till tomorrow?" RODRIGUEZ-VILLALOBOS stated, "Well, yes, man, because..." MORALEZ replied, "Asshole! [Laughs] Why do you make me bring that... shit then, Yogi?" Later in the conversation RODRIGUEZ-VILLALOBOS stated, "But it's a sure thing." RODRIGUEZ-VILLALOBOS asked, "At two (2) [U/I] each one. How much? Two (2) three hundred (300)?" MORALEZ stated, Well, two (2) [U/I], man." RODRIGUEZ-VILLALOBOS confirmed, "All right then. Set them aside. Let me call them, man."

131.    Based on your affiant's training, experience, and knowledge of the investigation, MORALEZ advised RODRIGUEZ-VILLALOBOS that, "the food was here and ready," referring to MORALEZ's possession of the two (2) pounds of methamphetamine for distribution to the UC, by way of RODRIGUEZ-VILLALOBOS.

132.    On January 30, 2025, at 1:50 p.m. the UC received a text message from (414) 531-███, used by RODRIGUEZ-VILLALOBOS that said, "so was the plan." The UC continued to communicate with RODRIGUEZ-VILLALOBOS in a series of text messages set forth below:

*UC: U tell me bro Ima head up just lmk where to link*
*RODRIGUEZ-VILLALOBOS: My shop*
*RODRIGUEZ-VILLALOBOS: But no wired shit please*
*UC: I aint on bullshit bro*
*UC: Where that at*
*RODRIGUEZ-VILLALOBOS: 58██ w capitol rd*

RODRIGUEZ-VILLALOBOS: See @t 4

133. The address, 58█ W. Capitol Drive, Milwaukee, Wisconsin lists to the Mid Town Center, a public shopping area with multiple businesses sharing a large open parking lot. The location is across the street from Car Clinic, a business owned and operated by MORALEZ and located at 58█ W. Capitol Drive, Milwaukee.

134. At approximately 3:45 p.m. members of Milwaukee DEA Group 62 established surveillance in the area of 36█ N. 35th Street, Milwaukee, Wisconsin in anticipation of RODRIGUEZ-VILLALOBOS leaving work to meet with the UC. At approximately 4:03 p.m. agents observed RODRIGUEZ-VILLALOBOS exiting the building and walking through the parking lot of 3660 N. 35th Street. RODRIGUEZ-VILLALOBOS appeared to be walking with an unknown Hispanic male and ultimately both RODRIGUEZ-VILLALOBOS and the UM entered a tan Buick SUV, bearing Wisconsin Plate APX-█. DEA SA Tyler Owenby observed RODRIGUEZ-VILLALOBOS in the front passenger seat and the UM was driving. Agents observed the tan Buick exit the parking lot and turning north onto North 35th Street which indicated RODRIGUEZ-VILLALOBOS, and the UM were heading toward the meet location RODRIGUEZ-VILLALOBOS had previously provided to the UC.

135. As agents observed the Buick leaving the parking lot of 36█ N. 35th Street, the UC received a phone call from RODRIGUEZ-VILLALOBOS. During this phone call the UC indicated that the UC would be parking in front of the Planet Fitness located in the Shopping Center of 5812 W. Capitol Drive. RODRIGUEZ-VILLALOBOS stated to the UC during this phone call, "it's across the street," and "I'm gonna call my guy right now to put the cameras on." Based on this call case agents believed that RODRIGUEZ-VILLALOBOS was affiliated with a shop near the shopping center, (i.e., the Car Clinic).

136.    Surveillance units followed the Buick from Pak Technologies and observed the vehicle drive directly to 58█ W. Capitol Dr., Milwaukee, Wisconsin, which is the parking lot of Car Clinic. The Buick was never out of view of surveillance units from the time it left Pak Technologies until it pulled into the parking lot of Car Clinic.

137.    Within this time frame, SA Tyler Owenby observed RODRIGUEZ-VILLALOBOS walking on foot in front of Car Clinic, but SA Owenby's view was slightly obstructed, and SA Owenby was unable to see if RODRIGUEZ-VILLALOBOS had entered the business or was just walking in the parking lot. Agents observed RODRIGUEZ-VILLALOBOS utilizing his cellular phone at this time and then agents observed RODRIGUEZ-VILLALOBOS entering the passenger seat of the Buick. The Buick departed its parked location and drove across west Capitol Drive, towards the Planet Fitness.

138.    On January 30, 2025, at approximately 4:14 p.m., RODRIGUEZ-VILLALOBOS, using (414) 531-███, received a call from TARGET TELEPHONE-2, used by MORALEZ. During the call, RODRIGUEZ-VILLALOBOS advised, "I'm here, on Fifty-fourth (54th)." MORALEZ responded, "Really? All right, then." RODRIGUEZ-VILLALOBOS asked, "Right now, I'm going to... do I put them in the car and then go there with you, or what?" MORALEZ answered, "Well, no. We'll head indoors." RODRIGUEZ-VILLALOBOS stated, "Oh well. All right, then. Well, this guy has the money, but all right, then." MORALEZ directed, "Tell him to give it to you." RODRIGUEZ-VILLALOBOS responded, "All right, I'll be there right now."

139.    At approximately 4:30 p.m. as the Buick was driving in front of Planet Fitness, Milwaukee Police Officers Christian Sanchez-Alcantar and Zachery Burczyk, who were operating their marked Milwaukee Police Department Squad Car, initiated a traffic stop on the Buick. The occupants of the vehicle were identified as J.V-F. (Driver) and Hector RODRIGUEZ-

55

VILLALOBOS (Passenger). Milwaukee Police Department K9 Officer Dionte King was called to the scene and performed an open-air sniff of the vehicle and Police Officer King's K9 partner positively alerted at this time to the presence of narcotics in the Buick. A search of the vehicle was initiated.

140.     At approximately 4:52 p.m. SA Owenby and TFO Mike Migazzi observed a Hispanic male later positively identified as Daniel MORALEZ standing in the parking lot of Car Clinic next to a black Cadillac Escalade. MORALEZ entered the driver's seat of the Escalade and drove across west Capitol Drive and into the parking lot of the Midtown Shopping Center. Agents observed the Escalade driving very slowly in close proximity to the traffic stop and then it departed the area and headed north on north 60th Street. The Escalade was not followed from the area. TFO Steven Kuhnmuench observed a license plate affixed to the Escalade bearing Wisconsin plate ANJ-███.

141.     According to the Wisconsin Department of Transportation Wisconsin Plate ANJ-███ is registered on a 2015 Cadillac Escalade to Andrea ROA-Romero with an address of 25██ S. 29th Street, Milwaukee, Wisconsin. SA Owenby later viewed a Wisconsin Driver's License photograph of MORALEZ and positively identified it as the individual seen operating the black Escalade.

142.     At approximately 5:00 p.m. SA Matt Kilby observed the Escalade returning to the parking lot of Car Clinic and parking. SA Owenby observed MORALEZ exiting the driver's seat and then retrieving what appeared to be a plastic bag from the back seat of the Escalade and then walking into the business.

143.     At approximately 5:10 p.m. Police Officers Sanchez-Alcantar and Burczyk completed their search of the Buick with no drugs, weapons, money or other contraband located. At this time both RODRIGUEZ-VILLALOBOS and J.V-F. were released from the scene.

144.     On January 30, 2025, at approximately 5:31 p.m., RODRIGUEZ-VILLALOBOS, using (414) 531-███, received a call from TARGET TELEPHONE-2, used by MORALEZ. During the call, RODRIGUEZ-VILLALOBOS stated, "Everything—everything is wrong, buddy." MORALEZ asked, "What happened?" RODRIGUEZ-VILLALOBOS explained, "Um... no, it's just that... no, it's that... that thing had a tail. Yes, but the good thing is that there was no— no food at all." MORALEZ asked, "Oh, they—they did a little four (4) on you." RODRIGUEZ-VILLALOBOS confirmed, "Yep, yep." MORALEZ responded, "Yeah. No, no no, it's not a problem. That's alright. It—it happens." RODRIGUEZ-VILLALOBOS replied, "Yeah, yeah. In any case, I'll go by... right here to your house." MORALEZ agreed, "Yeah, that's fine. Uh-huh."

145.     Based on your affiant's training, experience, and knowledge of the investigation, RODRIGUEZ-VILLALOBOS attempted to locate the UC, to obtain the money, prior to obtaining the two pounds of methamphetamine, at which time DEA agents initiated the traffic stop of RODRIGUEZ-VILLALOBOS. Case agents further believe that MORALEZ did possess two (2) pounds of Methamphetamine for the drug transaction. During the time of their investigation, DEA agents from Group 62 were unaware that investigators with North Central HIDTA were conducting a Title-III investigation into MORALEZ. Only after the traffic stop of RODRIGUEZ-VILLALOBOS occurred did agents realize the two investigations were linked.

**Carmelo HERNANDEZ-RAMIREZ, a/k/a "Monkey"**

_MORALEZ and HERNANDEZ-RAMIREZ Discuss the Distribution of Narcotics_

146.     Carmelo HERNANDEZ-RAMIREZ (a/k/a "Monkey") is a Hispanic male born in Mexico on ███, 1985.  HERNANDEZ-RAMIREZ has an additional date of birth documented as ███ 1984.  HERNANDEZ-RAMIREZ is a citizen and national of Mexico with no current lawful documentation to reside in the United States.  HERNANDEZ-RAMIREZ distributes narcotics on behalf of MORALEZ and is the user of (414) 514-███, (414) 736-███, and (414) 554-███.  Throught the course of the investigation, intercepted calls between MORALEZ, using TARGET TELEPHONE-2, and HERNANDEZ-RAMIREZ, revealed HERNANDEZ-RAMIREZ both holds and distributes illicit substances on behalf of MORALEZ.

147.     On November 15, 2024, at approximately 4:23 p.m., MORALEZ, using TARGET TELEPHONE-2, called (414) 514-███, used by HERNANDEZ-RAMIREZ. During the call, MORALEZ asked, "And then?" HERNANDEZ-RAMIREZ replied, "And then, what?" MORALEZ asked, "Are you short?" HERNANDEZ-RAMIREZ replied, "Well, I have seven (7) there, I think . . . but you said today. Well…I'm just waiting on you. If you want, I'll get them." MORALEZ asked "Uh…what time are you arriving at my house?" HERNANDEZ-RAMIREZ answered, "No, well, shortly, in about half an hour. I'm getting ready to eat." HERNANDEZ-RAMIREZ asked, "Where you at?" MORALEZ responded, "Well, here at the shop. I'm going to start heading… I will head home right now. The two parties then confirmed that they would both meet at MORALEZ's residence at approximately 5:00 p.m. Based on my training, experience, and knowledge of the investigation, I believe that during this call MORALEZ asked HERNANDEZ-RAMIREZ about the amount or quantity of unknown narcotics HERNANDEZ-RAMIREZ currently possessed for distribution. HERNANDEZ-RAMIREZ provided the quantity of seven, ("Well, I have seven (7) there, I think."), and MORALEZ instructed HERNANDEZ-RAMIREZ

58

to meet with MORALEZ at MORALEZ's residence to obtain further amounts of controlled substances for distribution.

148.    On November 15, 2024, at approximately 5:46 p.m., MORALEZ, using TARGET TELEPHONE-2, received a call from (414) 514-███ used by HERNANDEZ-RAMIREZ. During the call, HERNANDEZ-RAMIREZ asked, "Where are you?" MORALEZ replied, "I came to drop off a ("chu") [PH] really quick, man, because you were not calling me, asshole." HERNANDEZ-RAMIREZ indicated that he (HERNANDEZ-RAMIREZ) was "parked here in front." Both parties joked about how they both were late, and HERNANDEZ-RAMIREZ stated, "Yeah right, dude. You always fuck me, and I wanted to do it to you." MORALEZ stated that he was arriving at "Sixth and Lincoln, just one stop." MORALEZ asked, "Hey, you have your thing there." HERNANDEZ-RAMIREZ asked, "Huh?"  MORALEZ reiterated, "Did you bring that thing?" HERNANDEZ-RAMIREZ responded, "Yes, my, my, my,…my Herman, my tool?" MORALEZ confirmed, "Yes," and instructed HERNANDEZ-RAMIREZ to "bring it."

149.    Based on my training, experience, and knowledge of the investigation, I believe HERNANDEZ-RAMIREZ was waiting in front of RAMIREZ's residence, as previously planned, to provide MORALEZ with the "tool" (possibly narcotics proceeds) and for MORALEZ to provide HERNANDEZ-RAMIREZ with an unspecified quantity of controlled substances. Upon examination of pen register/trap and trace data, I further noted that TARGET TELEPHONE-2 received an incoming text from (414) 514-███ (i.e., HERNANDEZ-RAMIREZ) at approximately 6:03 p.m., followed by an outgoing text from TARGET TELEPHONE-2 to HERNANDEZ-RAMIREZ's telephone approximately twenty seconds later, which messages agents believe to be related to the discussed drug transaction.

150.     On November 19, 2024, at approximately 10:13 p.m., MORALEZ, using TARGET TELEPHONE-2, received an intercepted call from (414) 514-███, used by HERNANDEZ-RAMIREZ. During the call, HERNANDEZ-RAMIREZ asked MORALEZ, "Hey bro what the fuck did you give some crystal (crystal methamphetamine) to Pablo." MORALEZ responded, "Yes, bro." HERNANDEZ-RAMIREZ asked, "Crystal?!" MORALEZ responded, "Quiet, bro.' Shut your trap." HERNANDEZ-RAMIREZ stated, "He... he did call me a little while ago, bro." MORALEZ asked what the unknown male had said and HERNANDEZ-RAMIREZ advised, "'Hey, bro, sell me a... a tostada.' And I tell him, 'Oh, okay, do you have the money?' Yes." MORALEZ responded, "Uh-huh." HERNANDEZ-RAMIREZ continued, "He says, 'Be serious, bro,' he says, 'give me twenty (20) of that.' 'No, bro, fuck off,' I told him, 'You told me you had the money.' 'No, no... I don't have the money, bro.' He says, 'tomorrow I'll...' 'Nah, fuck off.' I told him to fuck off."   HERNANDEZ-RAMIREZ continued to inform MORALEZ how the narcotics customer was unable to provide money for the drug transaction. MORALEZ asked, "There was no way to grab anything?"   Referring to HERNANDEZ-RAMIREZ receiving some form of payment for the methamphetamine. MORALEZ explained, "Said 'bro' because he is going to help me fix a car tomorrow, and I told him I'd give him something, but not." MORALEZ further indicated, "The homie said 'yes' [Coughs] and now he is shitting himself."   HERNANDEZ-RAMIREZ replied, "Yes, he said, 'I tried that shit, and it burned my whole fucking mouth." Based on my training, experience, and knowledge of the investigation, I believe HERNANDEZ-RAMIREZ discussed a methamphetamine customer of MORALEZ's, and how the customer did not have money to purchase narcotics from HERNANDEZ-RAMIREZ. MORALEZ indicated he was going to use the unknown male customer for labor and assistance in the repair of the car; however, MORALEZ provided the unknown male drug customer with another type of narcotic

that made the drug customer sick.  Furthermore, I am aware that "crystal" is a known code for crystal methamphetamine.

## Controlled Purchase of Cocaine by CI-2 from MORALEZ and ROA

151.    On or about October 15, 2024, CI-2[9] told investigators that CI-2 previously worked with Andrea ROA at a restaurant.  CI-2 informed case agents that during their employment together, ROA told CI-2 her boyfriend (MORALEZ) sells cocaine.  On November 20, 2024, case agents met with CI-2 and instructed CI-2 to arrange the purchase of one ounce of cocaine from ROA.  On November 20, 2024, at approximately 2:16 p.m., CI-2, at the direction of and in the presence of case agents, sent a series of text messages, in Spanish, to (414) 865-███, used by Andrea ROA, asking, "Hey, are you going to pass by my bar?"  Or, "Where do I see you?  Hello.  Tell me." At approximately 2:18 p.m., ROA responded to CI-2 via text message from (414) 265-███ stating, "Yes, I'll pass by give me a few minutes." Then, at approximately 2:31 p.m., ROA called MORALEZ on TARGET TELEPHONE-2. During the call, ROA asked, "Are you almost done, love?" MORALEZ advised he would need another thirty minutes, and ROA advised, "Okay. I'm gonna go to, um, McDonalds to pick up [U/I]."  Investigators conducted a toll analysis of the cellular device used by ROA ((414) 865-███) and confirmed the communications between ROA and CI-2.  The text message exchanges between CI-2 and ROA have been preserved.

152.    At 2:46 p.m., case agents followed CI-2 to a pre-determined location.  CI-2 was equipped with audio and video recording devices.

153.    At approximately 3:00 p.m., MORALEZ called ROA, using (414) 265-███. During the call, MORALEZ asked, "What's going on, babe?" ROA explained, "Uh, what

[9] CI-2 has been a confidential informant for approximately five years.  CI-2 has provided information in return for immigration benefits and has made statements against his/her penal interests.  Information provided by CI-2 has been independently verified and has resulted in the seizure of drugs and firearms and criminal arrests.

61

happened with the time?" MORALEZ responded, "With the time? Oh, uh, let me call him." ROA advised MORALEZ, "Okay, because he is already waiting on me for it." MORALEZ stated, "Okay, then. Let me call him." At approximately 3:17 p.m., MORALEZ, using TARGET TELEPHONE-2, called ROA at (414) 865-███. ROA said, "Hey." MORALEZ replied, "Hey." ROA asked, "Yeah?" MORALEZ said, "We got one more screw to take and then we are on our way to [U/I]." ROA replied, "Okay." MORALEZ confirmed, "Uhh, see you in a bit." ROA asked, "What happened with the…thing?" MORALEZ replied, "Oh, yes." ROA said, "Damn." MORALEZ said, "Yeah, [audio breaks] working still." ROA responded, "Okay, let me tell this guy to go to the shop at four (4:00 p.m.)." MORALEZ confirmed, "Okay, cool." ROA replied, "Okay, bye." Based on my training and experience, and familiarity with this investigation, during this call, ROA asked MORALEZ what happened with the drugs for CI-2. MORALEZ explained that he was still at work. ROA informed MORALEZ that ROA was going to contact CI-2 and tell CI-2 to go to the Capitol Drive Shop at 4:00 p.m. to conduct the drug transaction.

154.     Case agents verified CI-2 and ROA communicated over Facebook on November 20, 2024, at approximately 3:18 p.m., and again several times at approximately 3:21 p.m. The contacts were verified by pen register trap and trace data from ROA's Facebook account which is listed under the name Andrea ROA.

155.     At approximately 3:21 p.m., CI-2 called case agents to inform them that ROA wanted CI-2 to go to the Capitol Drive Shop at 4:00 p.m. Case agents followed CI-2 to 58█ W. Capitol Drive (Capitol Drive Shop). At approximately 3:31 p.m., MORALEZ (TARGET TELEPHONE-2) placed an intercepted call to ROA. During the call, MORALEZ stated, "Hey. We're outside already." ROA replied, "Okay, I'm pulling up to the parking lot."

156. At approximately 3:45 p.m., investigators observed CI-2 arrive at the Capitol Drive Shop. CI-2 parked the vehicle and remained inside of the vehicle. At approximately 4:29 p.m., case agents observed MORALEZ and ROA arrive at the shop in MORALEZ's Cadillac Escalade. MORALEZ was observed exiting the driver side of the vehicle, and ROA was observed exiting the passenger side. ROA was observed carrying a box, and both parties entered the shop.

157. At approximately 4:34 p.m., CI-2 called ROA, and the call went to voicemail. Case agents instructed CI-2 to enter the Capitol Drive Shop and meet with ROA in person. At approximately 4:44 p.m., CI-2 repositioned CI-2's vehicle to the northside of the parking lot. CI-2 exited the vehicle and entered the front door of the shop. CI-2 was heard speaking with ROA and MORALEZ on the recording device. After a brief discussion between ROA and CI-2, recording/monitoring equipment captured ROA asking MORALEZ about "the status" (the drugs). MORALEZ told CI-2, "He'll be here at 5:15-5:20 p.m. If he doesn't arrive, my friend gets here at 5:30, another friend from the southside from his house. Let's see who gets here first." Based on my training, experience, and knowledge of this investigation, I believe that MORALEZ told CI-2 that he (MORALEZ) was having a third-party deliver the cocaine that would be sold to CI-2.

158. Subsequently, CI-2 informed MORALEZ that CI-2 would wait outside, and that CI-2 would go to McDonalds. Following the conversation, CI-2 exited the shop and returned to CI-2's vehicle. CI-2 left the Capitol Drive Shop, followed by case agents. At approximately 5:32 p.m., CI-2 returned to the shop and arranged to conduct the purchase of cocaine with ROA and MORALEZ the following day.

159. On November 21, 2024, at approximately 12:15 p.m., MORALEZ, using TARGET TELEPHONE-2, sent a text message to CI-2, asking, "Are you ready, old man." CI-2 replied, "Yes, I'll pass by at 2 p.m." Because these were iMessages that did not appear on the pen

register; however, agents verified they occurred by reviewing the text messages and observing MORALEZ's phone number was included on the messages, and the text message exchange between CI-2 and MORALEZ has been preserved. At approximately 2:07 p.m., case agents met with CI-2 and subsequently followed CI-2 to the Capitol Drive Shop. Case agents provided CI-2 with $1,000 in U.S. currency along with audio and video recording equipment. Based on my training, experience, and knowledge of the investigation, I believe MORALEZ texted CI-2 to confirm CI-2 was ready and available to conduct the drug transaction between MORALEZ and CI-2.

160.    At approximately 2:11 p.m., CI-2 called MORALEZ at TARGET TELEPHONE-2. During the call, MORALEZ stated, "I'm here in your... in your area." CI-2 replied, "Oh, so then, then... should I go back over there? Go over there?" MORALEZ questioned CI-2 if CI-2 was going to meet MORALEZ at the Capitol Drive Shop. CI-2 advised, "I'm already there--I'm on my way there already." MORALEZ stated, "Oh, okay. Oh, well, I'll be there shortly." The two parties then agreed to conduct the drug transaction at the Capitol Drive Shop. Based on my training, experience, and knowledge of the investigation, I believe that during the intercepted conversation between CI-2 and MORALEZ both parties agreed to meet at MORALEZ' Capitol Drive Shop to conduct the drug transaction.

161.    At approximately 2:42 p.m., case agents observed CI-2 arrive at and enter the Capitol Drive Shop. Within the same timeframe, case agents observed ROA exit the front passenger side of the previously documented Cadillac Escalade. On the recording/monitoring device, case agents heard MORALEZ tell CI-2 that the drugs were in the bathroom where the toilet paper is located. MORALEZ further told CI-2 to leave the money in that same location. CI-2 entered the bathroom and was heard shutting the bathroom door. Case agents then heard CI-2

64

exiting the bathroom and bidding farewell to MORALEZ. At approximately 2:48 p.m., CI-2 exited the shop, walked back to the vehicle, and drove from the location, surveilled by agents.

162.     CI-2 was followed to a pre-determined meet location. Upon arrival, CI-2 provided a clear plastic freezer bag containing suspected cocaine to law enforcement.  CI-2 informed case agents that MORALEZ told CI-2 to go to the bathroom and that the cocaine would be inside the roll of toilet papers. MORALEZ instructed CI-2 to leave the money in the same location. Case agents subsequently searched CI-2 and CI-2's vehicle for any drugs, money, weapons, or other contraband and did not locate any.  CBP Lab analysis determined MORALEZ and ROA provided approximately 27.9 grams of cocaine to CI-2.

### MORALEZ and HERNANDEZ-RAMIREZ Discuss Preparing Drugs for Future Distribution and Drug Inventory on December 10, 2024

163.     On December 10, 2024, at approximately 5:13 p.m., MORALEZ, using TARGET TELEPHONE-2, received a call from (414) 514-███, used by HERNANDEZ-RAMIREZ. During the intercepted conversation, MORALEZ said, "Hey mother fucker."  HERNANDEZ-RAMIREZ replied, "Hey bitch."  MORALEZ said, "Hey bitch."  HERNANDEZ-RAMIREZ asked, "What's up?  When are we going to make the shoes, today or tomorrow?"  MORALEZ replied, "No, tomorrow, brother."  HERNANDEZ-RAMIREZ replied, "Okay."  MORALEZ explained, "Yes, I, uh…I am busy today, brother."  HERNANDEZ-RAMIREZ acknowledged, "Okay."  MORALEZ asked, "Do you still have shoes?"  HERNANDEZ-RAMIREZ affirmed, "Yes, yes."  MORALEZ said, "Okay, no, I still have shoes for today."  HERNANDEZ-RAMIREZ replied, "Yes, yes."  MORALEZ said, "Uh…yes, but I think that by tomorrow or the day after, then it's an emergency, tomorrow or the day after."  HERNANDEZ-RAMIREZ replied, "Okay." Later in the same conversation, HERNANDEZ-RAMIREZ said, "Okay then.  So then, so I think

65

that for tomorrow, right?" MORALEZ agreed, "Yes, tomorrow, bro." HERNANDEZ-RAMIREZ asked, "For, for the shoes, too? Okay." MORALEZ replied, "Yes. Yes, that's fine. You come here early, and then we will leave early from there to do it." HERNANDEZ-RAMIREZ agreed, "Oh, of course. Yes. Yes." MORALEZ commented, "Yeah, like we did last time." HERNANDEZ-RAMIREZ confirmed, "Of course." MORALEZ acknowledged, "Alright, bitch." HERNANDEZ-RAMIREZ agreed, "Alright, we'll do it that way." MORALEZ said, "Alright then." HERNANDEZ-RAMIREZ replied, "Alright."

164.    Based on my training, experience, and knowledge of the investigation, I believe MORALEZ and HERNANDEZ-RAMIREZ discussed whether HERNANEZ-RAMIREZ had enough of an unknown type of drug to sell ("Do you still have shoes?). I believe MORALEZ and HERNANDEZ-RAMIREZ further discussed when and where to prepare an unknown amount and type of drug for future distribution. Based on my training and experience I know "shoes" is a code MORALEZ and HERNANDEZ-RAMIREZ use for an unknown type of drug.

*MORALEZ and HERNANDEZ-RAMIREZ Discuss Narcotics Supply and Distribution on December 26, 2024*

165.    On December 26, 2024, at approximately 7:05 p.m., (414) 514-███, used by HERNANDEZ-RAMIREZ, called TARGET TELEPHONE-2. During the intercepted call, HERNANDEZ-RAMIREZ asked MORALEZ, "All right, all right. And how are you on shoes?" MORALEZ replied, "Yeah. Oh, man! We're on a break, but... the thing is right now we don't have shoelaces for the footwear." HERNANDEZ-RAMIREZ replied, "Oh, damn! That's fucked up." MORALEZ stated, "Yes, so, uh... tomorrow, we'll see if he can arrange something. Yes, because right now we're really dry." HERNANDEZ-RAMIREZ responded, "Oh, damn." MORALEZ continued, "And I tell you, brother... uh... ..but of the other kind, we're good. Of everything-- everything else we're fine." HERNANDEZ-RAMIREZ stated, "Yes, man. Well, yes.

I... I'll be needing some shoes in a little while. Fucking whatever I can come up with." MORALEZ asked, "You wa... you want another four (4)?" HERNANDEZ-RAMIREZ asked, "Huh?" MORALEZ reiterated, "You want another four (4)? Ahhh! [Laughs]." HERNANDEZ-RAMIREZ stated, "That guy! Don't fuck around! I still have three and a half (3 1/2)." MORALEZ replied, "Oh, damn!" HERNANDEZ-RAMIREZ stated, "It's been a bit slow." MORALEZ responded, "Oh, hell yeah. No, you'll see."

166.    Based on my training, experience, and familiarity with this investigation, I believe that HERNANDEZ-RAMIREZ and MORALEZ discussed arrangements for additional narcotics, and they also discussed the lack of business around this time of year.

_UM2563 (a/k/a "PUPPY") Requests Cocaine from MORALEZ on January 1, 2025_

167.    On January 1, 2025, at approximately 7:11 a.m., TARGET TELEPHONE-2 received a series of text messages from (414) 333-███ (UM███ a/k/a "Puppy") stating, "Happy New Year," followed by, "Is there anything?" followed by, "Of the white?" and finishing with, "They need."

168.    Based on my training, experience, and knowledge of the investigation, UM███ (a/k/a "Puppy") asked MORALEZ if MORALEZ had cocaine ("Of the white") for an unknown third-party ("They need"). I am also aware, based on my training and experience, that "white" is often used by drug traffickers as a code word for cocaine. Furthermore, your affiant believes UM███ (a/k/a "Puppy") is involved in the distribution of drugs because he is asking for cocaine to supply to another.

169.    For example, on December 30, 2024, at approximately 4:22 p.m., TARGET TELEPHONE-2, used by MORALEZ, received a call from (414) 333-███, used by UM███ (a/k/a "Puppy"). During the intercepted call, MORALEZ asked, "What's up, Puppy?" PUPPY

responded, "What's up, son?" MORALEZ said, "You get lost for seasons at a time." PUPPY replied, "No, you know, I'm here hustling all over the…United States." MORALEZ laughed, "What's happening?" PUPPY stated, "Well, ready. There's water there now." MORALEZ asked, "There's water there?" PUPPY confirmed, "There's water now for you all to drink." MORALEZ asked, "Oh, you already got it?" PUPPY stated, "Uh-huh. And, uh [Stammers]…oh, Danny, no, it's sugar. This shit is really…you know." MORALEZ replied, "It's bitching." PUPPY responded, "It's whole, man." MORALEZ exclaimed, "Oh, my!" PUPPY confirmed, "Hell, yeah!" MORALEZ asked, "How much is the ticket?" In English, PUPPY responded, "Big chunks! Big chunks!" MORALEZ asked, "Oh, yeah?" PUPPY said, "Uh-huh! Danny…they say that about me, 'PUPPY knows!'" Laughing, MORALEZ replied, "Oh, my!" PUPPY responded, "No, well, yeah, theirs is some there now." MORALEZ said, "Yeah? Oh, man. No, well, uh, I just got some yesterday, man, a whole bunch." PUPPY asked, "Oh, it's already there?" MORALEZ replied, "Yes, man." PUPPY said, "The truth is, Danny, yes [U/I] is very fashionable. It's looks like sugar, man." MORALEZ answered, "Well, yes, man. What good is having it really whole if it doesn't work." PUPPY replied, "Oh, Danny."

170. PUPPY continued, "I even went to Jalisco for it, you know." MORALEZ exclaimed, "Oh, man!" PUPPY confirmed, "Yeah." MORALEZ said, "You're exaggerating, Puppy." PUPPY replied, "Los Altos…Los Palos Altos from Jalisco had it." MORALEZ laughed, and PUPPY continued, "No, yeah, there is some there, there, in case you are interested. Let me know…if you want to see it or something." MORALEZ replied, "We'll see, man. I'm gonna let you know." PUPPY concluded, "All right, then." MORALEZ stated, "All right, Puppy."

171. Based on my training, experience, and knowledge of the investigation, PUPPY called MORALEZ and explained that PUPPY had recently acquired a large quantity of narcotics,

68

of good quality, and further inquired whether MORALEZ was interested in seeing it and possibly making a purchase. MORALEZ questioned PUPPY about the price, "How much is the ticket?" Thus referring to the cost of the narcotics. MORALEZ commented, "What good is having it really whole if it doesn't work." Based upon my training and knowledge of the investigation, MORALEZ, in this statement, referred to the benefit of breaking down a good quality kilogram ("really whole") of narcotics to maximize sales and profit.

### Luis QUINONEZ-HERNANDEZ (TARGET TELEPHONES – 3 and 5)

172.    Luis QUINONEZ-HERNANDEZ, also known as "Luis QUINONES," "Luis Gabriel QUINONEZ," and "Primo," is a Hispanic male born in the United States on ████ 1989.  QUINONEZ-HERNANDEZ's residence is 22██ E. Avenue R 10, Palmdale, California. QUINONEZ-HERNANDEZ is the user of TARGET TELEPHONE-3.  QUINONEZ-HERNANDEZ is also the user of (818) 478-████ (i.e., TARGET TELEPHONE-5). According to wire interceptions over TARGET TELEPHONE-2, QUINONEZ-HERNANDEZ is a narcotics source-of-supply and collects narcotics proceeds on behalf of unknown individuals in Mexico. The investigation to date has further identified QUINONEZS-HERNANDEZ as a kilogram quantity cocaine source-of-supply for SANCHEZ-GONZALEZ and PEREZ-SANTANA. Intercepted communications have also shown that QUINONEZ-HERNANDEZ has narcotics related communications with MORALEZ. Pen register and trap and trace data from May 2025 has further shown that TARGET TELEPHONE-3, used by QUINONEZ-HERNANDEZ, communicates with (414) 530-████, used by Equiel MEDINA-RODGRIGUEZ.

173.    On November 20, 2024, at approximately 6:52 p.m., TARGET TELEPHONE-2 placed a call to (747) 724-████ (i.e. TARGET TELEPHONE-3), used by QUINONEZ-HERNANDEZ. During the call, the parties greeted, and MORALEZ asked, "Hey, I was going to

69

say, uh…hey, uh…[stammers]…do you have the cold here now. The cold ones?" QUINONEZ-HERNANDEZ answered, "Uh, uh, how—how many, cuz? How many?" MORALEZ replied, "Yes, a friend of mine called, and he wants a pair, but he wants it right now, he says." QUINONEZ-HERNANDEZ stated, "Ooh, no, cuz. I may arrive, not tomorrow, Friday, cuz." MORALEZ asked, "On Friday?" QUINONEZ-HERNANDEZ answered, "For sure, eh?" MORALEZ replied, "Oh, fuck." QUINONEZ-HERNANDEZ admonished MORALEZ saying, "You should have let me know, and the guy would have brought it over." QUINONEZ-HERNANDEZ continued, "He called me a little while ago, ['Are you going to need anything over here, bro?']." QUINONEZ-HERNANDEZ further informed MORALEZ that he (unknown drug courier) would be returning on Friday. QUINONEZ-HERNANDEZ continued, "I have them for you, cuz. I have them for you. Just let me know. Let me know when you are ready with the document (i.e., money) and everything so that." MORALEZ stated, "All right. No, well, I will let the guy know and see—and see what he says." QUINONEZ-HERNANDEZ responded, "With a little notice, two (2) or three (3) days before; a couple days before you need them, and then we will do it for you right away." MORALEZ stated, "And that's why they're looking for it right now." QUINONEZ-HERNANDEZ replied, "Let me know, and I will have them there quickly. I'll have the kid bring it down Sunday." MORALEZ asked, "Or, or if…or if he fronts me the money, do you think I could go up there to the Winds (i.e., Chicago)?" QUINONEZ-HERNANDEZ replied, "Yes." QUINONEZ-HERNANDEZ continued, "Yeah, he went to Minnesota, and that's what he told me. That's why I was asking you…" Both parties agreed to further discuss the possible narcotics transaction the following day with MORALEZ stating, "Yeah, yes, tomorrow will be fine. I'll tell him that it can still happen."

70

174.     Based on my training, experience, and knowledge of the investigation, I believe that MORALEZ asked about purchasing "a pair," two (2) kilograms of narcotics, for an unknown third party. QUINONEZ-HERNANDEZ informed MORALEZ that the narcotics courier had already passed the Milwaukee area, enroute to Minnesota ("Yeah, he went to Minnesota,") as MORALEZ had not communicated with QUINONEZ-HERNANDEZ early enough regarding the purchase of the narcotics. I also believe that when MORALEZ asked "Or, or if…or if he fronts me the money, do you think I could go up there to the Winds (i.e., Chicago)," MORALEZ inquired about having his (MORALEZ's) drug customer provide MORALEZ with the U.S. currency prior to the customer's receipt of the narcotics.  To this end, it would enable MORALEZ to meet with QUINONEZ-HERNANDEZ and immediately provide QUINONEZ-HERNANDEZ with payment for the drugs. QUINONEZ-HERNANDEZ informed MORALEZ that he could possibly obtain narcotics in the coming days and reminded MORALEZ to give a two (2) or three (3) day notice next time to guarantee the availability of the narcotics.

175.     On December 5, 2024, at approximately 7:32 p.m., TARGET TELEPHONE-2 received a call from TARGET TELEPHONE-3, used by QUINONEZ-HERNANDEZ. During the call, the parties greeted each other, and QUINONEZ-HERNANDEZ asked, "That's all. Of which one, buddy? Of which one?" MORALEZ responded, "Well, buddy, right now I would say whatever there is, buddy." QUINONEZ-HERNANDEZ stated, "Yes." MORALEZ continued, "Uh-huh. Uh…there isn't—there isn't any of that material for . . . uh, the windows. But, well, uh, the other kind, buddy? What number is it at right now?" QUINONEZ-HERNANDEZ answered, "Honestly, it's at seventeen and a half (17.5), buddy."  MORALEZ responded, "Yeah? Okay, okay." QUINONEZ-HERNANDEZ confirmed, "Yes that's right." MORALEZ stated, "But let me tell him and see if we can go another five hundred (500) or so. We'll see if he is willing, buddy."

QUINONEZ-HERNANDEZ told MORALEZ to let him (QUINONEZ-HERNANDEZ) know and QUINONEZ-HERNANDEZ would "come by in a flash." MORALEZ asked, "Yeah. Yeah, and—and if he' s willing tomorrow, will you come by then?" QUINONEZ-HERNANDEZ replied, "Tomorrow? [Sighs] Give me until the day after tomorrow. The, the… [mumbles to self]… what's tomorrow?" MORLAEZ answered, "Yes, tomorrow is already Friday, buddy." QUINONEZ-HERNANDEZ responded, 'That's the problem, buddy." MORALEZ confirmed, "Yes, it's needed by tomorrow." QUINONEZ-HERNANDEZ stated, "Well, let me know." MORALEZ replied, "Let me confirm if for you right now, and it's a yes, so it can be done."

176.   Based on my training, experience, and knowledge of the investigation, QUINONEZ-HERNANDEZ contacted MORALEZ about the status of the sale of narcotics to MORALEZ, for an unknown third party. QUINONEZ-HERNANDEZ advised MORALEZ that the price for the unspecified narcotics was currently $17,500. MORALEZ informed QUINONEZ-HERNANDEZ that he (MORALEZ) would contact the third party to see if the third party was willing to pay the $17,500 in exchange for the drugs.

177.   On December 9, 2024, at approximately 1:47 p.m., TARGET TELEPHONE-2 received a call from TARGET TELEPHONE-3, used by QUINONEZ-HERNANDEZ. During the call, the parties greeted each other, and QUINONEZ-HERNANDEZ asked, "Hey, your friend wasn't interested after all?" [Referring to the previously discussed narcotics transaction involving the unknown third party]. MORALEZ asked, "Oh, with the windows?" QUINONEZ-HERNANDEZ stated, "No, with the other one!" MORALEZ replied, "Oh . . . no, to be honest, a guy showed up here selling them for sixteen (i.e., $16,000) buddy." QUINONEZ-HERNANDEZ asked, "For sixteen (16)?! Oh, fuck." MORALEZ explained, "Yeah. Yeah, yes, just one seasonal, that's all." MORALEZ continued, "Well, yeah, I'm saying, if something comes up, I'll let you

know right away." QUINONEZ-HERNANDEZ asked, "Okay, then, buddy. And what's the word on the other ones? Nothing?" MORALEZ responded, "Yes. Well, uh…well, when I needed it, you didn't tell me anything else after that." QUINONEZ-HERNANDEZ stated, "Yeah. The thing is, I was calling the guy, and he never answered. He took about two (2) days, and then after that, I said ["No, well, there's no reason to call the buddy anymore."]" MORALEZ commented, "Yeah. No, well, also…I need that too." QUINONEZ-HERNANDEZ replied, "Let me know. Let me know ahead of time. Let me know about two (2) or three (3) days beforehand, and I'll have them ready for you."

178. Based on my training, experience, and knowledge of the investigation, I believe QUINONEZ-HERNANDEZ again inquired about the sale of narcotics to MORALEZ. MORALEZ advised that either MORALEZ or the third party (unspecified in the call) would be able to obtain the narcotics for $16,000; however, the $16,000 reflected a one-time price for "just one season." Based on my training, experience, and knowledge of the investigation, I also believe that MORALEZ and QUINONEZ-HERNANDEZ further discussed a different narcotic. QUINONEZ-HERNANDEZ advised MORALEZ to provide two to three days' advance notice, so QUINONEZ-HERNANDEZ would have enough time to obtain the narcotic for MORALEZ.

179. On December 17, 2024, at approximately 10:45 a.m., TARGET TELEPHONE-2, used by MORALEZ, received a call from TARGET TELEPHONE-3, used by QUINONEZ-HERNANDEZ. During the intercepted call, MORALEZ said, "Hey, cuz, what's up." QUINONEZ-HERNANDEZ replied, "Cuz, good morning, how are you?" MORALEZ stated, "Only here, at work." QUINONEZ-HERNANDEZ answered, "What else is there to do, cuz. Hey bro, eh, eh, by any chance, is that I'm here nearby you." MORALEZ replied, "Uh huh." QUINONEZ-HERNANDEZ asked, "Well, I wanted to ask, do you know a guy from Zacatecas?

73

His name is George." MORALEZ asked, "George?" [audio breaks] MORALEZ repeated, "Um, George Medina?" QUINONEZ-HERNANDEZ replied, "Yes, Medina, something like that. He's from there, from the Portillo, I think." MORALEZ clarified, "Portillo? Portillos." QUINONEZ-HERNANDEZ replied, "Portillos, Portillo. I don't know. Portillos." MORALEZ said, "Yes, my, um, I don't know him, but my girlfriend says she does." QUINONEZ-HERNANDEZ asked, "Yes. And do you know if he's around? The other day, he owes me some little money and a document. And, I, I don't know what to do. He turned off the phone, and I don't know anything about him." MORALEZ responded, "Uh. Oh, okay. Ummm, well, yeah. I kind of know who he is." QUINONEZ-HERNANDEZ asked, "[Stammers] Where I can find him to go and ask him to see what's up?" MORALEZ replied, "Ummm. Fucking shit, cuz. [aside to Andrea, MORALEZ's girlfriend, "Look, do you know where he lives?"]. I can find out for you, cuz , because I don't, I don't know the guy, but, but I can find out more less and tell you where he lives." QUINONEZ-HERNANDEZ responded, "That's great, man. I need to see what's up with him, because, well, he turned his phone off and we have a pending document, and, to be honest." MORALEZ, replied, "Ah." QUINONEZ-HERNANDEZ continued, "I'm still looking from him. But I don't want to go to the dealer. I think from his brother-in-law, something like that, they told me he's his brother-in-law, that guy." MORALEZ stated, "Uh-huh." QUINONEZ-HERNANDEZ continued, "No, no, I don't want to go ask there, so, so I would like to go where he lives." [Voices overlap] MORALEZ stated, "Yeah." QUINONEZ-HERNANDEZ said, "...lives, go ask him and see what's going to happen." [Voices overlap] MORALEZ stated, "Yes, yes because the dealer, I do know where the dealer is at." QUINONEZ-HERNANDEZ replied, "Yes, the dealer, I think so. They sent me the location of where the dealer is at." MORALEZ explained, "Yes, at Thirteen (13th) …. at Thirteen (13th) and Oklahoma, nearby." QUINONEZ-HERNANDEZ confirmed, "Oklahoma, yeah, right.

74

What was I going to say? Eh. Here we are, cuz . Can you give a hand? Can you give me a hand from today to the weekend, to see if something pops out?" MORALEZ replied, "Yeah, fucking shit, cuz."

180. QUINONEZ-HERNANDEZ continued, "I am going to give it to you for cheap, cuz, for real. I am going to give it to you at Sixteen and a half (16 1/2) for you, so that you can make some money." MORALEZ replied, "Mm-hm." QUINONEZ-HERNANDEZ said, "Sixteen and a half (16 1/2), to come back, if you can give me a hand, at least with one." MORALEZ affirmed, "Yes." QUINONEZ-HERNANDEZ stated, "I have a hand, but, the truth." [Voices overlap] MORALEZ said, "Fucking shit, cuz. Look, I have the shop, and everything, so, I can... I can sell it for you, but you will have to 'machetearlo' [chop it off], uh, in pieces." QUINONEZ-HERNANDEZ answered, "Oh, I see. Yes." [Voices overlap] MORALEZ continued, "Uh-huh, if you give it to me like that, I can get it out." QUINONEZ-HERNANDEZ replied, "Yes, but, if you get it as a whole, well yeah, cuz. But you see that I am not [Stammers] coming back, and then I'm leaving Monday to my town, over there in Jalisco and I come back until the sixteen of January, after my birthday, I come back like the twenty-one (21) or twenty-two (22) of January." MORALEZ said, "Oh, Uh. If you want to leave it by the time you come back, I will have your money, cuz." QUINONEZ-HERNANDEZ replied, "No but, that's the problem." [Voices overlap] MORALEZ asked, "You need money then?" QUINONEZ-HERNANDEZ explained, "Eh, no. The thing is that the guy from the 'terreno' [LAND] needs the document." [Voices overlap] MORALEZ replied, "Uh-huh." QUINONEZ-HERNANDEZ replied, "…Going down, well. He's let me borrow." [Voices overlap] MORALEZ replied, "Yeah." QUINONEZ-HERNANDEZ clarified, "…but I have to come back with the document." [Voices overlap]

75

MORALEZ replied, "Yes." QUINONEZ-HERNANDEZ said, "He's from there, from, from Culiacan, the one that has me on 'jaque' [under pressure or threat], no shit."

181. MORALEZ stated, "Yeah." QUINONEZ-HERNANDEZ explained, "If it was up to me, there's no problem, [U/I] line. I'll leave it to you, so that you can work it." MORALEZ replied, "Yeah. The truth is, yeah, that if I bought it, yes, but right now, I just bought a mechanic shop of a million ($1,000,000) dollars." QUINONEZ-HERNANDEZ responded, "That's fucking good." MORALEZ replied, "I was left…I'm not investing, then. I'm not investing on phones, then. Only, on what I have." [Voices overlap] QUINONEZ-HERNANDEZ confirmed, "Yes, yes, yes." MORALEZ replied, "The way that . . . the way that it is coming out." [Unintelligible response from QUINONEZ-HERNANDEZ] MORALEZ said, "Uh-hu. But, yeah, I'm not investing. I'm not investing so much." QUINONEZ-HERNANDEZ replied, "Oh, I see." MORALEZ continued, "That is the problem. But if I get them out, I'll get it out." QUINONEZ-HERNANDEZ said, "No, well, no." [Voices overlap] MORALEZ continued, "And I would like…" QUINONEZ-HERNANDEZ said, "Let's get it out, cuz, let's get it." MORALEZ replied, "And I would like. And I would like that you come and visit me, so that you can see my shop, right. So that you can see that I am not any 'monkey'."

182. QUINONEZ-HERNANDEZ responded, "Any- Any of these days, cuz, go pick me up, and we can have and grab a taco, so that we can get to know each other well." MORALEZ agreed, "Uh-hm." QUINONEZ-HERNANDEZ stated, "And then, like, I stay at hotels and all that, be paying and at a hotel and all, cuz, I don't like it." MORALEZ replied, "Hm, it's fucked up." QUINONEZ-HERNANDEZ continued, "That's why, only what I am going for. Almost, all the time I go with the order, then. They call me, and I go with the order, like 'hey, come and bring two (2) or come with three (3).' That way I can get together like six (6) or seven (7) and then I go.

76

But then, you see, this fucker 'el rey', cuz, that guy sometimes has me under pressure and says, cuz 'man, bring one 'hand' and here I already have a client and I am going to move it, one guy needs two (2), one guy needs (3)." MORALEZ acknowledged, "Uh-hm." QUINONEZ-HERNANDEZ stated, "Then I get there, man, 'No, the guy that needed three (3) does not answer,' and this and that. No well, then you have me three or four days, its travel expenses, and it's everything, you understand me, cuz?" MORALEZ affirmed, "Yeah." QUINONEZ-HERNANDEZ explained, "It's be paying, and paying to be there, while it moves. That's why that day, there was nothing. I think the day that you needed it, the car…" MORALEZ replied, "Uh-hm." QUINONEZ-HERNANDEZ continued, "They called me early, and said 'Hey, we are going to need it, the Centauro called me,' the boss, that guy, and called me 'hey, I'm going to need one' and that's when he came and saw it and I saw how much they gave it to you and I said 'fucking abusers,' fucking shit. Later, they were bargaining to me, cuz." MORALEZ acknowledged, "Yeah." QUINONEZ-HERNANDEZ explained, "They were lowering it to me fucking bad." MORALEZ stated, "Yeah, no." QUINONEZ-HERNANDEZ continued, "And then they raised it to you, cuz." MORALEZ replied, "No, yeah [laughs] they gave me a beat up." QUINONEZ-HERNANDEZ said, "Yes, but…but it was good quality shit, cuz." [Voices overlap] MORALEZ confirmed, "Yeah, it was…" QUINONEZ-HERNANDEZ responded, "For real." MORALEZ affirmed, "Yes, that's right."

183.    QUINONEZ-HERNANDEZ stated, "That's why I'm telling you, cuz, I have it, I have it. If you can give me a hand, if you can make some calls or something, so that you can get one from me at least. [Laughs]." MORALEZ replied, "Right. Hmm, cuz." [Audio breaks] QUINONEZ-HERNANDEZ said, "If you stop later. I'm stuck here waiting to see what goes out." MORALEZ responded, "Well, let me see what I can do. Let me see what is there to do." QUINONEZ-HERNANDEZ replied, "Yes, cuz. If you have a chance in the afternoon, tomorrow,

the day after tomorrow or Saturday, or whenever you can. I have to go back Monday, cuz, because Monday..." MORALEZ affirmed, "Okay." QUINONEZ-HERNANDEZ stated, "At night, I have the…the trip over there to Jalisco. I take off to Jalisco." MORALEZ and QUINONEZ-HERNANDEZ continued to discuss when QUINONEZ-HERNANDEZ travels to Jalisco, Mexico, among other matters.

184. Based on my training, experience, and knowledge of the investigation, I believe QUINONEZ-HERNANDEZ and MORALEZ discussed, among other things, a purchase of a kilogram quantity of narcotics by MORALEZ from QUINONEZ-HERNANDEZ for the price of $16,500 [QUINONEZ-HERNANDEZ – "I'm going to give it (kilogram) for cheap, cuz, for real. I'm going to give it to you at sixteen and a half (16 ½) for you, so that you can make some money."]. I further believe that QUINONEZ-HERNANDEZ appeared to be willing to sell MORALEZ the narcotics at a discounted price, in exchange for the address of QUINONEZ-HERNANDEZ's drug customer "George Medina," whom QUINONEZ-HERNANDEZ explained owed him money [i.e., "little money and a document."]. MORALEZ indicated that he [MORALEZ] could sell the kilogram while QUINONEZ-HERNANDEZ was in Jalisco, Mexico, and give QUINONEZ-HERNANDEZ the drug proceeds upon QUINONEZ-HERNANDEZ's return from Mexico [MORALEZ – "Oh, uh, if you want to leave it (give MORALEZ the kilogram) by the time you come back (from Mexico) I will have your money, cuz."].

185. Based upon my training, experience, and knowledge of the investigation, I further believe that QUINONEZ-HERNANDEZ informed MORALEZ that MORALEZ's plan would not satisfy QUINONEZ-HERNDANDEZ's suppliers, ["Eh, no. The thing is that the guy from the 'terreno' (LAND) needs the document," (i.e., drug proceeds). "He's from there, from, from Culiacan, the one that has me on 'jaque' (under pressure or threat), no shit."]. QUINONEZ-

78

HERNANDEZ explained to MORALEZ that not only was he (QUINONEZ-HERNANDEZ) under pressure or threat to deliver drug proceeds to sources of supply in Mexico (i.e., Culiacan), but that QUINONEZ-HERNANDEZ was also under pressure to deliver the drug proceeds in an unspecified amount of time.

### December 24, 2024, Seizure of Two Kilograms of Cocaine Shipped by QUINONEZ-HERNANDEZ from West Allis, Wisconsin

186.    On December 18, 2024, United States Magistrate Judge Nancy Joseph, Eastern District of Wisconsin, authorized a GPS/E911 court order (see Case No. 24-949M(NJ)) over (747) 724-███ (i.e. TARGET TELEPHONE-3).   On December 18, 2024, E911/GPS data revealed TARGET TELEPHONE-3 was located in the area of Van Nuys, California.   On December 20, 2024, at approximately 8:10 a.m., E911/GPS data revealed TARGET TELEPHONE-3 was in the area of/or at, the Los Angeles International Airport (LAX).   On December 20, 2024, at approximately 1:40 p.m., E911/GPS data revealed TARGET TELEPHONE-3 was at the Chicago O'Hare International Airport (ORD).   Case agents continued monitoring E911/GPS data over TARGET TELEPHONE-3 that same day which placed TARGET TELEPHONE-3 in Milwaukee, Wisconsin.

187.    On December 19, 2024, the Honorable United States Magistrate Judge Nancy Joseph, Eastern District of Wisconsin, authorized a Pen Register and Trap and Trace (See App. No. 16566) over TARGET TELPHONE-3.

188.    Case agents monitored both E/911 and Pen Register data over TARGET TELEPHONE-3 and determined between December 19, 2024, and December 23, 2024, TARGET TELEPHONE-3 attempted to call TARGET TELEPHONE-2 approximately six times, which was corroborated by intercepted data over TARGET TELEPHONE-2.   Case agents believe MORALEZ, using TARGET TELEPHONE-2, did not have a completed call or text exchange

(incoming or outgoing) with TARGET TELEPHONE-3.  However, based on Pen Register data over TARGET TELEPHONE-3, TARGET TELEPHONE-3 had approximately 30 telephonic contacts with (414) 213-███ (Reynaldo SANCHEZ-GONZALEZ).

189.    Between December 19, 2024, and December 23, 2024, case agents attempted to locate TARGET TELEPHONE-3 based on E911/GPS data.  However, the GPS radius of TARGET TELEPHONE-3 generally produced too large of a radius for case agents pinpoint the exact location of TARGET TELEPHONE-3, at times contending with a radius of nearly 4,000 meters, or the equivalent of approximately 2.5 miles.  On December 24, 2024, at approximately 6:57 a.m., GPS data placed TARGET TELEPHONE-3 at the Milwaukee General Michell Airport.  On December 24, 2024, at approximately 3:26 p.m., GPS data placed TARGET TELEPHONE-3 in the vicinity of the Los Angeles International Airport.  Case agents conducted an analysis of GPS data and cell tower data and determined TARGET TELEPHONE-3 was likely at one of several hotels near a Milwaukee Veterans Affairs building.  On December 26, 2024, case agents issued a subpoena to the Best Western Plus, located at 5501 W. National Avenue, Milwaukee, Wisconsin.  Case agents requested all folio information for guests who provided a California identification upon registry on December 20, 2024, and who checked out of the Best Western Plus on December 24, 2024.  One registered guest matched the guest parameters: Luis Gabriel QUINONEZ.  A Best Western Plus employee provided case agents with the registration information provided by QUINONEZ-HERNANDEZ.    QUINONEZ-HERNANDEZ,    who    provided    the    email    address L.g████████@hotmail.com, telephone number (818) 478-███, and address 62█ Hazeltine Avenue, Van Nuys, California, 91401. Law enforcement queries of the address listed Luis Gabriel QUINONEZ with a corresponding date of birth of ██████ 1989, associated with the above address.  The Best Western Plus employee provided case agents with still images of QUINONEZ-

HERNANDEZ from the hotel's video surveillance. The photograph associated with California Department of Motor Vehicles for QUINONEZ-HERNANDEZ matched the surveillance images of QUINONEZ-HERNANDEZ at the Best Western Plus.

190. On December 24, 2024, case agents received information from an Ontario, California, police officer, who is also a HSI Task Force Officer and canine handler, indicating the officer seized a suspicious United Parcel Service (UPS) parcel while conducting interdiction operations at a UPS next day inbound sorting facility located in Ontario, California. According to the parcel's label, the parcel was shipped by "Alfredo Garcia," bearing a listed phone number of (818) 478-███ and address of 29██ S. 100th Street, West Allis, Wisconsin. The consignee was listed as "Ana Ortiz" at 10642 Haskell Avenue, Granada Hills, California. The parcel had assigned tracking number 1Z 180 9EF 15 7565 7540 and was shipped "UPS Early 1+," the most expensive method of UPS shipping. The cost to ship the parcel from West Allis, Wisconsin, to Granada Hills, California, was approximately $233.00.

191. Based on the officer's narcotics training and experience, the officer deployed canine "Pip." "Pip" alerted to the presence of narcotics in the parcel. The officer obtained a California State Search Warrant, signed by the Honorable Judge J. Wilkerson of the San Bernardino Superior Court of the West Valley District. After obtaining the search warrant, the officer opened the parcel and discovered two rectangular brick shaped objects that were double bagged with a black and brown grocery bag. The officer cut into one of the bricks which revealed a white colored powder inside. A sample from one of the bricks later field-tested positive for the presence of cocaine. The officer seized approximately two kilograms of suspected cocaine from the parcel.

192.    The drugs were subsequently sent to the CBP Lab for analysis. U.S. Customs and Border Protection (CBP) Laboratories and Scientific Services Directorate (LSSD) analysis determined a total net weight of approximately 2008.63 grams of cocaine HCL.

193.    On December 30, 2024, case agents spoke with the UPS employee who assisted with the parcel's mailing on December 23, 2024. According to the UPS employee, the shipper stated he was shipping Christmas decorations to California. The UPS employee stated that after assisting with the parcel, the shipper asked where he could get a haircut. The UPS employee offered the Sport Clips store located in the strip mall next to the UPS store. The UPS employee stated the shipper paid cash to ship the parcel and walked to the Sport Clips store. Case agents presented a photograph of Luis QUINONEZ-HERNANDEZ, and the UPS employee positively identified QUINONEZ-HERNANDEZ as the shipper of the seized cocaine.

194.    On December 30, 2024, case agents went to the same Sport Clips store where QUINONEZ-HERNANDEZ received a haircut. A Sport Clips employee provided the customer log from December 23, 2024, at approximately the time QUINONEZ-HERNANDEZ was in the store, to case agents. According to Sport Clips customer records, an "Alfredo G" registered for a haircut using (747) 724-███ (i.e. TARGET TELEPHONE-3).

**Equiel MARTINEZ**

*QUINONEZ-HERNANDEZ Discusses a Future Narcotics Shipment with MARTINEZ*

195.    EQUIEL MARTINEZ (also known as "24," "Raul Vidal MARTINEZ," and "Equiel MARTINEZ CID") is a Hispanic male born in Mexico on ████, 1985 (alternate date of birth lists ████, 1985). MARTINEZ is illegally present in the United States after previous immigration benefits expired and an application to adjust immigration status in 2018 was denied. According to California Department of Motor Vehicles Driver's License information,

MARTINEZ lists a home address of 14█ Lemay Street, Van Nuys, California. MARTINEZ is the user of telephone number (818) 614-█, subscribed to EL MEJOR TAXI at 14█ Erwin Street, Apartment █, Van Nuys, California. According to financial record queries, between approximately May 2018 and December 2024, approximately 102 financial transactions occurred under the name Equiel MARTINEZ with listed telephone number (818) 614-█ and associated with 14█ Erwin Street, Apartment █, Van Nuys, California. Although some transactions did not include the apartment number, they did include the name Equiel MARTINEZ and (818) 614-█. Furthermore, Facebook account number 1000934█████ lists the profile name of "Equiel Martinez Cid," and Business Owner profile status of, "El Mejor Taxi," which matches the subscriber's name for telephone number (818) 614-█. The photo depicted in the aforementioned Facebook profile matches the photo of the individual depicted in the California Driver's License for Equiel MARTINEZ. An immigration records photograph of MARTINEZ also matches the same individual depicted in both the aforementioned Facebook account and California Driver's License. MARTINEZ is also the known user of (818) 692-█. Indeed, during intercepted conversations over TARGET TELEPHONE-3 and (818) 614-█ and (818) 692-█, QUINONEZ-HERNANDEZ refers to the user of both telephone numbers as "24." A voice comparison analysis over intercepted calls between telephone numbers (818) 614-█ and (818) 692-█, determined the voice of the user of both cellular phone numbers are the same individual. According to the MARTINEZ's criminal history records, a type of employment listed is Taxi Driver.

196. On January 18, 2025, at approximately 6:17 p.m., TARGET TELEPHONE-3, used by QUINONEZ-HERNANDEZ, contacted (818) 692-█, used by MARTINEZ. During the call, the parties greeted each other, and QUINONEZ-HERNANDEZ stated, "Man?" MARTINEZ

83

replied, "Mm-hmm?" QUINONEZ-HERNANDEZ related, "He wants to send ten (10)-- a hundred (100). A hundred (100). A hundred (100) devices over there, to the Kangaroo, man." MARTINEZ stated, "Uh-huh." QUINONEZ-HERNANDEZ continued, "All the way to the Kangaroo, man. Over, over you know where?" MARTINEZ replied, "Yes." QUINONEZ-HERNANDEZ stated, "Where the Kangaroo come from, man. And he says, man, and for every fifty (50) they place, man, for every (50) the place – we're going to start with ten (10), man. But for fifty (50), he's going to give me sixty thousand bucks ($60,000), man." MARTINEZ acknowledged, "Uh-huh." QUINONEZ-HERNANDEZ continued, "For, for, for, for the one hundred (100), he's going to give me a hundred and twenty (120). But I asked him for eighty (80), man. I told him, 'No. Don't fuck around, man.' Over there, honestly, I told Prieto, 'Honestly, over there, man, they're at forty-five bucks ($45) each one, man.' It's a fucking shitload of money. How much is your buddy going to pay for us here? How much is he going to give us? You fucking kidding me. He wants to give us a thousand bucks ($1,000) for each one, Prieto. No. Honestly, I want one thousand eight hundred (1,800), two thousand (2,000). If it's at least one thousand five hundred (1,500) we go for it. I'll just charge six hundred (600) to eight hundred (800), right inside here. And he told me, 'Well, I need for you to start moving,' he told me. 'I'm going to talk to him, but you, don't abuse it,' he told me, 'Because we're just starting.' He told me, 'And if everything goes well, there's going to be work there [Stammers] for, for the entire year.' He says, 'As long, as long as you show up.' He says. 'As long as you show up, man,' he says, 'I told him that you had a way, with your buddy and all,' he says. But he says, man, that there over at Kangaroo's, 'it has to be by, by DHL, man.'" MARTINEZ confirmed, "Yes."

197.    QUINONEZ-HERNANDEZ continued, "That it has to be by DHL, man. That only DHL does deliveries over there." MARTINEZ commented, "Oh shit." QUINONEZ-

HERNANDEZ stated, "[Sighs] I told him, 'I don't think so.' I said to him, 'This shit is global,' I told him. How can you believe it, man? He told me, 'Well, fine.' I spoke to him, and he tells me that the one who delivers at the town, is only DHL. [Pause] [Sighs] He says, 'I made it at twenty-four (24) so that [U/I] ---.'" MARTINEZ responded, "I don't believe that. Federico is [Audio Breaks] badass." QUINONEZ-HERNANDEZ replied, "Well, that what I thought, man. No, but he says, he, he already told me. He told me, 'Look, let me talk to my buddy. I know what [Audio Breaks].' And I know that it's true. Because I said, 'Don't fucking kid me.' [Muffled] [Audio Breaks] 'Where doesn't that shit go? It goes anywhere. It arrives anywhere.' I told him, 'It arrives to the fucking corners of Africa.' You see that on TV. He told me, he told me, 'I know, but let me talk to my buddy and see if there's another way.' 'All right, then,' I told him, 'I prefer the other one.' I said, 'All right, then.' And then he told me, he called me, and told me, 'No. My buddy says that it has to be with the other one,' by the D-S, that one that I just told you about." MARTINEZ acknowledged, "Mm-hmm." QUINONEZ-HERNANDEZ stated, "Huh?" The call was subsequently terminated.

198. Based my training, experience, and knowledge of the investigation, I believe QUINONEZ-HERNANDEZ explained to MARTINEZ the shipping arrangements made with the Mexico based source(s) of supply regarding the receipt of the narcotics laden shipment(s) that would eventually be reshipped to Australia, ["there over at Kangaroo's"] via DHL (i.e., a shipping company). QUINONEZ-HERNANDEZ further discussed distribution quantities and potential narcotics proceeds that were offered/negotiated with QUINONEZ-HERNANDEZ. Based upon my training, experience and familiarity with the investigation, I believe QUINONEZ-HERNANDEZ is referring to cocaine because the per kilogram price corresponds to the price of a kilogram in Australia ("45 bucks each") - $45,000 per kilogram of cocaine.

85

199.    On January 18, 2025, at approximately 6:20 p.m., QUINONEZ-HERNANDEZ, using TARGET TELEPHONE-3, called (818) 692-███, used by MARTINEZ. During the call, the conversation continued, and QUINONEZ-HERNANDEZ stated, "They have made them liquid, and everything, dude. No, he says that it's well checked, dude, well checked, dude." MARTINEZ stated, "Uh." QUINONEZ-HERNANDEZ continued, "He also says that, he says, 'We are going to figure out the way you do it,' he told me. And then I told him, 'Nothing has ever fallen over here.' I told him, 'I have never dropped anything over here, only this one time that it happened'. [Sighs] [Clears Throat] And he tells me, 'Well, we are going to figure it out, but we are going to start with ten (10). If ten (10) go without an issue, then you can start. How much is the max you can put in one (1) box?' And I told him, 'I think that I can put around fifteen (15), twenty (20) if I am able to assemble them right in a box.' I told him, 'Remember that we have to pay here and there, but if it's going to be via DHL, dude, how am I going to tell them that I'm going to pay the, the UPS warehouse guy?'" MARTINEZ chuckled, and QUINONEZ-HERNANDEZ continued, "How am I going to tell him, he is going to say, 'No way'. It's not like you know someone at DHL, dude." MARTINEZ commented, "Look at you, influencer. [Chuckles]." QUIONONEZ-HERNANDEZ stated, "But, but there's no problem, dude.  I already told him one thousand five hundred (1,500) at least, dude. No way, that's fine, dude. Just alone for ten (10) it's fifteen thousand (1,500), dude. No way. For, for twenty (20), it's twenty-five thousand (25,000), imagine, dude?" MARTINEZ agreed, "Yes." QUINONEZ-HERNANDEZ stated, "Nah, yes, dude. I told him that... because he told me that he wanted to give me sixty (60), dude, for fifty (50). He said, 'Look, my buddy will give you sixty (60).' He said. 'That's as much as he can do.' That ends up being about one thousand two hundred (1,200), dude.  But I asked him for another five hundred more (500), dude.  I told him, 'Nah, honestly, Prieto. At least one thousand seven hundred

(1,700), one thousand eight hundred (1,800), yes.' I told him. 'Don't give me that shit, they are about forty-five (45) over there.' He said, 'No, you're crazy,' he said. 'Nah.' He said. 'Yes, they are about thirty (30), thirty-five (35), but not at forty-five (45).' I told him, 'Imagine, Prieto, over there, over there in Mexico, they are about eight thousand (8,000), six thousand (6,000) right now.' I told him." MARTINEZ responded, "Uh-huh."

200.    QUINONEZ-HERNANDEZ continued, "But he told me, 'Now, dude!' He said, 'You have to get ready now.' He said, 'Now!'" MARTINEZ replied, "Well, you are ready." QUINONEZ-HERNANDEZ answered, "I am ready, dude, but I'm going to need some help, too, dude, no way. No, I'm not going to be able to do that much, and that they need to be really, really, really good, dude. And besides, twenty-four (24) of that shit, we have to [U/I], no way. I could almost tell you that we should wear... we should even wear a special suit and shit, shave our heads bald, to hell. [Chuckles]." MARTINEZ asked, "Why?" QUINONEZ-HERNANDEZ answered, "Why? Well now way, dude, that shit is... whatever DNA, whatever, even a thin hair of something, whatever, you never know. [Pause] Well, with you, what? You are a ghost over here, fuck it, but I..." MARTINEZ stated, "You are an idiot. What ghost? [U/I]..." QUINONEZ-HERNANDEZ commented, "Hey already have my fingerprints over there when I got caught with the credit cards that they wanted to give me a felony. That they made me give my fingerprints, blood and everything, dude. But then the lawyer took the felony away for me and turned it into a misdemeanor, but nonetheless, they got my fingerprints and everything, dude." MARTINEZ responded, "Me, too. I was also in jail, dude."

201.    QUINONEZ-HERNANDEZ asked, "But so what, no way. What, oh... they also got your fingerprints on record, right?" MARTINEZ responded, "Yes, dude, no bullshit." QUINONEZ-HERNANDEZ stated, "Mmm... But that's why I'm telling you. But, 'Now, dude,'

that guy told me, 'Now.' He said, 'If you can, if you can do...,' oh, oh dude, something else, too. Those dudes are going to send it via... it's because he says they're going to send it in a machine, dude, the fifty (50). In a machine. I don't know how big the machine is or how that shit is arranged, but he says it comes from Mexico in a machine, dude. That shit, and that--that he wants an address to send that shit to, dude." MARTINEZ replied, "Oh shit." QUINONEZ-HERNANDEZ stated, "That's what he told me, dude. He said, 'That shit is going to arrive hidden really well in a machine, dude.' Said, 'And I need you to give me an address to send that shit, but as soon as possible so I can send it to my buddy.' [Clears Throat] And then Ramiro called me as well, dude. That there's this dude that has to pay him thirty thousand (30,000) bucks. And I called the dude. He is over at Whittier [PH], and the dude told me that he was going to try to get ten thousand (10,000) bucks now. And Ramiro told me, 'Buddy, if you do me a favor, I will give you two thousand (2,000) bucks.' [Smacks Lips] 'Ah,' I told him, 'But for real, man, because you've already told me, told me that he's been saying the same thing to you for two (2), three (3) weeks.' Well, he said that today, today, today. That today, as soon as he closes the place, since he closes at six (6:00) in the afternoon, and he is going to see how much he can gather for me. I asked him for ten thousand (10,000) bucks. He said, 'If he gives me ten thousand (10,000), and you do me a favor to send them to me over here in Mexico, I will give you two thousand (2,000) bucks and you send me eight thousand (8,000).'" MARTINEZ responded, "Oh." QUINONEZ-HERNANDEZ continued, "That's good, buddy. I told him. 'Honestly, I will do you a favor.' I told him. 'Yes, I need the money.' He said, 'Honestly. No,' he said, 'Well, we all, listen, we all need money.' And [U/I], dude. Honestly, I'll tell you how I feel. I, I stressed myself too much to the neighbor [PH]. [Chuckles]."

202.    MARTINEZ stated, "Not…" QUINONEZ-HERNANDEZ continued, "Honestly, Prieto [PH] didn't make me happy. Rather, he stressed me because, it's too much work, it's too much trouble, dude, honestly. Honestly, honestly, honestly, I'm in too much trouble. What do you think?" MARTINEZ replied, "No, well... [Sighs] Well, first [AUDIO BREAKS] the stuff arrive and then after..." QUINONEZ-HERNANDEZ responded, "No, well regarding if they arrive, they will arrive, it'll arrive. He said that's how his buddy does it, dude. That that's how it arrives to an uncle from here in Orange County, and it has always arrived, always. But that right now it's not going to arrive to his uncle, because those things are going somewhere else. Since they are going over there, they don't want mix one thing with another. [Clears Throat]."

203.    MARTINEZ asked, "But how inside a machine? It's not like..." QUINONEZ-HERNANDEZ said, "Huh?" MARTINEZ asked, "In a car machine or what?" QUINONEZ-HERNANDEZ answered, "I don't know, dude. Honestly, I don't know how that shit is done, dude. But he wants an address where the machine is going to be sent to. He says it's a machine. That's all he told me. 'It's going to be a machine that is arriving with that.' I don't know what, dude." MARTINEZ replied, "Damn." QUINONEZ-HERNANDEZ stated, "I thought the same thing. I said, 'Oh, damn!' What other shit is there? I don't know. But he said, 'It always arrives. That's not an issue.' He said, 'From there, [Stammers] from there where you are to over there is where, the issue will be. That's when you'll see if... if it's true that... that you can arrange them really good and all that,' he told me." MARTINEZ responded, "But, maybe since they are going from here in the United States, it won't... maybe it won't be checked a lot, dude." QUINONEZ-HERNANDEZ replied, "No, I don't think so. He said that, no, dude, that his buddy has sent some over there, dude... to, to somewhere else he says that it gets there slower, dude. That's the only thing he told me, but obviously, he told me that it has passed through customs and everything, dude. But that it

89

travels slower. I don't know if it goes by ship or what the process is, dude, but that it ships from here, from right here. From, from over there in Mexico, no because everything gets checked thoroughly and properly and it passes, he said it passes through more customs, dude. And they lose everything, dude, everything. They say, 'Oh, it's coming from Mexico, open that shit. Search it thoroughly.'"

204.    MARTINEZ acknowledged, "Mmm." QUINONEZ-HERNANDEZ continued, "But when it's from here, it's not much of a problems, dude. I don't know if it's the treaty that is in place or what the process is. I don't--I don't understand that but, [clears throat] that's why it has to go through here. [Coughs]." MARTINEZ replied, "Oh, damn." QUINONEZ-HERNANDEZ stated, "I said, 'Let me ask Veinticuatro to give me a hand to see if we're up for it or what.' Fuck it. And don't think it's going to be sixty (60) for each one, no way. Because it's also a lot of fucking distribution, dude. This and that has to be distributed, the shipping, pay here, pay there." MARTINEZ stated, "From here. I think from here it's going to be a... [U/I]." QUINONEZ-HERNANDEZ continued, "That's what he told me, dude, that's what he told me. 'How ever long it takes you to get them. If the, if you can get the fifty (50) in one day, let's have them go in one day, fuck it! If you can,' he told me. But we are going to start with ten (10), if ten (10) arrive and if you can put the rest another day, and they arrive, then we'll move forward. After that, it's on however long you take to arrange them and put them. As soon as they say the ten (10) arrived, with that, you do the rest and that's it.  Ask for the rest as soon as they arrive. 'This dude has a bunch of work, but he works towards the outside,' he told me, towards the outside. Do you remember what Saul told me one day, dude? 'No,' he said, 'this guy, no dude, to the U.S. not anymore, dude.' Do you remember that I told you?" MARTINEZ responded, "Yes. Yes." QUINONEZ-HERNANDEZ stated, "That's why, dude, that's why, because now... they don't do

much over here because they know this shit is really cheap." MARTINEZ replied, "Yes, they are

getting it from elsewhere." QUINONEZ-HERNANDEZ responded, "Yes, no way. Go figure,

'Thirty (30), thirty-five (35),' he says. He says, 'I really don't know for certain how much they pay

over there, but... no, not for forty-five (45),' he told me [smacks lips]. "What do you mean, no,

Prieto [PH]? They are going for around forty-five (45), fifty (50) over there,' I told him. Don't give

me that shit." MARTINEZ acknowledged, "Yes, dude."

205.    QUINONEZ-HERNANDEZ continued, "'No,' he said, 'they are not that

expensive,' he said. 'They are around thirty (30), thirty-five (35),' he told me." MARTINEZ

responded, "You know why? Because they know that it's really tough to get them to make it all

the way over there." QUINONEZ-HERNANDEZ agreed, "For sure, dude. And then that shit is

another fucking continent, fuck, dude." MARTINEZ agreed, "Yes." QUINONEZ-HERNANDEZ

stated, "Don't give me that shit, dude. [U/I]." MARTINEZ asked, "Over there they are, um... They,

they use Euros over there, right, dude?" QUINONEZ-HERANNDEZ repeated, "Don't give me

that shit, they are [stammers] [U/I]. I don't know, dude. No, no, that's a different currency

altogether, dude." MARTINEZ stated, "Yes, it's Euros." QUINONEZ-HERNANDEZ asked,

"Huh?" MARTINEZ repeated, "Euros, it seems." QUINONEZ-HERNANDEZ asked, "Yes?"

MARTINEZ confirmed, "[Clears Throat] Yes. Right now they euro is worth more than [Audio

Glitch] the dollar." QUINONEZ-HERNANDEZ stated, "Yes, don't give me that shit, dude.

[Pause]. Well, I don't know. Check it out." MARTINEZ acknowledged, "Okay, dude. [Pause]

What [U/I]?" The intercepted call then terminated.

206.    Based on my training, experience, and knowledge of the investigation, I believe

QUINONEZ-HERNANDEZ continued the conversation with MARTINEZ regarding a narcotics

laden shipment sent from Mexico based source(s)-of-supply that would be received by

QUINONEZ-HERNANDEZ and his co-conspirators in a "machine" and then re-shipped to narcotics supplier(s) in Australia ["a different continent"]. QUINONEZ-HERNANDEZ told MARTINEZ that the shipment must be sent from the United States instead of Mexico in order to avoid seizure of the narcotics ["Oh, it's coming from Mexico, open that shit. Search it thoroughly.'"]. QUINONEZ-HERNANDEZ and MARTINEZ continued to discuss logistics, currency issues, customs enforcement, and other methods to safeguard themselves from detection by law enforcement. Based upon the prices involved, case agents believe QUINONEZ-HERNANDEZ referred to cocaine during the intercepted call.

### *QUINONEZ-HERNANDEZ Discusses a Drug Shipment with UM ("Treni/Trevi")*

207.    On January 19, 2025, at approximately 2:06 p.m., TARGET TELEPHONE-3, used by QUINONEZ-HERNANDEZ, called Mexican telephone number +52-████, used by UM███. During the call, QUINONEZ-HERNANDEZ stated, "I'm sorry, I forgot I was using the personal. Talk to me, talk to me." UM████ stated, "No, well, I am going to change it too." QUINONEZ-HERNANDEZ responded, "No, yeah, because it's tough." QUINONEZ-HERNANDEZ continued, "Just send me the new one. No, well, I'm telling you, I said, 'Come on, get on it. Motivate, motivate us to do things. Instead... Listen, Rin, there...'" UM███ replied, "Uh-huh." QUINONEZ-HERNANDEZ stated, "...Are a some there. [Stammers] I'm going to give you this much for the expenses and other things so you can pay, and God's sake, everything will be good." UM███ replied, "Listen, QUINON, listen to this. We all want to make something without investing." QUINONEZ-HERNANDEZ acknowledged, "Mm-hmm," and UM███ continued, "[U/I]. Everyone. And from here... to tell you the truth [AUDIO BREAKS] [U/I] cool. [U/I] so, then... What I'm trying to say and what you are trying to say, it's that, I mean we have to invest a little. And if everything goes well tomorrow or the day after, we are, are all going to be good.

92

[Stammers] It's the first thing we'll notice. Can you hear me?" QUINONEZ-HERNANDEZ replied, "No, no, yeah, yeah, I understand. And even then, it's not...." UM███ continued, "And honestly, it's at one thousand (1,000)." QUINONEZ-HERNANDEZ replied, "The truth is that it's going to be done. I already moved where to it and everything. I already moved." UM███ asked, "You [Stammers] already know where you are going to go?" QUINONEZ-HERNANDEZ asked, "Pardon me?" UM███ repeated, "You already know everything then? Then everything it's ready?" QUINONEZ-HERNANDEZ answered, "[Stammers] I already moved. But actually, I had a missed call earlier from him. I didn't answer but I already called him back and he didn't answer me, so I just wrote down to return my call when he can, when he is free." UM███ stated, "That's fine, and—and honestly, dude, I know. Over here, this friend, cheap and good, [Stammers] and good money. The guy doesn't tell me anything. He just told me the day before yesterday, 'Hey, friend, how are we doing? It's been some time.' I told him how things were, and we spoke. I told him, 'There is this and that, but that fucker is over there.' Then he tells me, 'Well, let's start moving, because [Stammers] it's been some time, right?'"

208.    QUINONEZ-HERNANDEZ replied, "Okay, Trini [PH]. Okay, the only thing that's needed right now are the coordinates of arrival so that it could be received. And once it's here, then it's, it's going to be sent to Santa Rosalia, the meat, right?" UM███ confirmed, "That's right. [Stammers] The papers get changed and then it's sent to Santa Rosalia." UM███ continued, "That's it, that's it. You... and then, if this come out good, the next one... I don't know, two (2) tons will be sold or ten (10) kilos, then it's going to be participation. And good." QUINONEZ-HERNANDEZ stated, "Yes, from this one, I also need to see something, to give out, even though, I, I, am telling you, I know, I know, that, that, hopefully, God's sake, everything, everything good and I know that you are going to include me there in the package. That's why I don't worry, but I

at least, I need to get something to the people. That's how people are, the people, 'No, man, screw that.' And how I am here, everything, everything... I stayed at the warehouse to receive certain amount, and I didn't see anything. I, I burned my spot here and you didn't give me..." I mean... go ahead." UM█████ replied, "That's fine. That's why I am telling you again, we have to invest a little. [Stammers] I... don't think that I am like, 'Come on, dude,' without anything. No, invest on your people, I am not investing, but I am investing on people."

209.    QUINONEZ-HERNANDEZ responded, "No, no, well, yeah." UM█████ asked, "Alright? So, then... the guy says, 'Dude, invest a little. You don't have to get involved in anything, there is no problem, but just invest.' And I do get him, so then I said, 'Listen, dude, this is what's going on, I know who you are with, I know who your friend are, tell him to invest.' And I am... I'll tell you again, I'm not investing. This guy... he has a great appreciation for me from a while back. And the guy said, 'Listen, dude, I want to you to succeed. I need... because you helped me, I want to to help you. So, then I need... how much?' I said, 'This much.'" He said, 'No problem, I'll get it. And for you...'" QUINONEZ-HERNANDEZ replied, "That's fine, that's fine. We are going to move forward, Trini. We are going to work hard, you'll see." UM█████ continued, "[Stammers] What I am trying to get to is, we need to invest a little, man. In any case, let's do it little by little. I don't think it's a lot. How much could he ask you for, one thousand (1,000)? Your friend? Your friend [Stammers] in order to receive."

210.    QUINONEZ-HERNANDEZ asked, "Tell me something. How, how is it going to get here? What I didn't understand, what Prieto [PH] mentioned to me, that it's going to be... that everything it's going to arrive in a machine, that's what I didn't get. And that it has [Stammers] to arrive through parcel services, but that everything is going to arrive in a machine. I didn't understand if they are arriving [Stammers] in apparatus or in a machine, that's what I didn't

understand. Or is it going to be in a fucking big box of a machine. Or what, or how?" UM ▮ answered, "It's a machine that weights about two hundred and fifty (250) kilos, three hundred (300) kilos." QUINONEZ-HERNANDEZ replied, "Oh, shit," and UM ▮ advised, "Just how it arrives, you just need to take of [Stammers] the insignias of Mexico and that's where you put... so it can ship..." QUINONEZ-HERNANDEZ asked, "So, there is no need to touch it, to do anything?" UM9187 advised, "But you are not going to do anything there, just take off and put down." QUINONEZ-HERNANDEZ confirmed, "Oh, it's set, it's set. It's set." UM ▮ explained, "The machine is brand new. Brand new. I mean, [Stammers] nobody is going to do anything. It will just arrive..." QUINONEZ-HERNANDEZ acknowledged, "It's set, it's set." UM ▮ responded, "It gets changed and it ships. That's it." QUINONEZ-HERNANDEZ advised, "Am going to tell you something, one thousand (1,000) dollars— one thousand (1,000), two thousand (2,000) dollars, it's not going to be possible." UM ▮ replied, "Man, we'll invest a little, and God willing..." QUINONEZ-HERNANDEZ explained, "No, well, I am going to invest right now. I am going to put all that, but don't you think that because for a big box... Can you imagine I tell him, 'Hey, dude, a machine is going to arrive.' And what I work on the matching shop, and I am going to get a huge machine to weld and this... He is going to say, 'Don't fuck around, you don't know...'" [Voices Overlap] UM ▮ asked, "What, what?" QUINONEZ-HERNANDEZ continued, "'...how to work, asshole. Why are you going to be asking for it, and to my address?' No, I'll work on that, I'll work on that."

211. UM ▮ elaborated, "It's a machine, and also, it's probably like a type of corporation. A type of corporation [U/I] registered with documentation so that everything is fine." QUINONEZ-HERNANDEZ responded, "Okay, okay. Yeah, I understand now." UM ▮ advised, "So that you're aware. Alright? it arrives to a corporate office and... well, the company

uses more [U/I]." QUINONEZ-HERNANDEZ asked, "Do you know how long it takes to arrive? Did your friend tell you how long it will take to arrive? To see." UM███ answered, "No, well, what does it take? Two (2) or three (3) days." QUINONEZ-HERNANDEZ stated, "Okay, it's set. Well, let me get on it." UM███ advised, "As long as it's, as long as it's a company." QUINONEZ-HERNANDEZ asked, "How, how? It's not an address... it's doesn't have to arrive to a residential address?" UM███ answered, "To a company. It could arrive, but if it's at a company, it will be better." QUINONEZ-HERNANDEZ responded, "No, he didn't tell me that. He told me to find a house, a residential so that it arrives." UM███ replied, "Yes, I mean, that's possible but so that, that, it looks better, some type of company." UM███ continued, "But if there is no other way, it can be a house." QUINONEZ-HERNANDEZ asked, "But it's for right now, right? You need it right now?" UM███ answered, "It's better. Yeah, yeah, if it's tomorrow, it's better. It's for now..." QUINONEZ-HERNANDEZ replied, "Alright then. I am going to start looking." UM███ responded, "Yeah because that shit has been there for a while, dude. Get it on, dude, because... we need it." QUINONEZ-HERNANDEZ reiterated, "Oh. Alright, let me start looking. I am telling you to take care, don't drink too much, get well." UM███ stated, "Give it your best with that, dude. [U/I]." QUINONEZ-HERNANDEZ replied, "Yes, let me work on that. It's set."

212. Based on my training, experience, and familiarity with the investigation, I believe that QUINONEZ-HERNANDEZ told UM███ that QUINONEZ-HERNANDEZ was using TARGET TELEPHONE-5 (not TARGET TELEPHONE-3) ("I'm sorry, I forgot I was using the personal") when QUINONEZ-HERNANDEZ and UM███ (based in Mexico) discussed logistics, related to a possible large narcotic laden shipment, concealed inside a "machine," preferably sent to a "corporation," that QUINONEZ-HERNANDEZ would receive on behalf of UM███ and another unknown subject, referred to as "Prieto." UM███ directed QUINONEZ-HERNANDEZ

to locate an address, preferably a corporation/business, as this type of location would look less suspicious. QUINONEZ-HERNANDEZ would receive the "machine" at a location that QUINONEZ-HERNANDEZ located, after which I believe that QUINONEZ-HERNANDEZ would then send the delivery to a secondary location (i.e., Australia). The parties also discussed future shipments and the need for QUINONEZ-HERNANDEZ to invest and/or to locate investors in their narcotics trafficking. Based on their training, experience and familiarity with the investigation, case agents believe in this intercepted conversation UM█████, and QUINONEZ-HERNANDEZ discussed a large shipment of cocaine.

213. Preceding the above-referenced January 19, 2025, intercepted call at 2:06 p.m., between TARGET TELEPHONE-3 and UM████, my review of telephone toll analysis over TARGET TELEPHONE-5 revealed TARGET TELEPHONE-5 received a call on January 19, 2025, at 1:58 p.m. from +52-███████ (UM████). According to toll analysis over TARGET TELEPHONE-5, the call between TARGET TELEPHONE-5 and UM████ commenced at 1:58 p.m. and lasted for approximately seven (7) minutes, with UM████ ending the call at approximately 2:05 p.m. Based on my training, experience and familiarity with the investigation, I believe that after UM████ called TARGET TELEPHONE-5, and ended the call, QUINONEZ-HERNANDEZ then switched to TARGET TELEPHONE-3 and called UM████ approximately one minute later. At the outset, QUINONEZ-HERNANDEZ was apologetic about the change in phones and identified the reason, "I'm sorry, I forgot I was using the personal. Talk to me, talk to me," indicating a preference to continue the conversation over TARGET TELEPHONE-3.

*QUINONEZ-HERNANDEZ and MARTINEZ Discuss Logistics for a Future Drug shipment*

214. On January 19, 2025, TARGET TELEPHONE-3 and (818) 692-███ (i.e. MARTINEZ) sent a series of text messages, in Spanish, to and from each cellular phone. At

approximately 2:42 p.m., MARTINEZ, using (818) 692-█████ sent a text message in Spanish to TARGET TELEPHONE-3 (i.e., QUINONEZ-HERNANDEZ) stating, "What happened?" At 2:43:29 p.m., TARGET TELEPHONE-3 responded in Spanish, "Did you get me an address there, dude?" QUINONEZ-HERNANDEZ immediately followed up by sending two additional text messages. One stated, "They already called me, that it's urgent." The other stated, "Tell them at 5-4." At 2:43:45 p.m., (818) 692-███ replied, "Lucy," followed by "Don't fuck around." Then, at approximately 2:43:52 p.m., TARGET TELEPHONE-3 responded, "It arrives in 3 days." TARGET TELEPHONE 3 then sent another text message, which asked, "What's wrong?" At 2:44:08 p.m., (818) 692-███ replied, "Now I have to?" followed by, "It's you business." At 2:44:24 p.m., TARGET TELEPHONE-3 replied, "Alright, faggot." TARGET TELEPHONE 3 then sent another message that stated, "I'm won't involve you again, dude. I'm telling you." At approximately 2:47 p.m., (818) 692-███ sent a reply message which stated, "Well, dude, you want me to be moving when you are the the Good one. And then you told me to put down an address, and you are barely telling me." At approximately 3:36 p.m., (818) 692-███ sent an additional text message stating, "Should I put down Nancy's?" Then at 3:49:46 p.m., (818) 692-███ sent a text message that stated, "Look in Lancaster for an empty house" That same phone then sent another message: "That nobody lives there."

215.   On January 21, 2025, at approximately 3:04 p.m., (818) 692-███ sent a text message to TARGET TELEPHONE-3 that stated: "1 (747) 444-███."

216.   On January 21, 2025, at approximately 3:35 p.m., (818) 692-███ sent a text message to TARGET TELEPHONE-3 stating, "14██ SNF mission █ Mission Hills."

217.   On January 21, 2025, at approximately 7:36 p.m., QUINONEZ-HERNANDEZ, using TARGET TELEPHONE-3, received a call from (818) 692-███, used by MARTINEZ.

During the call, the parties greeted each other, and MARTINEZ stated, "Hey, I sent you that." QUINONEZ-HERNANDEZ replied, "What, dude?" MARTINEZ answered, "Well, what do you mean? The information." QUINONEZ-HERNANDEZ repeated, "The information, the information, the information?" MARTINEZ asked, "You haven't check the messages, not even if that's what's urgent for you. Fucking [U/I]." QUINONEZ-HERNANDEZ replied, "Hold on, hold on, hold on. Oh, yes, yes, yes." MARTINEZ stated, "Oh, alright. Just... ...just let me know more or less at what time it will arrive so that way that guy can go." QUINONEZ-HERNANDEZ asked, "So, [Stammers] who goes?" MARTINEZ responded, "Or do you want to go?" QUINONEZ-HERNANDEZ asked, "So that who goes?" MARTINEZ clarified, "Well, that dude. So that guy can say, 'Everything is here good, come on.'" QUINONEZ-HERNANDEZ replied, "Hey, send me, send me a name, dude. The one who is going to make the pick-up, dude. They are not just going to drop it off there, dude." MARTINEZ responded, "Well, that's why I'm telling you, for that guy to go." QUINONEZ-HERNANDEZ asked, "Under what name?" MARTINEZ answered, "Just put V█████ F██████, idiot." QUINONEZ-HERNANDEZ responded, "Don't fuck around. Something decent..." MARTINEZ replied, "Oh," and QUINONEZ-HERNANDEZ continued, "...Veinticuatro [Twenty-four]. Don't give me an abandoned place or something, dude." MARTINEZ clarified, "Come on, dude. No, a lady lives there." QUINONEZ-HERNANDEZ asked, "Is that ███'s number too." MARTINEZ, "[Clears Throat] ███'s number is the one on top." The two parties continued in a conversation, unrelated to the narcotics shipment and QUINONEZ-HERNANDEZ then confirmed, "So, everything is good with that address, right dude? Because they [U/I] ..." MARTINEZ answered, "Yes, dude, yes." MARTINEZ directed, QUINONEZ-HERNANDEZ, "Just put there... E████ L███, he is going to receive and that's it."

218.     Based on my training, experience, and familiarity with this investigation, I believe the text message and telephone exchanges between MARTINEZ and QUINONEZ-HERNANDEZ are a continuation from the aforementioned wire interceptions, related to an attempt to locate a legitimate address in California to be listed as the recipient of narcotics, sent from source(s)-of-supply in Mexico. In an effort to distance themselves from the narcotics, I believe the narcotics shipment from Mexico will be delivered to consignee "F█████ L█████ at 14███ San Fernando Mission Blvd, Mission Hills, CA 91345," and will be held for future shipment/distribution to Australia.

*QUINONEZ-HERNANDEZ and UM█████ Discuss Owing Money and Future Drug Distribution*

219.     On January 25, 2025, QUINONEZ-HERNANDEZ, using TARGET TELEPHONE-3, engaged in a series of text exchanges with UM█████ and discussed paying a drug debt and delivering between eight and ten kilograms of cocaine.

220.     On January 25, 2025, at approximately 11:47:40 a.m., TARGET TELEPHONE-3 received four sequential text messages in Spanish from (747) 313-███, used by UM█████, which stated: (1) "Buddy, Luis how are you."; (2) Man these people are breathing down my neck."  (3) "I don't know what to say be we need a solution." (4) "These people want to be paid." Approximately one second later, TARGET TELEPHONE-3 received another text from UM█████, which stated, "A solution is needed."  And then UM█████ wrote another message to TARGET TELEPHONE 3: "These people want us to pay them and honestly it has to be paid man."

221.     On January 25, 2025, at approximately 4:04:21 p.m., TARGET TELEPHONE-3 sent a text message to (747) 313-███ stating, "Yes buddy I don't have any work right now. I am waiting on you right now.  TARGET TELEPHONE-3 then sent the following three messages: (1) "We are going to pay them buddy."  (2) "But we need to go up buddy."  (3) "I'm also fucked."

TARGET TELEPHONE-3 stated in the next outgoing text message to UM ███, "I haven't been out in four days because I don't even have money for gas buddy." TARGET TELEPHONE-3 followed up in the next text message to UM ███ stating, "They're still waiting up there." And then, "They need eight, but I know that if we get there with ten they will take them, man." TARGET TELEPHONE-3 continued and stated, "It's four thousand in profit they they're paid right then and there. Quick man." At approximately 4:06:54 p.m., TARGET TELEPHONE-3 sent another text message to UM ███ stating, "Let's take care of them buddy." Followed by, "So that we can fix that and they stop pressuring you, man."

222. Based on my training, experience, and knowledge of the investigation, I believe that UM ███ explained to QUINONEZ-HERNANDEZ that UM ███ is being pressured to pay a drug debt. QUINONEZ-HERNANDEZ responded by telling UM ███ that unknown individuals need eight kilograms of suspected cocaine and would purchase ten kilograms if QUINONEZ-HERNANDEZ offered ten kilograms. QUINONEZ-HERNANDEZ explained that by selling the aforementioned kilograms, QUINONEZ-HERNANDEZ would profit $4,000 per kilogram which would be paid the same day the kilograms are provided to the unknown individuals. Case agents believe the reference to, "up there," refers to SANCHEZ-GONZALEZ who resides in the Eastern District of Wisconsin, specifically, Milwaukee, Wisconsin. This is evidenced by intercepted communications between QUINONEZ-HERNANDEZ (i.e., TARGET TELEPHONE-3) and UM ███ on January 28, 2025, referenced in the below paragraph of this Affidavit.

*QUINONEZ-HERNANDEZ Discusses Narcotics Trafficking with UM* ███

223. On January 28, 2025, at approximately 6:04 p.m., TARGET TELEPHONE-3 placed a call to (747) 313-███, used by UM ███. During the call, the parties greeted each other and as the conversation continued, QUINONEZ-HERNANDEZ stated, "I'm here, just checking

in with you." UM ▉ replied, "Looking for [U/I], as a friend says." QUINONEZ-HERNANDEZ reiterated, "Checking in with you to see what's to see what there is." UM ▉ answered, "Well, at the moment nothing, man. We are wanting to convince –I'm trying to convince a guy to…to give me work, son-of-a bitch because these [guys] are fucking pressuring me, for real. Yesterday, [Stammers] I set up a deadline for myself that—I didn't call him, I said, 'What the fuck for?' I set up a deadline for two (2) weeks. 'No, dude, I will pay you in two (2) weeks.' Just like that, that's what I told him. He said, 'You better, you son-of a bitch because, the truth, you are already fucking pushing it.' He said, 'And you don't give a deadline, you don't pay, nor anything.' I told him, 'No, no, no, give me two (2) weeks, dude, for real.' Let's see what the fuck we can do. QUINONEZ-HERNANDEZ advised, "They are – they are calling me from up there, buddy. He called me." UM ▉ stated, "Yes, I know, man." QUINONEZ-HERNANDEZ continued, "Rey called me again. You know how the week starting, and he wants to know what's going on. 'What's up man? You still haven't…'" UM ▉ replied, "Yeah. Yes, yes, yes." QUIONNEZ-HERNANDEZ continued, "'…come over here?' I said, 'No, man. I'm, I'm stopped.' He said, 'Why is that?' I said, 'No, man, supposedly they are going up in price, [U/I].' That's the excuse I gave him. 'No, well.'" UM ▉ confirmed, "Right."

224. QUINONEZ-HERNANDEZ continued, "'We haven't heard anything over here…that they're going up. I told him, 'Well, it still hasn't…made it all the way up there yet, but it's already getting like that here and they're being increased.' I said, 'I'm trying to set a price because…they do have it a little high right now, for real.' He told me, 'Oh, check on that, man, because we are needing some over here. Let me know the price to see if we can do something.' I said, 'Alright, then.' That was the excuse I came up with man." UM ▉ replied, "Yes, yes, I know, man. and…" QUINONEZ-HERNANDEZ stated, "I said, 'I will resolve this for you this

week, man, but there is going to be something, man, there is going to be something. They…are already working on it.' I told him, 'It's a new year and they are working on it. Just…give me a chance to see what's up.' But, to avoid telling them that there's nothing or anything. I didn't want to tell them that." UM█ responded, "Right. I know other people do have some, but we are the ones that are fucked." QUINONEZ-HERNANDEZ asked, "Pardon me?" UM█ continued, "I'm saying other people probably have some, but's just us that are fucked, with no work." QUINONEZ-HERNANDEZ answered, "No, well…"

225.    UM█ stated, "Well, uh I'm talking to a friend about that. I'm talking to a friend about that to see what he says. I'm working on it, I'm working on it, I'm working on it and see what the fuck…he tells me. He just hasn't told me anything." QUINONEZ-HERNANDEZ responded, "Yeah, and I-I, if you want to go with me, we'll go, buddy. So, that you can see how things are over there, man." UM█ replied, "No, no, I know, I know." QUINONEZ-HERNANDEZ stated, "We'll leave, you and I, and over there, I know, I know…" UM█ asked, "Um, about how much. About how much…" QUINONEZ-HERNANDEZ replied, "I know that maybe having you, with your gift of the gab/smooth talk, and you over there…we can meet more people, or something, buddy. I don't know." UM█ agreed, "Yeah." QUINONEZ-HERNANDEZ stated, "Right now, I-I calmly…ten (10) will—will head out easily. Imagine with you over there or something. Us moving together over there, we'll make something." UM█ asked, "Yeah. Around how many are they asking you for over there?" QUINONEZ-HERNANDEZ answered, "Eight (8). It's eight (8) right now. It's five (5) and it's three (3)." UM█ confirmed, "Yeah, eight (8), alright." QUINONEZ-HERNANDEZ replied, "But I know if I take the ten (10), I know…" UM█ responded, "Well, let me see. I'm working on it, I'm working on it, I'm working on it, son-of-a-bitch. I'm pressuring a buddy to see what's up, but I'm

working on it, I'm working on it." QUINONEZ-HERNADEZ acknowledged, "That's fine buddy." UM ■ stated, "Well, [Stammers] keep looking, man, because things are getting tight here…" QUINONEZ-HERNANDEZ responded, "That's fine, that's fine, buddy. I'm here, I'm here searching…" UM ■ commented, "Well, it's all fucking bad."

226.     QUINONEZ-HERNANDEZ replied, "Searching to see what come up, man. Because, honestly, I am also very desperate, man." UM ■ advised, "Keep the phone by you all the time because it's tough. No, well, I'm worse off because I have that fucking problem and it's rough. I think that…if they pressure me, I put the pressure on, too. I don't have any other choice, but, in the meantime…" QUINONEZ-HERNANDEZ asked, "What ever happened with the, with the one who got jacked? That you told me that…" UM ■ answered, "No, well, uh…that one gave—that one gave a property there—there in Nayarit. That guy, more or less, he hasn't paid everything, but he gave a property that was worth more than the account. That—that…well, they are taking care—taking care of selling it. I don't know what the fuck they are going to do with him. No, well, he—he…he already paid his debt. He got out of it because he gave the property that's worth twice the—the debt. QUINONEZ-HERNANDEZ acknowledged, "Alright, alright." UM ■ continued, "The debt is like one million eight hundred (1,800,000). That shit it's worth two million six hundred (2,600,000). Well, that what it was valued at two (2) years ago. They are saying it's easily worth three million (3,000,000) right now. So, he already…with what he gave in property, the debt is overpaid."

227.     UM ■ continued, "He [Stammers] already…and I'm arranging for these fuckers to loosen up [Stammers] the reins on me a little." QUINONEZ-HERNANDEZ stated, "That's fine, buddy. Check to see what we can do." UM ■ commented, "Fuck, I had everything squared away, I had everything squared away. I don't know what the fuck happened. Son-of-a-bitch."

QUINONEZ-HERNANDEZ replied, "[Sighs] Son-of-a-bitch, I also haven't been able to pick myself up, man. I said, 'Not, this year…'" The parties continued an approximately 20-second-non-pertinent conversation after which QUINONEZ-HERNANDEZ stated, "I want to pick myself up, man, I want to make money, I want to make money." UM ██ replied, "No, well, the-the money…well, of course, man. The debts are coming again, it's tough. Well, search, search around. I'll call you if anything comes up here. Because I need to find a solution. It's fucked up." QUINONEZ-HERNANDEZ responded, "Alright then, buddy. Let me know because those people are calling me to do something this week, man." UM ██ agreed, "Alright then. I'll call you if anything."

228.     Based on my training, experience, and knowledge of the investigation, I believe that QUINONEZ-HERNANDEZ and UM ██ discussed a drug customer identified in the call as "Rey," whom investigators know to be Reynaldo SANCHEZ-GONZALEZ.  I am aware that SANCHEZ-GONZALEZ resides and operates in the Eastern District of Wisconsin.  QUINONEZ-HERNANDEZ discussed the need to provide SANCHEZ-GONZALEZ with unspecified narcotics in what QUINONEZ-HERNANDEZ described as quantities of, "eight," "five," and "three." The parties further discussed drug debts which UM ██ and QUINONEZ-HERNANDEZ had owed to source(s)-of-supply based out of Mexico.

*QUINONEZ-HERNANDEZ Discusses a Pending Drug Shipment with MARTINEZ*

229.     On January 30, 2025, at approximately 6:59 p.m., MARTINEZ, using (818) 614-██, placed a call to TARGET TELEPHONE-3, used by QUINONEZ-HERNANDEZ. During the call, the parties greeted each other, and MARTINEZ asked, "What's up, dude? Manuel called me a little while ago, dude, saying, 'What's up, dude?'" QUINONEZ-HERNANDEZ replied, "Invite me to eat something, faggot. I'm fucked right now without any money."  MARTINEZ

105

stated, "But, dude, how dumb are you? Why continue when you said, 'I am getting low.' 'No, it's better I just fucking leave with this.'" QUINONEZ-HERANNDEZ replied, "Well, yeah, dude... [Sighs] I'm under a lot of stress, Veinticuatro. You don't know, dude. It's all going to shit, dude. [Smacks Lips] [Sighs] Son of a bitch! I'm such an idiot. But, oh well..." MARTINEZ stated "But…," and QUINONEZ-HERNANDEZ continued, "Got—I got a call from the Prieto, dude. [Stammers] That the guy who was doing the process for—for the shipment, dude..." MARTINEZ acknowledged, "Mmm," and QUINONEZ-HERNANDEZ stated, "No bullshit, he dude decided to fucking disappear. And that this dude paid him for the procedure and everything. [Smacks Lips] I told him, 'Don't fuck around.' 'Yes,' he said, 'that's why I kept calling you yesterday and your phone was off.' 'Then what?' 'No, I found someone else,' he said, 'who is going to send it, but he is not going to be able to send it this week.' 'No,' I said, 'then what? Because the guy of the house is calling me, that he needs the payment, and I don't know what else.' I told him... and he wanted money. He asked me if it was going to happen or not. And he tells me, 'No, it's all set, no, no, no. The only thing is that, look, I already knew this dude was going to do some shit like this, that the package got lost or something.' I asked him, 'Why?' 'Because, dude, I was noticing that the dude was not answering me, I paid him the money, he was acting... No, right away he,' he said, 'he never took the package because I was going to send somebody [Stammers] who would give it to him but going with him to send it. Because, you have to be careful with people.' I said, 'Yes, no, yes, I understand.' He said, 'That's why, but when he came up with that shit, I didn't give him the package.' 'Oh, no. No. So, right now,' he said, 'I'm looking for... I'm —I'm...' he said, 'I'm looking for [Stammers] another dude to send it, but we are going to send it as if it was a company.' 'Oh, okay.' 'But we already found him, we already have him.' 'Oh, that's good.' And Prieto told me, 'I'm there.' He first told me about that, that the dude was going was going to disappear with the

package, that he was going to make it seem it got lost, and then he told me something else. He said... what did he tell me? He said, um... [Sighs] It's not coming to me, I had it, what did he tell me? He said, 'So, the package is going to arrive over there with you so that—that way you can put it over there. But do you already have all the people and everything?' 'Yes,' I told him, 'I'm only missing is the money, but I think there's a guy who can lend me the money.' I told him—I told him to lend it to me for fifteen (15) days. Until you pay me. 'No, yes, yes. In fifteen (15) days, it's done. As soon as that arrives, I will pay you, and I will pay you your thirty (30) bucks. I already told you. I'm going to give you thirty (30) for you.' 'Alright, that's fine.' 'But that has to be all set because...' Oh, he told me, 'That's going to be all set because I already have that, it's in my possession and everything. It's just a matter of sending it.' 'Oh, that's fine, that's fine. Well, let me know, Prieto.' I told him. 'Let me know.' 'Yes, yes. I think next week it will be all set, it will be over there with you.' 'Alright then.' I told him. 'Let me know.' And I said, 'Oh, I hope, dude, I hope.'

230. MARTINEZ responded "Nah, but…," and QUINONEZ-HERNANDEZ stated, "But…" MARTINEZ continued, "I'm going to tell Manuel [Stammers] that—because we are going to find another address for him, dude. That'll be better, dude." QUINONEZ-HERNANDEZ stated, "Don't bullshit. Why would I want to change it for Prieto? He is going to tell me, 'Dude, didn't you say that...' [Voices Overlap] MARTINEZ stated, "No... No, dude, if the guy..." QUINONEZ-HERNANDEZ continued, "...Was the guy? Why did you change it?" MARTINEZ explained, "No, well, dude... I'm telling you that this fucking dude... better get another one so we're not saying, 'Oh, what if this, or that?' No, dude. Another address and that's it, dude." QUINONEZ-HERNANDEZ stated, "No, no, I don't want to change it on Prieto. Once it arrives..." MARTINEZ responded, "No, dude. I'm also... when I told you that, you started to shake. Well, then just erase

that, dude. Tell him, 'No, you know what, dude... that man is not... he is not answering me or anymore. It's best, um... he give you another address.' And that's it." QUINONEZ-HERNANDEZ directed, "Send me Sadoc's [PH] number. Please." MARTINEZ replied, "Mm-hm," and QUINONEZ-HERNANDEZ continued, "To, to, to see what, what, what... how we can arrange that shit." MARTINEZ replied, "Already told you, dude. That dude is not—not going to do anything until he doesn't see it." QUINONEZ-HERNANDEZ stated, "If not, I'm going to send the num—... Maria's address, dude. Let me call her, let me call Zule [PH], dude." MARTINEZ replied, "Alright then." QUIONEZ-HERNANDEZ concluded, "To tell her. Alright then."

231. Based on my training, experience, and familiarity with this investigation, I believe that QUINONEZ-HERNANDEZ advised MARTINEZ about the conversation with the Mexican source-of-supply referred to as "Prieto," regarding a delay in the pending narcotics shipment. QUINONEZ-HERNANDEZ and MARTIENZ confirmed the address and communications with a third party referred to as "Manuel," who may be an individual who associated with receiving the narcotics-laden shipment in California, on behalf of QUINONEZ-HERNANDEZ, MARTINEZ, and "Prieto." Based on the intercepted conversation, in addition to previously discussed interceptions between QUINONEZ-HERNANDEZ, MARTINEZ and UM███, case agents believe QUINONEZ-HERNANDEZ discussed a pending shipment of cocaine.

*QUINONEZ-HERNANDEZ and UM███ Discuss a Drug Debt*

232. On February 4, 2025, at approximately 1:00:55 p.m., TARGET TELEPHONE- 3 sent five sequential text messages in Spanish, to (747) 313-███ stating: (1) "Good morning, buddy." "Those guys called me again." (2) "They're already ready. Desperate." (3) "They're asking when." (4) "But let me know, buddy." (5) "You didn't tell me anything, buddy."

233.     On February 4, 2025, at approximately 9:12 p.m., TARGET TELEPHONE-3 received four sequential text messages, in Spanish, from (747) 313-███ stating, (1) "I didn't tell you anything because, honestly, I'm still waiting." (2) "I didn't tell you anything, man, because I'm looking somewhere else because this dude, to be honest, is not going to give me any work." (3) "On the contrary, he is charging and charging me. I can't stand him." (4) "I'm waiting for them to call me from somewhere else to do something, man, because I honestly can't stand this person anymore."

234.     Based on my training and experience and familiarity with the investigation, I believe QUINONEZ-HERNANDEZ told UM███ that unknown individuals were ready to receive an unknown amount and type of drug.  Additionally, I believe that the individuals were desperate for an answer as to when the next drug shipment would be ready.  UM███ explained to QUINONEZ-HERNANDEZ that other unknown individuals failed to provide updates to UM███, and those unknown individuals were waiting for something to happen, (e.g. a drug shipment).  UM███ expressed frustration that unknown individuals are constantly charging UM███ and UM███ was waiting to hear from another potential source-of-supply.

*Intercepted Conversations over TARGET TELEPHONE-3 and TARGET TELEPHONE-5 Regarding a UPS Parcel Shipped by QUINONEZ-HERNANDEZ to the Eastern District of Wisconsin*

235.     Interceptions over TARGET TELEPHONE-3 and TARGET TELEPHONE-5 revealed QUINONEZ-HERNANDEZ and UM███ owe a substantial drug debt to unknown individuals in Mexico.  QUINONEZ-HERNANDEZ and UM███ agreed to work together trafficking drugs to pay their drug debts. Based on the intercepted calls, case agents suspect that, unbeknownst to UM███, QUINONEZ-HERNANDEZ began devising a plan to steal drugs from UM███ and make it appear as though law enforcement seized the shipment of the drug-laden

109

parcel, in part, or entirely, supplied by UM███.  Agents further believe that QUINONEZ-HERNANDEZ planned to steal the drugs, using a theatrical ruse, so QUINONEZ-HERNANDEZ could independently, and without UM███'s knowledge, keep all the proceeds from the sale of the drugs.

236.    For example, on February 19, 2025, at approximately 12:20 p.m., TARGET TELEPHONE-3, used by QUINONEZ-HERNANDEZ, received a call from (818) 614-███, used by MARTINEZ.  During the intercepted conversation, QUINONEZ-HERNANDEZ said, "Hey." MARTINEZ responded, "Dude." QUINONEZ-HERNANDEZ asked, "What?" MARTINEZ replied, "Well, the same thing that happened to you happened to me. That, no, yes, no, well yeah, but now they're not answering. They don't have any. You know what's going to happen? Um, oh, well, you're going to have to take two (2), uh, of the expensive ones, two ... 'little onions.' Well, it's the same thing." QUINONEZ-HERNANDEZ stated, "No, nothing [U/I], dude." MARTINEZ asked, "Huh?" MARTINEZ said, "Well, make it two 'little onions,' dude. So, like, just make sure it matches the weight, but on top, we'll sprinkle it with that from over here." MARTINEZ continued, "Because either way, either way, those guys are going to smell it, whether it's this one or the other one."

237.    Based on my training, experience, and familiarity with the investigation, I believe QUINONEZ-HERNANDEZ and MARTINEZ discussed packing the box with items that would equal the weight of approximately two kilograms ("two little onions") and then lining the parcel with drugs, presumably so it would be seized by law enforcement.  (MARTINEZ said, "Well, make it two (2) 'little onions,' dude. So, like, just make sure it matches the weight, but on top, we'll sprinkle it with that from over here.").

238.     On February 19, 2025, at approximately 4:17 p.m., TARGET TELEPHONE-3, used by QUINONEZ-HERNANDEZ, called (818) 614-███, used by MARTINEZ.  During the intercepted conversation, MARTINEZ said, "Hey!" QUINONEZ-HERNANDEZ replied, "Man, lend me a little bit, like twenty (20), thirty (30) bucks, man, a rock or something. A good rock to, to put it on the outside of the tape, man. So that shit can be detected really good. That rock could be falling off that shit and not be detected. [Laughs] It's best if I . . ."  MARTINEZ asked, "That guy already brought it to you?" QUINONEZ-HERNANDEZ explained, "He already answered me, man, he already answered me. He says that he's just picking it up and that he's on his way. I told him, 'In how long, man?' He says, 'Give me like twenty minutes.' He says, 'Just the traffic, what it takes me from San Fernando to go over there, man.'" MARTINEZ uttered, "Uh-huh." QUINONEZ-HERNANDEZ said, "Well, I'll take them to you right now. Besides, we still have till four-thirty, man, there's no problem." MARTINEZ responded, "Well, uh...fine." QUINONEZ-HERNANDEZ asked, "What?" MARTINEZ said, "Four-fifteen. Uh... fine, then. Well... well, alright. I'll be arrive shortly." QUINONEZ-HERNANDEZ said, "Here, here, here, I came back to your house just now. I'll see you here so you can give me that." MARTINEZ uttered, "Mm-hm." QUINONEZ-HERNANDEZ said, "Around thirty buck..."  MARTINEZ responded, "Yeah." QUINONEZ-HERNANDEZ continued "...and a good small rock, dude, to place it right there outside. To . . . as a mock. [Chuckles] Let's hope that it doesn't fall off and it doesn't get fucking detected. The last thing we want is for it to arrive and make it there." [Laughs] MARTINEZ replied, "How can it not, man. Stop fucking kidding." QUINONEZ-HERNANDEZ agreed, "Let's see, hopefully. All right, then."

239.     Based on my training, experience, and familiarity with the investigation, I believe QUINONEZ-HERNANDEZ asked MARTINEZ for drugs to place on the outside of the parcel,

and the parties discussed not wanting the parcel to be delivered. ("...and a good small rock, dude, to place it right there outside. To . . . as a mock. [Chuckles] Let's hope that it doesn't fall off and it doesn't get fucking detected. The last thing we want is for it to arrive and make it there.").

240.    On February 19, 2025, at approximately 5:36 p.m., TARGET TELEPHONE-3, used by QUINONEZ-HERNANDEZ, called (818) 614-███, used by MARTINEZ.  During the intercepted conversation, MARTINEZ said, "Hello?" QUINONEZ-HERNANDEZ replied, "Hey!" MARTINEZ asked, [Aside: Huh, what?] [BACKGROUND: UF: (U/I).] [Aside: No. That's fine.] "What's up?" QUINONEZ-HERNANDEZ replied, "Dude."  MARTINEZ asked, "What happened?" QUINONEZ-HERNANDEZ answered, "No, that stupid guy there didn't get them. He said he is still waiting, man." MARTINEZ exclaimed, "Oh no way!" QUINONEZ-HERNANDEZ said, "The guy called me, man, asking if I had the tracking number, to pass it to him, man." MARTINEZ said, "Send that shit, man, because if not, he is going to keep asking you for it and then it'll be worse. Rub that in just like that." QUINONEZ-HERNANDEZ asked, "You think so?" MARTINEZ replied, "And rub, put a frame, like that, and measure that, man. Make it look like a square.  How should we do it? I'll help you if you want but, it would have to be, uh, like... getting a [U/I] or... yes, a, a [U/I] and wrap it like and like that, man." QUINONEZ-HERNANDEZ said, "I just went and passed by fucking Rosa [PH] to, to buy two weights of five pounds, five pounds, two. I added the two weights to make it ten pounds, man. And I added the, the cover of, of, of fucking, that, so it doesn't keep moving." MARTINEZ uttered, "Uh-huh-huh." QUINONEZ-HERNANDEZ explained, "And right now I just threw everything on top of yours and outside of the box [U/I]. I smeared it, all like that, very good... but I was waiting for that shit to put it in like that, loosely." MARTINEZ said, "No, like that, send it like that, either way, either way once they open it, they won't make [U/I]. It's going to be disassembled and opened, man." QUINONEZ-

HERNANDEZ replied, "Yeah, right?" MARTINEZ confirmed, "Yes, man." QUINONEZ-HERNANDEZ asked, "And should I call or not?" MARTINEZ responded, "Huh?" QUINONEZ-HERNANDEZ repeated, "Call them? Should I call them or not?" MARTINEZ replied, "I say no, right? Or yeah?" QUINONEZ-HERNANDEZ confirmed, "No, right? No, better not to." MARTINEZ said, "No, man. No, just with that and... if you want, I can take you a little piece more so you can give me a hundred bucks." QUINONEZ-HERNANDEZ asked, "What, what?" MARTINEZ explained, "If you want, I can take you another piece so that way, so that it can be tied up, more secured." QUINONEZ-HERNANDEZ replied, "To give me a hundred bucks." [Chuckles] What a jerk." MARTINEZ said, "Well, man [Chuckles] well that shit... it's going to go down and... because..." QUINONEZ-HERNANDEZ responded, "Well let me see, let me see. Let me see if this guy doesn't answer me right now in . . . like twenty minutes." MARTINEZ agreed, "Alright."

241.    Based on my training, experience, and familiarity with the investigation, I believe QUINONEZ-HERNANDEZ and MARTINEZ discussed how to rub drugs along the frame of the parcel so the parcel will be seized by law enforcement authorities.  QUINONEZ-HERNANDEZ further explained that QUINONEZ-HERNANDEZ purchased two 10-pound weights to place in the parcel. QUINONEZ-HERNANDEZ and MARTINEZ discussed whether QUINONEZ-HERNANDEZ should share the parcel's tracking number with UM███, and MARTINEZ advised QUINONEZ-HERNANDEZ to do so.

242.    On February 20, 2025, at approximately 8:29 a.m., E/911/GPS data over TARGET TELEPHONE-3 and TARGET TELEPHONE-5 revealed QUINONEZ-HERNANDEZ was at the Los Angeles International Airport.

243.     On February 20, 2025, at approximately 12:11 p.m., TARGET TELEPHONE-3, used by QUINONEZ-HERNANDEZ, called (747) 313-3██ (UM████).  During the intercepted conversation, UM████ said, "Hello?"  QUINONEZ-HERNANDEZ asked, "How are you, buddy?" UM████ replied, "Good, good, thanks. Here with a—a... cold, but I'm here." QUINONEZ-HERNANDEZ replied, "That's good. What was I going to tell you, buddy?" UM3003 asked, "Yeah?" QUINONEZ-HERNANDEZ continued, "Have you checked the package, buddy?" U███ replied, "No." QUINONEZ-HERNANDEZ said with a sigh, "Son of a bitch, buddy. That shit has me shaking now, man." UM███ asked, "How, how?" QUINONEZ-HERNANDEZ replied, "Well, check the package, I sent you the tracking number in a picture yesterday and... I was checking it right now as I was getting off the plane of the, of the delivery." UM███ responded, "Yeah?" QUINONEZ-HERNANDEZ explained, " And it changed to... first it said it wasn't going to arrive but then it was, that because of the weather it wasn't going to arrive, but then it was going to arrive and... well it says a shit lot of things and... right now it says that no, it's not going to be delivered, that somebody has to go to the UPS warehouse and take an identification." UM███ acknowledged, "Yeah." QUINONEZ-HERNANDEZ continued, "To pick up the package, buddy." UM███ replied, "Ah... I don't know, buddy, but honestly, we're going to be fucked if [U/I]." QUINONEZ-HERNANDEZ asked, "Son of a fucking bitch! I'm looking at that shit right now and why, buddy? Why do we have to go to the warehouse, with identification?" UM███ asked, "Who knows?" QUINONEZ-HERNANDEZ said, "It's saying that, 'Check your, your, [U/I] your government ID,' I don't know what, to be able to pick up the package." UM███ indicated, "Yeah. No, well, that's no problem." QUINONEZ-HERNANDEZ replied, "That shit has me fucking shaking like hell, buddy." UM███ said, "Don't say that shit, buddy, because I'm going to cry honestly, right now, buddy." QUINONEZ-HERNANDEZ replied,

"No way! No, and look, I've started shaking now because why does it say that shit, buddy? Why does it say to, to, to go to the warehouse to claim the package and 'Take your government ID' and I don't know." UM ▇ stated, "Hmm?" QUINONEZ-HERNANDEZ asked, "No way! No! How the fuck is one going into the warehouse, buddy?" UM ▇ replied, "Yeah. No, no, but you can't lose it either." QUINONEZ-HERNANDEZ said, "No, but supposedly ID... I don't even have an ID with that name or anything, buddy. I just arrive at the lobby and then I ask 'Hey, um, did my package arrive?' 'Yes, under whose name?' 'Matthew [PH].' 'Oh yes, let me see.' 'Okay.' 'On Matthew's.'" UM ▇ responded, "But it's because sometimes it's put... Hey! To get picked up with ID, or without?" QUINONEZ-HERNANDEZ said, "No, buddy, no, how can I put—I put on there to send it to an address and they didn't send it to the address. They didn't, didn't send it." UM ▇ asked, "Where did they send it?" QUINONEZ-HERNANDEZ replied, "It's at—it's at a UPS warehouse that…" QUINONEZ-HERNANDEZ continued, "...they want somebody to claim it." UM ▇ asked, "Uh-huh?" QUINONEZ-HERNANDEZ continued, "With ID and everything. That's very weird, buddy. I've never, also, have never had to go to a UPS warehouse with an ID and everything to claim your package."

244. UM ▇ asked, "And what does the guy over there say?" QUINONEZ-HERNANDEZ asked, "Huh?" UM ▇ repeated, "The guy... what does the client tell you?" QUINONEZ-HERNANDEZ replied, "I haven't talked to him. I'm still in the airport waiting for my luggage." UM ▇ asked, "Uh-huh?" QUINONEZ-HERNANDEZ said, "I just—I just went in to see the package. I said, 'Let's see how... let's see if the package has arrived. I'll stop by the hotel for it.' No way! I go see that shit, buddy." UM ▇ replied, "No way, don't say that because that's fucked up. Don't tell me that, buddy. Don't tell me that." QUINONEZ-HERNANDEZ said, "No, check it, buddy. Check it and call me." UM ▇ said, "No, no. It's not going to be bad, sir."

QUINONEZ-HERNANDEZ replied, "It's there. That's what's bad about it, buddy. Listen, I'm even trembling." [Voices Overlap] UM███ said, "That's why. But I don't know how to check it." QUINONEZ-HERNANDEZ exclaimed, "Motherfucker!! Let's see. Let's see. Let me see why UPS will not deliver it..." UM███ replied, "Don't tell me that." QUINONEZ-HERNANDEZ asked, "Or what, buddy?" UM███ said, "Well, yes. Call! I'm good to tell that guy!" QUINONEZ-HERNANDEZ responded, "Yeah. I'm going to call him. I'm going to tell that..." UM███ replied, "Everything is fine. Everything is fine." QUINONEZ-HERNANDEZ commented, "I hope so, buddy. That shit started to make me tremble." UM███ said, "No, no. Everything is fine because... well, they might just fuck the whole thing up." QUINONEZ-HERNANDEZ replied, "No. Just up. Don't say that buddy. Don't even say it." UM███ stated, "No, well..." QUINONEZ-HERNANDEZ said, "Well, I put everything in it, buddy!" UM███ replied, "I'm telling you, buddy, no." QUINONEZ-HERNANDEZ asked, "How the fuck, buddy?" UM███ said, "I lied to the guy, that, that I was going to sell it, for the same reason, and he's fucking with me. 'Did you sell it? Did you sell it?' I mean, I'm carrying a lie for you." QUINONEZ-HERNANDEZ responded, "No, no, no. Wait, buddy. Take it easy. No, no, no. Everything is fine, sir." UM███ repeated, "Hey, I have a lie because of you." QUINONEZ-HERNANDEZ replied, "Have to see why the fuck they don't want to deliver that package. Why does it say that..." UM███ stated, "I lied for you, sir." QUINONEZ-HERNANDEZ continued, "That we need to show an ID? What's the problem?" UM███ said, "Now..." QUINONEZ-HERNANDEZ continued, "I shipped it to be delivered..." UM███ said, "No, no. But probably..." QUINONEZ-HERNANDEZ explained, "There at the—the hotel's lobby. At the address that I gave, sir. Motherfucker!" UM███ commented, "I thought that you always shipped it to the guy's address." QUINONEZ-HERNANDEZ asked, "What?" UM███ repeated, "I thought that you always shipped it to the

guy's address. The guys." QUINONEZ-HERNANDEZ asked, "How can you think, buddy? That I'm going to send it to their address. Never! No! I ship it to a hotel, to a lobby. I go and pick it up from there, and that's it. Oh, 'I'm staying at this hotel... I'm just going to [U/ I], a package arrived.' 'Oh, yes.' 'Under whose name?' 'Oh, John Doe.' 'Oh yes, this is the package. Here you go.' 'Oh, you know what? I'll come by later because it's still early, to do check-in. I'll came back later.' It was fucking shit. I would not come back to the hotel. I would go to another hotel." UM █ replied, "Yeah." QUINONEZ-HERNANDEZ said, "But that fucking shit should have been here by now. And it's saying that no, that one has to go and claim it, with an ID. I didn't like that shit at all, buddy. "What do mean with an ID?"" UM █ exclaimed, "No, no! Well, call. Call." QUINONEZ-HERNANDEZ asked, [U/I] "buddy?" UM █ repeated, "Call, call. There's no problem. Everything is fine." QUINONEZ-HERNANDEZ acknowledged, "All right then, buddy." UM █ confirmed, "All right. Go ahead. Bye."

245.    Based on my training, experience, and familiarity with the investigation, I believe QUINONEZ-HERNANDEZ explained the parcel's status to UM █. In keeping with the ruse that the parcel was unintentionally seized by UPS, I believe QUINONEZ-HERNANDEZ expressed panic about the requirement to show identification to retrieve the parcel because QUINONEZ-HERNANDEZ wanted to maintain his cover about his association with the parcel. As noted, QUINONEZ-HERNANDEZ intentionally wanted the parcel seized, evidenced by QUINONEZ-HERNANDEZ lining the parcel's tape with cocaine.  Furthermore, I believe QUINONEZ-HERNANDEZ shipped the "fictitious" parcel with the intention of stealing the actual kilograms of drugs from UM █, thus making it appear the drugs were instead seized in the fictitious parcel.

246.     On February 21, 2025, at approximately 2:40 p.m., case agents retrieved the parcel from the UPS Access Store located at 4623 75th Street, Kenosha, Wisconsin 53142. While at the UPS Access Store, a UPS manager advised case agents that the status of the parcel was changed by the account holder from delivery to in-store pickup.   It therefore appears as though QUINONEZ-HERNANDEZ changed the status before leaving Los Angeles International Airport on February 20, 2025, at approximately 4:14 a.m. (Pacific Standard Time).

247.     After taking possession of the parcel, case agents observed a white powdery substance affixed to the inside of the clear tape placed around both the top and bottom edges of the parcel.

248.     On February 24, 2025, Milwaukee Police Department Canine Officer Joseph Esqueda, a Homeland Security Investigations Task Force Officer, deployed drug detection canine "Ghost" over the parcel.  "Ghost" alerted to the presence of narcotics on/in the parcel.

249.     On March 3, 2025, case agents requested that UPS modify the status of the parcel to reflect, "Generally prohibited item identified in package contents that does not comply with UPS policies and procedures." Case agents anticipated that such a change would prompt QUINONEZ-HERNANDEZ to update UM███, securing the outcome QUINONEZ-HERNANDEZ devised.  At approximately 2:32 p.m., that same day, UPS updated the status of the parcel to reflect the aforementioned status.

250.     On March 3, 2025, at approximately 3:41 p.m., TARGET TELEPHONE-3, used by QUINONEZ-HERNANDEZ called, (818) 423-███, used by ███ R███.  During the intercepted call the parties greeted each other, and R███ said, "Go ahead."  QUINONEZ-HERNANDEZ replied, "Send me a – a picture of the – of the shit…they are returning the fucking package. Fuck!"  R███ asked, "Which one?" [Voices Overlap] QUINONEZ-HERNANDEZ

replied, "It says that now…that it's going to show – going to show delivery of when they are going to return it. Send me the picture of that thing…the ticket, ▮▮▮, so I can call right now." R▮▮▮ [Sighs] and said, "I told you not to put that." [Voices Overlap] QUINONEZ-HERNANDEZ stated, "Motherfucker. [Sniffles] But I think they just picked it up today because that shit is still going to be over there. So, I can call and tell them not to." R▮▮▮ replied, "Okay." QUINONEZ-HERNANDEZ directed, "Send it to me. Send it to me, so I can call right now. Bye."

251. Based on my training, experience, and familiarity with the investigation, I believe QUINONEZ-HERNANDEZ instructed R▮▮▮ to send a photo of the tracking status of the parcel, believing UPS was going to return the parcel ["Motherfucker. [Sniffles] But I think they just picked it up today because that shit is still going to be over there. So, I can call and tell them not to."]. Furthermore, I believe the aforementioned intercepted conversation was about the same "fictitious" parcel QUINONEZ-HERNANDEZ sent to Wisconsin in furtherance of the ruse to steal cocaine from UM▮▮▮.

252. On March 3, 2025, at approximately 3:43 p.m., TARGET TELEPHONE-5, used by QUINONEZ-HERNANDEZ, received a call from (818) 423-▮▮▮, used by R▮▮▮. During the intercepted call, QUINONEZ-HERNANDEZ said, "Hello?" R▮▮▮ replied, "What is that you wanted? The card number, or what?" QUINONEZ-HERNANDEZ answered, "No, the ticket." R▮▮▮ replied, "Oh, okay." QUINONEZ-HERNANDEZ said, "Bye. Every….the information, everything from the ticket. Take a picture and send it to the other one." R▮▮▮ replied, "Bye."

253. Based on my training, experience, and familiarity with the investigation, I believe QUINONEZ-HERNANDEZ instructed R▮▮▮ to take a picture of the parcel's status history and send the information to TARGET TELEPHONE-3 [QUINONEZ-HERNANDEZ said, "No,

the ticket." R█████ replied, "Oh, okay." QUINONEZ-HERNANDEZ said, "Bye. Every….the information, everything from the ticket. Take a picture and send it to the other one."]. I further believe that QUINONEZ-HERNANDEZ intended to share the parcel's tracking status with UM██ to complete the fictitious parcel ruse so that UM███ would not question whether or not the parcel had been seized. Based on my training and experience, I know that either UM███ and/or QUINONEZ-HERNANDEZ would be financially liable to the unknown source(s) of supply in Mexico for the drugs "seized." I further believe QUINONEZ-HERNANDEZ intended to share the parcel's tracking status after the status designated the parcel's seizure so UM███ could, in turn, provide that information to the source(s) of supply in Mexico. The tracking information therefore served as evidence to the source(s) of supply that the cocaine was not stolen by UM███ and/or QUINONEZ-HERNANDEZ.

254.    On March 3, 2025, QUINONEZ-HERNANDEZ engaged in a series of text message exchanges with UM███ regarding the parcel. For example, on March 3, 2025, at approximately 4:23 p.m., TARGET TELEPHONE-3 sent a text message to (747) 313-███ (UM███), stating, "And you wanted me to go inside the warehouse and get fucked." Followed by, "To me, Makica? Come on." At approximately 4:29 p.m., TARGET TELEPHONE-3 received a text message from (747) 313-███ (UM███) stating, "These people over here, with the payment, that's the only thing I…" Followed by, "…can tell you, and they are asking for you, and they want their money. They want…" Followed by, "…the money."

255.    On March 3, 2025, at approximately 5:07 p.m., TARGET TELEPHONE-3 received a text message from (747) 313-███ (UM███), stating, "Give thanks to God nothing happened to you. We have to pay." Followed by, "You already know the rule of this hell. You already know, the only way, it's by paying." At approximately 7:08 p.m., TARGET TELEPHONE-3

received a text message from (747) 313-███, UM███, stating, "These people want their money, that's what I can tell you." Followed by, "There is no forgiveness of anything. You ask for it, it gets lost, and you have to res…" UM███ continued, stating, "…pond." Followed by, "That's your problem." UM███ continued, "That's what that shit says? I don't understand, I don't get it." Followed by, "I have never sent it that way, man. I don't know, you are the one who knows. You are the one who understands, and only you know." At approximately 7:10 p.m., TARGET TELEPHONE-3 received a text message from (747) 313-███, UM███, stating, "You have been sending like that for 8 years. I don't know what happened, but now you lo…" Followed by, "…it, and you have to pay. That's how the devil things work." Followed by, "The men you said you are going to have to pay. You going to pay even if they have to invest…." Followed by, "They are going to get their money back with you."

256.    On March 3, 2025, at approximately 7:22 p.m., TARGET TELEPHONE-3 sent a text message to (747) 313-███, UM███, stating, "Say whatever you want, Makica. Have ball, asshole. Now you are saying that I…" Followed by, "…sent it, when you almost sent it yourself because of your greed." Followed by, "Remember you were calling me to send them, and now that they went down, now you…" Followed by, "You want to put the blame on me, fuck no. Have some ball…" Followed by, "…asshole and accept that you wanted to send that, you knew the risk of…" Followed by, "…those things. I just lost three apparatus. I am not responsible." Followed by, "…of these ones that you wanted to send over there." Followed by, "And do whatever you want, Makica. Just like you told me, either I was getting fucked over there or you here…if either you or me are getting fucked, then it's you, asshole." Followed by, "And don't be threatening people, asshole, because everyone of us could be hit."

257.     Based on my training, experience and familiarity with the investigation, I believe QUINONEZ-HERNANDEZ recapped that UM█████ asked QUINONEZ-HERNANDEZ to send the parcel, and that UM████ understood the parcel's seizure risk.  QUINONEZ-HERNANDEZ further explained that anyone of them (QUINONEZ-HERNANDEZ, UM████, etc.) could be killed by unknown parties for the seized drugs and failure to pay the drug debt.

258.     On March 3, 2025, at approximately 7:24 p.m., TARGET TELEPHONE-3 sent a text message to (747) 313-████ (UM████) stating, "You are too old to come up with that bullshit." Approximately two minutes later, TARGET TELEPHONE-3 received a text message from UM████ stating, "I'm just passing on the message that you have to pay."  Followed by, "You shouldn't have sent me that ugly message.  Over here, they took it another w…" Followed by, "…ay.  But you know what you write and what you say."

259.     Based on my training, experience, and knowledge of the investigation, I believe QUINONEZ-HERNANDEZ and UM████ blamed each other for losing the "drugs" UM████ believed to have been in the parcel.  UM████ told QUINONEZ-HERNANDEZ, that QUINONEZ-HERNANDEZ is expected to pay for the seized "drug shipment."

260.     On March 4, 2025, the Honorable William E. Duffin, United States Magistrate Judge, Eastern District of Wisconsin, authorized a search warrant for the parcel [See 25-MJ-5I]. That same day, investigators searched the parcel, and discovered the clear plastic tape lining the frame of the parcel contained a white-powdery substance that field tested positive for the properties of cocaine.  Investigators further discovered two five-pound weights in the parcel.  The parcel also contained Styrofoam packing and an undetermined amount of loose white-powdery substance which case agents believe was supplied by MARTINEZ.

261.     On March 5, 2025, TARGET TELEPHONE-3 received a text message from (747) 313-███, UM ███, stating, "Listen I need for you to pay because this is not going to end good is what."  Followed by, "The men are telling me."  Followed by, "I can't take this much longer man Honestly things are fucked up they are."  Followed by, "Fucked up."

262.     Based on my training, experience, and familiarity with the investigation, I believe UM ███ texted QUINONEZ-HERNANDEZ insisting QUINONEZ-HERNANDEZ pay for the "seized drug shipment" from the parcel ["Listen I need for you to pay because this is not going to end good is what."].

### *QUINONEZ-HERNANDEZ and MARTINEZ Coordinate Receiving Drugs*

263.     On February 19, 2025, at approximately 4:06 p.m., TARGET TELEPHONE-5, used by QUINONEZ-HERNANDEZ, received a call from (818) 614-███, used by MARTINEZ. During the intercepted call QUINONEZ asked, "What's up dude?" MARTINEZ responded, "Where are you?" QUINONEZ-HERNANDEZ replied, "I'm arriving to your house. I just had to stop by the bank." MARTINEZ confirmed, "I'll see you there, then. So, uh...Uh-huh. But, [Stammers] did you get a hold of that?" QUINONEZ-HERNANDEZ replied, "Yes, dude, yeah. What was I going to tell you?" MARTINEZ stated, "Alright." QUINONEZ-HERNANDEZ asked, "You don't need one (1)?" MARTINEZ replied, "[U/I]. One (1)..." [Voices Overlap] QUINONEZ-HERNANDEZ explained, "This guy says he has three (3) and wanted to know if I needed the other one (1). I told him, 'No, dude, I only need two (2).'" MARTINEZ asked, "What's the price he gave you?" QUINONEZ-HERNANDEZ said, "At eight (8)-fifty (50) is the lowest he'll give them to me." MARTINEZ replied, "Oh..." [Voices Overlap] QUINONEZ-HERNANDEZ said, "I think they gave it to that guy for like around eight (8)." MARTINEZ replied, "Yeah, right?" QUINONEZ-HERNANDEZ said, "Yes, because he was going to make like fifty (50) bucks in

123

profit, I think. But that's fine, dude, oh well." MARTINEZ responded, "That's fine, dude, I'll take it, because the dude..." [Voices Overlap] QUINONEZ-HERNANDEZ asked, "Yes?" MARTINEZ continued, "...Asked me for one (1) and, well... I was waiting for cheaper ones..." [Voices Overlap] QUINONEZ-HERNANDEZ said, "Alright, so I can tell him." MARTINEZ continued, "...but if I... if I wait..." [Voices Overlap] QUINONEZ-HERNANDEZ said, "Alright, let, let me tell him to bring them." MARTINEZ replied, "Alright." QUINONEZ-HERNANDEZ confirmed, "Alright, then."

264.     Based on my training, experience, and familiarity with the investigation, I believe QUINONEZ-HERNANDEZ received at least two kilograms of cocaine [QUINONEZ-HERNANDEZ explained, "This guy says he has three (3) and wanted to know if I needed the other one (1). I told him, 'No, dude, I only need two (2).'" MARTINEZ asked, "What's the price he gave you?" QUINONEZ-HERNANDEZ said, "At eight (8)-fifty (50) is the lowest he'll give them to me."].  QUINONEZ-HERNANDEZ asked MARTINEZ if MARTINEZ needed one kilogram since QUINONEZ-HERNANDEZ only needed two. I further believe that "At eight (8)-fifty (50) is reference to an unknown quantity of cocaine (i.e., $850)

*QUINONEZ-HERNANDEZ Discusses a Drug Shipment with UM ███ ("Alejandro Gonzalez")*

265.     As previously discussed, QUINONEZ-HERNANDEZ has engaged in several intercepted conversations with "TREVI/TRINI" regarding a future drug shipment concealed and/or co-mingled in some type of machinery originating from Mexico, and destined for California, which will then be re-packaged and shipped from California to Australia. QUINONEZ-HERNANDEZ continues to engage with Mexico-based DTO members in furtherance of the drug shipment concealed and/or co-mingled in some type of machinery.

266.    For example, on April 2, 2025, at approximately 11:34 a.m., TARGET TELEPHONE-3, used by QUINONEZ-HERNANDEZ, placed a call to Mexico-based telephone number +52 █████████, used by an unknown male self-identified as "Alejandro Gonzalez," hereinafter referred to as UM███. During the call, QUINONEZ-HERNANDEZ asked, "Mister Alejandro?" UM███ responded, "At your service. Alejandro. Alejandro Gonzalez." QUINONEZ-HERNANDEZ asked, "What's going on, friend? Listen, that guy told me to give you a call, man." UM███ replied, "Yes. Um, he told me that you are going to help us out with receiving some tools." QUINONEZ-HERNANDEZ responded, "Yes, man. Yes, yes, yes." UM███ continued, "Oh, that's good. Well, the only thing... what I was explaining here to our friend, is that I already have all... all the service so that it's taken... or—or however you indicate... for it to be dropped off at the place you indicate... that you indicate to us. And, um... and the only thing I need is like... because of the times, and because of... because of the transition of power over there with you guys, and the conflicts that exist with your representative... with the president, some details were changed. Alright? But I have ability to get the tools in, over here, through Laredo. They will provide us the service... um, and I'll—I'll cover the transportation to where you tell me. We had spoken about... about L-A." QUINONEZ-HERNANDEZ confirmed, "That's right man." ALEJANDRO asked, "Is that correct?" QUINONEZ-HERNANDEZ answered, "That's right. Uh-huh."

267.    UM███ explained, "Oh, good. Well, also, um... uh, I would only need... an identification. If the identification does not match the... the address that I'm giving, the proof of residence... a proof of residence, an identification and a telephone number. And my customs agent, his name is Hector, will get in contact with you and he will give you—he will give you instructions and say, 'Uh, your merchandise is ready. Where do I take it to?' And he will... he will... figure it's

125 of 191

125

going to be a personalized shipping service. Do you understand me?" QUINONEZ-HERNANDEZ confirmed, "Alright, alright, man, perfect." UM ▮▮▮ continued, "With the confidence that, over here, we are working with them, and they provide us the service of... at one hundred (100) percent." QUINONEZ-HERNANDEZ asked, "Alright, mister Alejandro. Then what information do you need, so I can send it to you?" UM ▮▮▮ answered, "I need, obviously, your ID." QUINONEZ-HERNANDEZ replied, "Okay," and UM ▮▮▮ continued, "And the—the address of where the tools are arriving to. And... [Coughs] a proof of residence." QUINONEZ-HERNANDEZ asked, "Proo—proof... what do you mean 'proof of residence'"? UM ▮▮▮ answered, "Yes, of where you live. Where you're going to receive. Where... like where you have a light bill, that says, 'I live at this place.' And proves that... that 'I have... that at this place,' um..."

268.    QUINONEZ-HERNANDEZ elaborated, "The thing is... uh, look, look, mister Alejandro. That's the little problem I had told, uh, that man as well. That... the problem is the person that—that is providing their address, their location, um, he—he doesn't want to... he doesn't want to provide too much information like that, of—of putting, um... of putting one's face. Having to put his face, [Stammers] with his I-D, and also put, well, the proof that is being asked. Well, because we thought that it was going to be package and it was just going to arrive... and, yeah, well, sometimes you have to sign for the package to... well... the package is delivered... go ahead. [Voices Overlap] UM ▮▮▮ responded, "Oh, no. It's—it's... look. It's... we could do that way, but, uh... because of the type of tools that they are, the situation doesn't allow for it to be done that way."

269.    QUINONEZ-HERNANDEZ stated, "Oh," and then UM ▮▮▮ informed QUINONEZ-HERNANDEZ, "First, the package weights one hundred eighty (180) kilos. It's going on a pallet." QUINONEZ-HERNANDEZ replied, "Yes," and UM ▮▮▮ continued, "Yeah?

126

It's going on a pallet. And, beside that, um, my customs agent is who is going to be taking care of the—of the exporting and importing. And, um, we do need someone who... who can receive us, in order to... look. I don't know if it was explained to you that wasn't the final destination. Right?" QUINONEZ-HERNANDEZ confirmed, "No, no, no. Yes, I understood everything. Yes, yes." UM ▮ explained, "It's just a layover. It's a layover, alright? So, then... uh, then... well, we... from that, we legitimize it over there, and from there, it goes elsewhere. Alright? We do—we do a whole series of—of... um, a whole series of events. But... [Coughs] but I do need... I have to meet that requirement and... I'm telling you, it's new. Before, we could do that... any package. It was just, uh, 'Juan Perez,' or 'Johnathan X,' or whatever name you would tell me, and with whichever ID you would—would give us... just with that. But now, they are requiring that of me [Stammers] because the border is tight. Right?" QUINONEZ-HERNANDEZ replied, "Yes, yes, yes, yes, I understand."

270. UM ▮ stated, "There has been a lot of, um... well, um, a series of questions that... um, both governments imposed and that. And, well, we continue trying to work, but... for this, I need... they are requiring this of me. You tell me. I'm here at your service. Let me know if you can get that for me, and if not, I will let our friend over here know. So, we could look for other options. Right? Because we are not just going to give up." QUINONEZ-HERNANDEZ responded, "Uh, yes, mister Alejandro. Look, mister Alejandro, [Stammers] give me a few days, two (2) days if you could. I'm going to speak with the guy that I already had the address from, to coordinate, and see if the guy wants to provide me with that information. [Stammers] And if not... go ahead." [Voices Overlap] UM ▮ advised, "Look, um, I'll wait for you to see if—if you convince him. Because our friend over here is also... he fell behind. Um, I'll wait for you until tomorrow. Is that fine?" QUINONEZ-HERNANDEZ answered, "Oh, perfect. You're on, friend. Thank you very

127

much, Alejandro." UM ███ asked, "Yeah?" QUINONEZ-HERNANDEZ replied, "Okay. Perfect. Yeah, it's fine." UM ███ asked, "Who do I have the pleasure with?" QUINONEZ-HERNANDEZ answered with an alias name stating, "With... with Alfredo Garcia, sir. Alfredo Garcia." UM ███ stated, "Okay. Okay, Alfredo. We'll be in touch. I'm here at your service." QUINONEZ-HERNANDEZ replied, "Thank you. Same to you, mister Alejandro. Alright, thank you very much."

271. Based on my training, experience, and familiarity with the investigation, UM ███ contacted QUINONEZ-HERNANDEZ to coordinate the shipment of 180 kilograms of cocaine (i.e., "tools") from Mexico, across the Laredo, Texas, Port of Entry, with the final destination being Australia, via California. Case agents believe UM ███, to conceal his identity, utilized the fictious name "Alejandro Gonzalez," as QUINONEZ-HERNANDEZ has previously used the fictitious name "Alfredo Garcia." Case agents are aware that QUINONEZ-HERNANDEZ previously used the name "Alfredo Garcia" on the shipping label for two kilograms of cocaine QUINONEZ-HERNANDEZ shipped from West Allis, Wisconsin. These kilograms of cocaine were intercepted and seized at a UPS sorting facility in Ontario, California, on December 24, 2024. UM ███ directed QUINONEZ-HERNANDEZ to provide proof of identity and proof of address for the other unnamed co-conspirator (consignee), who would receive the cocaine laden shipment, as a safety measure to prevent the theft of the 180 kilograms of cocaine. UM ███ further discussed having a "customs agent" who would assist in crossing the 180 kilogram "pallet" of cocaine into the United States. At this time, case agents are working to determine if the "customs agent" is a United States Customs and Border Protection Officer (CBPO) assigned to the Laredo, Texas, Port of Entry, or if the reference to "customs agent" is a Customs Broker responsible for facilitating the importation from Mexico into the United States, and the exportation of the cocaine-laden

commodity from the United States [California] to Australia. [UM ▮ continued, "Yeah? It's going on a pallet. And, beside that, um, my customs agent is who is going to be taking care of the—of the exporting and importing."].

*QUINONEZ-HERNANDEZ Discusses the Pending Drug Shipment from Mexico with MARTINEZ*

272.    On March 29, 2025, at approximately 7:42 p.m., TARGET TELEPHONE-5, used by QUINONEZ-HERNANDZ, received a call from (818) 614-▮▮▮, used by MARTINEZ. During the call, the parties greeted, and MARTINEZ said, "What was I going to tell you? Uh, um…call the man and make a three-way call and see what he has to say. Because…[Voices Overlap] QUINONEZ-HERNANDEZ asked, "What man?" MARTINEZ continued, "The guy with the store, bro. To make an appointment to see him and everything." QUINONEZ-HERNANDEZ replied, "Fine." MARTINEZ said, "The thing is, from the start, we need to…I don't know if we need to give him another ID, another name, or some…I don't know how to do it." QUINONEZ-HERNANDEZ commented, "I was also going to tell you, Prieto called me today in the morning, dude." MARTINEZ responded, "Uh-huh." QUINONEZ-HERNANDEZ explained, "That we need another face, because he says that over there, they are going to send it differently. It's now going to be through a company, dude. And that shit is asking for all the information about who, uh…well, where it's going to arrive. And even…but the company is going to call, man, the company. And I said, 'Oh well, it's no problem. I will give you the face and everything. A house and that's it.' And he told me, 'That's fine. As long as they have the same address of where that is going to arrive.' And I said, 'Alright, that's fine.' [Voices Overlap] MARTINEZ [U/I]." QUINONEZ-HERNANDEZ asked, "Huh?" MARTINEZ continued, "No, I was talking about they needed an ID card…the person. Uh-huh. [Voices Overlap]." QUINONEZ-HERNANDEZ said, "Like that. And the guy told me…Prieto told me that…he said, 'Have that

129

ready for me because…'  He says that the problem was that, dude, when they sent it- he guys there at the-at the border, they made holes through the metal, dude."  MARTINEZ stated, "Uh-huh."  QUINONEZ-HERNANDEZ explained, "They put some damn…some damn things that they made holes all over, dude, to see if it had anything.  But he said the good thing was that it didn't have anything.  And they sent it back, dude.  They sent it back and those guys fixed it and all.  And he said that… [Voices Overlap]."  MARTINEZ said, "Good thing it didn't have anything."  QUINONEZ-HERNANDEZ replied, "Nothing, dude, nothing at all.  And he says that – that it's coming back again, but that it took them like three weeks, a month to fix it.  It was a pain, dude.  And I told him, 'Well, yeah, it's fine.'  And he said, 'But have that ready for me on Monday.'  He said, 'Have it…'  MARTINEZ acknowledged, "Yeah."  QUINONEZ-HERNANDEZ continued, "…'face and everything.'"  MARTINEZ asked, "And has Ramiro said anything?"  QUINONEZ-HERNANDEZ replied, "Huh?  No, dude.  Well, he just texts me, man, that, 'What's up?  What's up?' and this, but, well…"  MARTINEZ stated, "Oh, so then, so then…[Voices Overlap]."

273.   QUINONEZ-HERNANDEZ exclaimed, "Oh!  I didn't tell you, right?"  MARTINEZ replied, "No, I don't know anything."  QUINONEZ-HERNANDEZ asked, "Oh, no?  Oh, I'll show you when I see you.  The audio that they sent me." [Voices Overlap] MARTINEZ stated, "Uh-huh." [Voices Overlap] QUINONEZ-HERNANDEZ explained, "He was going to travel there.  The guy was supposed to go there driving, and I told him, 'Look, man.  It's up to you.'  He said, 'Yes, man, they don't believe me over here, how is that possible?  Again?  And that…'  I said, 'Well, I don't know what happened, man.  It's the new administration.'  But let me tell you…well, I called and everything, and said, 'No, man, that…that's done.  It was done right there at UP-s…at that thing.'  MARTINEZ asked, "Huh?"  QUINONEZ-HERNANDEZ replied, "In that little truck.   They told me." [Voices Overlap] MARTINEZ stated, "Uh-huh."

130

QUINONEZ-HERNANDEZ explained, "They said, 'That's over.' I said, 'What do you mean?' They said, 'Yes, that…it's no use.' Well, I recorded that same call and I sent it to him. And I told him, 'Look, man, I already investigated and look at that. This is what the operator from there is telling me. That thing is already…' He said, 'Son of a bitch, then it's real.' I said, 'Well, yeah, man. And you wanted me to go in there, man. No, of course not.' MARTINEZ said, "Yeah, well, you're…well, you looked good." QUINONEZ-HERNANDEZ asked, "And he kept talking asking, 'What's up? Have you gotten any money from somewhere to make a payment over here, or something?' I said, 'No, man, from where? Right now, I'm going to [U/I] and shit!' I was about to call you, dude, because, look…I want to…well, I don't know, are we going to do that clandestine, or are we going to take our cars, or what, dude? I want to check out three or four cars at the auction this week, dude." MARTINEZ said, "Well, get them, man. Honestly, me with the cars right now…well, it's a no. I'm going to…well…well, I'm going to get…I'm going to do this shit. If he is not going to get involved, I will do it by myself, dude. Because…" [Voices Overlap] QUINONEZ-HERNANDEZ replied, "Mm-hmm." MARTINEZ continued, "Because it's there. That's how I see it. [Aside: Let me get a carne asada torta to go, please. No, that's it.]. Yeah, man. It's good there now. And…but you must be there, constantly hauling people, and all that." [Voices Overlap] QUINONEZ-HERNANDEZ acknowledged, "Well, of course, Veinticuatro. Of course, I know. You probably think…" [Voices Overlap] MARTINEZ agreed, "Alright, then." QUINONEZ-HERNANDEZ continued, "…That I'm going to do all that work and that guy is just going to show up as the boss. Fuck that!" MARTINEZ replied, "Well, okay [Aside: How much do I owe you?] [Voices Overlap]."

274. QUINONEZ-HERNANDEZ stated, "Once you have a business…let's go, let's go, I will pick you up. Where are you?" MARTINEZ replied, "No, [Stammers] I…" [VOICES

OVERLAP] QUINONEZ-HERNANDEZ said, "[U/I] So we could have a chat.  It's been a while since I've seen you and…if you want [U/I]." [Voices Overlap] MARTINEZ responded, "No, it's because you…as soon as you arrive [U/I] you lock yourself in and nobody will take you out, dude. And…" [Voices Overlap] MARTINEZ said, "I say, 'No, this dude later…'  I'm going to running up and down, like, 'bring beers, we need ice…'  And Luis just there…no." [Voices Overlap] QUINONEZ-HERNANDEZ responded, [U/I] "I already have the [U/I] for the beers.  Don't tell me about it.  But take it easy, I already got it.  In fact…" [Voices Overlap] MARTINEZ stated, "Yeah."  QUINONEZ-HERNANDEZ continued, "In fact, do you want to invest in [U/I] right now? We could already open it."  MARTINEZ replied, "No, what for, dude?  No, first, it's the shop, dude." [Voices Overlap] QUINONEZ-HERNANDEZ said, "Listen!  I'll wait,  [U/I]. They stole a beer truck, dude."  MARTINEZ exclaimed, "No fucking way!"  QUINONEZ-HERNANDEZ replied, "Corona or Modelo.  For real, man.  And he said, 'It's just because I don't have anywhere else to put it.'  But he said, 'If you want to invest, go ahead.'  And I feel like buying around three thousand dollars, dude.  To have some there." [Voices Overlap] MARTINEZ commented, "Oh, that's good.  Yeah, man.  You could rent a storage and put it there." QUINONEZ-HERNANDEZ [U/I] stated, "But, no, I'm might just buy a fucking car.  I don't know. [U/I]" [Voices Overlap] MARTINEZ responded, "I'm – I'm going to give you the number so you can call the guy, dude.  Because you speak English.  He – he is white, that guy is white." [Voices Overlap] QUINONEZ-HERNANDEZ confirmed, "Send it to me.  Yeah.  Okay, but let's see. What am I going to tell him, dude?  The lease, how much, what, how…[Mumbles]." [Voices Overlap] MARTINEZ said, "Uh-huh. No.  I already know how much it costs.  It costs two thousand, two hundred, but he has two locations.  Tell him you want to see both locations.  And when he could make an appointment to see the locations.  He is going to ask you – he is going to

ask you, what you are going to sell." [Voices Overlap] QUINONEZ-HERNANDEZ acknowledged, "Uh-huh." MARTINEZ directed, "Tell him that clothes, that you bought a pallet, like…" [Voices Overlap] QUINONEZ-HERNANDEZ agreed, "Oh! I'm going to tell him that I get pallets of clothing, and stuff like that, from…merchandise from Costco and Amazon." [Voices Overlap] MARTINEZ affirmed, "Uh-huh. And that…uh-huh, and you have cell phone cases, chargers, and all that stuff." [Voices Overlap] QUINONEZ-HERNANDEZ confirmed [U/I], "Yeah, we need to make a façade, right? To the thing, right?" MARTINEZ replied, "Well, yeah, maybe. But I'm saying…uh-huh, just for…maybe just for the first few days so the guy can see it." QUINONEZ-HERNANDEZ acknowledged, "Uh-huh." MARTINEZ continued, "I already asked everything about that, and the lady told me, 'No, that guy doesn't even come. He doesn't even come.' [Voices Overlap] QUINONEZ-HERNANDEZ commented, "No…yeah, they don't give a fuck. They just want to collect the rent, dude." MARTINEZ answered, "Yeah, she said, 'As long as you paid the rent, he doesn't show up.' Then, uh, make the appointment and ask him when we can see the stores." QUINONEZ-HERNANDEZ replied, "Okay, all set. Send it to me right now so I could just do it." [Voices Overlap] MARTINEZ agreed, "I'll send you a text. Alright." QUINONEZ-HERNANDEZ replied, "Alright, then."

275. Based on my training, experience, and familiarity with the investigation, I believe QUINONEZ-HERNANDEZ explained to MARTINEZ that Prieto requested a new identity to receive the drug shipment concealed in the metal commodity. QUINONEZ-HERNANDEZ told MARTINEZ that Prieto further explained that the metal shipment will be sent using a different company so the identity and address of the person receiving the shipment must match the shipping company's records. QUINONEZ-HERNANDEZ further explained that Customs and Border Protection Officers drilled multiple holes in the metal. Based on my training and experience, I

know that Mexico-based drug traffickers will often send a "test-run" of a vehicle, or commodity, to make it appear the future drug laden vehicle or commodity has a history of being inspected, or "crossing" into the United States from Mexico successfully. QUINONEZ-HERNANDEZ and MARTINEZ also discussed renting a space and making it appear as a legitimate business ["I'm going to tell him that I get pallets of clothing, and stuff like that, from…merchandise from Costco and Amazon"] to conceal it's use for illegal activity. MARTINEZ explained to QUINONEZ-HERNANDEZ that so long as rent is paid, no one will show up to see what activity is happening in the rented space ["They just want to collect the rent, dude."].

### Reynaldo SANCHEZ-GONZALEZ (TARGET TELEPHONE – 4)

276. Reynaldo SANCHEZ-GONZALEZ, also known as "Rey," is a Hispanic male born in Mexico on ████ 1997. SANCHEZ-GONZALEZ is a citizen and national of Mexico with no current lawful immigration documentation to reside in the United States. SANCHEZ-GONZALEZ was ordered removed from the United States, to Mexico, by an Immigration Judge on November 6, 2019. SANCHEZ-GONZALEZ resides ast 20█ S. 31st Street, Milwaukee, Wisconsin. On May 12, 2025, at approximately 9:30 a.m., case agents conducting surveillance at or near 20█ S. 31st Street observed SANCHEZ-GONZALEZ sitting in the backyard of this residence. During intercepted communications over TARGET TELEPHONE-2 on December 21, 2024, and December 23, 2024, MORALEZ, using TARGET TELEPHONE-2, called (414) 213-████ (i.e., TARGET TELEPHONE-4). During the two intercepted calls, MORALEZ referred to the user of (414) 213-███ as "Rey," which is a common abbreviation for the name Reynaldo. Furthermore, during a 2019 narcotics investigation, a Wisconsin law enforcement database listed cellular telephone number (414) 213-███ (TARGET TELEPONE-4) linked to Reynaldo SANCHEZ-GONZALEZ.

277.    On December 21, 2024, at approximately 7:05 p.m., MORALEZ, using TARGET

TELEPHONE-2, called (414) 213-███ (i.e., TARGET TELEPHONE-4), used by SANCHEZ-

GONZALEZ. During the call, the parties greeted each other, and SANCHEZ-GONZALEZ asked,

"What was I going to tell you? Uh…do you need a doll there?" MORALEZ answered, "No. We're

all really full on everything, man." SANCHEZ-GONZALEZ asked, "Really?" MORALEZ

inquired, "How much?" SANCHEZ-GONZALEZ replied, "I'll give it to you for…for you,

seventeen and a half (17.5)." MORALEZ repeated, "Seventeen and a half (17.5)?" SANCHEZ-

GONZALEZ replied, "Mm-hmm. Yes, because I'm leaving tomorrow already." MORALEZ

asked, "Chapo's kind?" SANCHEZ-GONZALEZ replied, "Not Chapo's kind. It's the one from

the other day…when you went to ..uh [U/I]…the young boy [U/I]." MORALEZ responded, "Oh,

no! Because—because the people are all gone on vacation!" MORALEZ continued, "So, nothing

can be done right because, well, there are no—no buyers." SANCHEZ-GONZALEZ agreed, and

MORALEZ suggested, "Yeah. Only if you can front…[U/I]…only if you can front them, and then

I'll give you the money when you come back."  SANCHEZ-GONZALEZ replied, "Damn!"

MORALEZ continued, "To break it down to...to mince it." SANCHEZ-GONZALEZ asked, "Let

me see, then…how long will that take? Leave them for the sixth (6th)…fifth (5th)?" MORALEZ

answered, "No, well, I'm telling—that's why—that's why I'm saying, in order to do you the

favor." Both parties agreed to further discuss the matter later.

278.    Based on my training, experience, and knowledge of the investigation, I believe

SANCHEZ-GONZALEZ asked MORALEZ whether MORALEZ was interested in purchasing an

unspecified quantity and type of narcotic for $17,500, because SANCHEZ-GONZALEZ was

"leaving tomorrow." Based upon my training and experience, I am aware that $17,500 is within

the price range for a kilogram quantity of cocaine. MORALEZ was unwilling to purchase the cocaine, because of the holidays, and that many of his narcotics customers are on vacation and out of town. MORALEZ suggested that SANCHEZ-GONZALEZ provide the narcotics on consignment, to MORALEZ, so MORALEZ could break down the narcotics into smaller quantities, for increased sales and profits, as a favor to SANCHEZ-GONZALEZ ("in order to do you [SANCHEZ-GONZALEZ] the favor").

*MORALEZ Seeks Drugs from SANCHEZ-GONZALEZ on December 23, 2024*

279.    On December 23, 2024, at approximately 12:12 p.m., MORALEZ, using TARGET TELEPHONE-2, called (414) 213-███ (i.e., TARGET TELEPHONE-4), used by SANCHEZ-GONZALEZ.  During the call, MORALEZ asked, "What up, Rey? How are you?" SANCHEZ-GONZLAEZ responded, "Over here, I am already over here." MORALEZ asked, "You're already over there?" SANCHEZ-GONZALEZ replied, "Well, here passing by…Colorado," suggesting that SANCHEZ-GONZALEZ had left Wisconsin. MORALEZ commented, "Oh, fuck." SANCHEZ-GONZALEZ asked, "What did you need?" MORALEZ responded, "No, well, I wanted to see if you could help me with that!" SANCHEZ-GONZALEZ advised, "Let me tell my brother. I will call you, then, in a bit." MORALEZ confirmed, "Alright."

280.    Based on my training, experience, and knowledge of the investigation, I believe MORALEZ called SANCHEZ-GONZALEZ to follow-up on the availability of obtaining narcotics from SANCHEZ-GONZALEZ. During the call, SANCHEZ-GONZALEZ advised MORALEZ that he (SANCHEZ-GONZALEZ) was travelling through Colorado and would discuss MORALEZ's request with "my brother." Case agents believe that in this intercepted conversation, MORALEZ and SANCHEZ-GONZALEZ referred to cocaine.

*QUINONEZ-HERNANDEZ and SANCHEZ-GONZALEZ Discuss Future Drug Business*

281.    On January 10, 2025, at approximately, 8:07 p.m., TARGET TELEPHONE-3, used by QUINONEZ-HERNANDEZ, called (414) 213-███ (i.e., TARGET TELEPHONE-4), used by Reynaldo SANCHEZ-GONZLAEZ. During the initial part of the call, the parties greeted each other and engaged in conversation about the fires in California. QUINONEZ-HERNANDEZ said his (QUINONEZ-HERNANDEZ) house was not burned. QUINONEZ-HERNANDEZ said he has not slept because he has been helping his family members since his brother's house was burned in the fires. As the conversation continued, SANCHEZ-GONZALEZ advised, "Well, I haven't moved anything, I'm going to see what we can do once you are free." QUINONEZ-HERNANDEZ replied, "Let me know, man. We'll see what comes up next week." SANCHEZ-HERNANDEZ stated, "You got it. You got it." QUINONEZ-HERNANDEZ concluded, "Okay, man. Thanks, man. We'll keep in touch."

282.    On January 10, 2025, at approximately 9:02 p.m., (414) 213-███ (i.e., TARGET TELEPHONE-4), used by Reynaldo SANCHEZ-GONZLAEZ, called TARGET TELEPHONE-3. During the call, SANCHEZ-GONZALEZ asked, "What happened?" QUINONEZ-HERNANDEZ replied, "Yes, Guache. How are you? Good night." SANCHEZ-GONZALEZ answered, "Fine, fine." QUINONEZ-HERNANDEZ stated, "Listen, Guache, I'm here with the Man. Uh... I had, to stop by, and see if by next week..." SANCHEZ-GONZALEZ replied, "Okay. Let me…call that man." QUINONEZ-HERNANDEZ advised, "Tell him, 'Look, a hand of five (5).'" SANCHEZ-GONZALEZ responded, "All right, then." QUINONEZ-HERNANDEZ stated, "All right. But I'll arrive around Tuesday." SANCHEZ-GONZALEZ agreed, and QUINONEZ-HERNANDEZ advised, "Wednesday at the latest. I'll be visiting you, Rey." SANCHEZ-GONZALEZ responded, "Let-let, let me call him and see what he says." QUINONEZ-

137

HERNANDEZ asked, "Notify me on the weekend, please." SANCHEZ-GONZALEZ replied, "I'll let you know tomorrow." QUINONEZ-HERNANDEZ directed, "Get going so we can do something over the weekend, Rey."

283.    Based on my training, experience, and familiarity with the investigation, I believe that QUINONEZ-HERNANDEZ discussed a specified quantity of narcotics that QUINONEZ-HERNANDEZ either did or would provide to SANCHEZ-GONZALEZ. QUINONEZ-HERNANDEZ indicated QUINONEZ-HERNANDEZ would travel to the Eastern District of Wisconsin in the upcoming days, to facilitate the narcotics transaction with SANCHEZ-GONZALEZ and an unknown third-party.

### Gerardo OSORIO-JARMILLO

*SANCHEZ-GONZALEZ Distributes Illicit Substances to OSORIO-JARMILLO and Communicates with QUINONEZ-HERNANDEZ on February 11, 2025*

284.    Gerardo OSORIO-JARAMILLO is a Hispanic male born in Mexico on ▮▮▮▮▮, 1997. OSORIO-JARAMILLO is a citizen and national of Mexico with no current lawful documentation to reside in the United States. OSORIO-JARAMILLO has an associated address of 101▮ W. Forest Home Avenue, Apartment ▮, Hales Corners, Wisconsin. The investigation, in part, has revealed that OSORIO-JARAMILLO receives distribution quantities of controlled substances from SANCHEZ-GONZALEZ. According to Wisconsin Energy utilities records, OSORIO-JARAMILLO has had an active utilities account at the address since approximately December 1, 2013.  OSORIO-JARAMILLO is the user of (414) 334-▮▮▮ subscribed to Gerardo Osorio at 101▮ W. Forest Home Avenue, Hales Corners, Wisconsin 53130. On May 7, 2025, at approximately 1:00 p.m., case agents placed a digital recording device at 101▮ W. Forest Home Avenue. On May 9, 2025, at approximately 12:00 p.m., case agents recovered the covert digital

recording device from 10▮▮ W. Forest Home Avenue. Case agents reviewed the digital recordings between May 7, 2025, and May 9, 2025, which revealed OSORIO-JARAMILLO walking out of 10▮▮ W. Forest Home Avenue Apartment ▮▮ and locking the door with a key.

285.    On February 11, 2025, at approximately 8:04 a.m., SANCHEZ-GONZALEZ using TARGET TELEPHONE-4, called (414) 334-▮▮, used by Gerardo OSORIO-JARAMILLO. After non-pertinent conversation, SANCHEZ-GONZALEZ asked, "You know where it is though?" OSORIO-JARAMILLO responded, "What was I going to tell you?" SANCHEZ-GONZALEZ directed, "Go ahead." OSORIO-JARAMILLO said, "He... he [U/I] called me." SANCHEZ-GONZALEZ asked, "Uh-huh. What is he saying?" OSORIO-JARAMILLO responded, "Uh-huh." SANCHEZ-GONZALEZ asked, "Is it ready?" OSORIO-JARAMILLO replied, "Yeah, he wants more." SANCHEZ-GONZALEZ said, "Okay. That's fine... but did he tell you how much?" OSORIO-JARAMILLO said, "Huh?" SANCHEZ-GONZALEZ asked, "Didn't he tell you..." OSORIO-JARAMILLO answered, "Well, now he wants more." [Laughter] SANCHEZ-GONZALEZ said, "Uh-huh [Stammering] Tell, tell him yes. That... it's what we agreed upon." OSORIO-JARAMILLO responded, "Uh-huh." SANCHEZ-GONZALEZ continued, "He wanted the... the half (1/2) piece." OSORIO-JARAMILLO asked, "What?" SANCHEZ-GONZALEZ clarified, "He wanted [Stammering] half (1/2) a piece, 'half (1/2) a car.'" [Background noise] SANCHEZ-GONZALEZ added, "I don't know how much he wants now. [Clears throat] Well, tell him and let me know." OSORIO-JARAMILLO said, "Uh-huh." Later in the conversation, OSORIO-JARAMILLO advised SANCEHZ-GONZALEZ, "He wants eight (8)." SANCHEZ-GONZALEZ asked, "Say again? Oh, okay." [Pause] SANCHEZ-GONZALEZ continued, "I will get them for him. Ask him by when." OSORIO-JARAMILLO replied, "For

139

tomorrow." SANCHEZ-GONZALEZ asked, "Tomorrow? Okay." [Pause] SANCHEZ-GONZALEZ confirmed, "That's fine."

286.    Based on my training, experience, and familiarity with this investigation, OSORIO-JARAMILLO advised SANCHEZ-GONZALEZ that a drug customer requested more illicit substances from SANCHEZ-GONZALEZ, via OSORIO-JARAMILLO. SANCHEZ-GONZALEZ confirmed the availability of the illicit substances; however, SANCHEZ-GONZALEZ requested that OSORIO-JARAMILLO discuss the requested drug quantity with the customer. SANCHEZ-GONZALEZ stated, "He wanted [Stammering] half (1/2) a piece, 'half (1/2) a car.'" I believe this is in reference to a ½ kilogram quantity of narcotics. Later in the conversation OSARIO-JARMILLO advised "He wants eight (8)."  I believe that OSARIO-JARMILLO indicated that the drug customer wanted eight (8) ounces of a controlled substance from SANCHEZ-GONZALEZ, via OSORIO-JARAMILLO.

287.    On February 11, 2025, at approximately 8:22 a.m., SANCHEZ-GONZALEZ, using TARGET TELEPHONE-4, sent a text message in Spanish to (414) 334-███ (i.e., OSORIO-JARMILLO) which stated, "1900 w. North ave."

288.    Based on my training, experience, and familiarity with the investigation, I believe SANCHEZ-GONZLAEZ sent OSORIO-JARMILLO the address/location of SANCHEZ-GONZLAEZ's known garage/shop, the location where the two were to meet.

289.    On February 11, 2025, at approximately 9:33 a.m., TARGET TELEPHONE-4, used by SANCHEZ-GONZALEZ, placed a call to (414) 210-███ (TARGET TELEPHONE-6), used by Carlos PEREZ-SANTANA. During the call, the parties greeted, and PEREZ-SANTANA asked, "What's going on." SANCHEZ-GONZALEZ answered, "No, well, I was going to... [Sighs] I wanted to know if the same thing as the other day is available?" PEREZ-SANTANA responded,

"Um..ah…," and SANCHEZ-GONZALEZ elaborated, "The same car." PEREZ-SANTANA replied, "Uh-huh," and SANCHEZ-GONZALEZ asked, "You tell me what time." PEREZ-SANTANA said, "Huh?" SANCHEZ-GONZALEZ repeated, "You tell me what time." PEREZ-SANTANA responded, "Uh... look, uh, let me see because I'm with the family." SANCHEZ-GONZALEZ acknowledged, "Yeah, yeah. That's fine." PEREZ-SANTANA continued, "I came to have breakfast. Uh, I'll call you. Give me an hour and I'll call you back, okay?" SANCHEZ-GONZALEZ replied, "Oh okay, that's fine," PEREZ-SANTANA stated, "Alright bye, alright." SANCHEZ-GONZALEZ asked, "But it'll get done today, right?" PEREZ-SANTANA answered, "Uh... probably yes, between today and tomorrow, but yes, it'll get done. Alright?" PEREZ-SANTANA stated, "Wait, uh, I'll call you later." SANCHEZ-GONZALEZ replied, "Alright."

290.     On February 11, 2025, at approximately 9:48 a.m., TARGET TELEPHONE-4, used by SANCHEZ-GONZALEZ, received a call from TARGET TELEPHONE-6, used by PEREZ-SANTANA (i.e., Carlos). During the call, the parties greeted, and PEREZ-SANTANA stated, "It's just that, no, I couldn't talk about it around my family." SANCHEZ-GONZALEZ responded, "Yes, yes." PEREZ-SANTANA related, "I was there with my kids everyone [U/I]." SANCHEZ-GONZALEZ responded, "Yeah, that's fine." PEREZ-SANTANA continued, "Um, look, what was I going to tell you? Okay. For me [Stammering] since yesterday, dude..." SANCHEZ-GONZALEZ responded, "Uh-huh," and PEREZ-SANTANA continued, "All right! But this fucker has not arrived." SANCHEZ-GONZALEZ replied, "Son of a, uh-huh." PEREZ-SANTANA acknowledged, "All right." SANCHEZ-GONZALEZ stated, "Uh-huh." PEREZ-SANTANA explained, "So, then this, then this guy is coming from [Stammers] Chicago." SANCHEZ-GONZALEZ replied, "Yes, yes." PEREZ-SANTANA continued, "All right. So... um, the, I start getting worried because, um, I was waiting since early in the morning. Since my

141

family came to go get breakfast..." SANCHEZ-GONZALEZ stated, "Uh-huh." PEREZ-SANTANA explained, "And this motherfucker is not answering me. All right! He never fails me. All right." SANCHEZ-GONZALEZ responded, "Yeah-yeah." PEREZ-SANTANA continued, "So, [Stammers] I--the car that I had, well, I took it apart." SANCHEZ-GONZALEZ stated, "Right." PEREZ-SANTANA continued, "And I only have [Stammers] I only have around, two (2), three (3) tires..." SANCHEZ-GONZALEZ exclaimed, "Damn!" PEREZ-SANTANA asked, "Uh-huh. You understand me?" SANCHEZ-GONZALEZ answered, "Uh-huh." PEREZ-SANTANA continued, "That's [Stammering] what... I could have given you..." SANCHEZ-GONZALEZ replied, "Uh-huh." PEREZ-SANTANA continued, "One (1) or two (2) in the meantime." SANCHEZ-GONZALEZ acknowledged, "Okay." PEREZ-SANTANA stated, "But, but, but, listen." SANCHEZ-GONZALEZ responded, "All right." PEREZ-SANTANA continued, "But... um, if you contact your friend, the one over there..." SANCHEZ-GONZALEZ replied, "Uh-huh," and PEREZ-SANTANA followed up stating, "Um... get a full vehicle and uh, [Stammers] you keep one (1) tire and give the other three (3) to me. No problem?" SANCHEZ-GONZALEZ stated, "Mm-hm. But, what was I going to tell you?" PEREZ-SANTANA asked, "You understand me? Yeah." SANCHEZ-GONZALEZ answered, "Mm... I don't think this dude is going to come right away. [U/I] to come..." PEREZ-SANTANA asked, "Huh?" SANCHEZ-GONZALEZ continued, "Come right away. Let me call him." PEREZ-SANTANA replied, "Yeah, well….," SANCHEZ-GONZALEZ stated, "Or which one…." PEREZ-SANTANA continued, "You don't lose anything by calling him." SANCHEZ-GONZALEZ replied, "Uh-huh," and PEREZ-SANTANA continued, "I mean, um, [Stammers] just so you know, I [Stammers] will let you know..." SANCHEZ-GONZALEZ stated, "Yes, yes, yes." PEREZ-SANTANA continued, "And--and--and... uh-huh, and then, and then, and then things will go well for you." SANCHEZ-

GONZALEZ confirmed, "Okay." PEREZ-SANTANA stated, "Okay. And leave me [Stammers] the, everything that you can. There's no problem. [U/I] for me." SANCHEZ-GONZALEZ replied, "Yes, yes. Well, just one (1). Well, I only need one (1). What was I going to tell you?" PEREZ-SANTANA stated, "Right? And... Uh-huh." SANCHEZ-GONZALEZ said, "Well, let me call him so that..."

291. PEREZ-SANTANA stated, "[Stammers] And a few days ago, David told me. He also has vehicles to breakdown." SANCHEZ-GONZALEZ confirmed, "Yes, yes." PEREZ-SANTANA asked, "Why aren't you asking him? He offered some to me." SANCHEZ-GONZALEZ replied, "He doesn't have any right now. No." PEREZ-SANTANA responded, "Oh, no? Because a few days ago, um... That's when I also... ...fucking vehicles set aside. You understand?" SANCHEZ-GONZALEZ answered, "Yeah." PEREZ-SANTANA continued, "It's just that when I [U/I] I buy the vehicles [U/I]. SANCHEZ-GONZALEZ responded, "Yeah, well, of course." Both parties agreed, and SANCHEZ-GONZALEZ stated, "Let me find out." PEREZ-SANTANA replied, "These, um, yeah. Um, [Stammers] but first... [Stammers] and um... [Stammers] I will do something like that. Right?" SANCHEZ-GONZALEZ confirmed, "Okay." PEREZ-SANTANA continued, "It [Stammers] would be one (1) or two (2) tires when [U/I]." SANCHEZ-GONZALEZ directed, "Put, put two (2) [Stammers] for me also. [Stammers] While I wait." PEREZ-SANTANA stated, "Mm," and SANCHEZ-GONZALEZ continued, "So that way I don't lose, that, that...That client." PEREZ-SANTANA responded, "And—and, um... uh-huh. [Stammers] And you, find the way to, to, to... to contact your friend." SANCHEZ-GONZALEZ confirmed, "To, to get that. Okay. Let me call him." PEREZ-SANTANA asked, "Uh-huh. Understand? All right then." SANCHEZ-GONZALEZ responded, "All right. But, put the twelve (12) [U/I]." PEREZ-SANTANA stated, "Uh, yes. [Stammers] With two (2), yes, but [Stammers]

um..." SANCHEZ-GONZALEZ interrupted, "For, for…" PEREZ-SANTANA continued, "Um, [Stammers] even if I barely have anything." SANCHEZ-GONZAELEZ stated, "Or at least with one (1)... ...[Stammers] to extend it. While we get, to send one (1)." PEREZ-SANTANA finalized, "Okay. That's... Uh-huh. With one (1), one (1), one (1)..." Both parties agreed, and SANCHEZ-GONZALEZ stated, "To, to take them because that guy also has nothing." PEREZ-SANTANA asked, "Oh, yeah? Oh, okay. [U/I]. Go ahead." SANCHEZ-GONZALEZ replied, "And I told him, for my car, to tell me beforehand. Now he is bothering me." PEREZ-SANTANA stated, "Uh-huh. [Pause] Yes, [Stammers] and, I'm telling you, [Stammers] I have been waiting for, uh, [U/I]. He was set on coming yesterday. Alright!" SANCHEZ-GONZALEZ offered, "Let me call him to see [U/I]." Followed by, "But I will see you in a while..." PEREZ-SANTANA stated, "Alright then. Alright dude," and SANCHEZ-GONZALEZ finished his sentence stating, "...to get that."

292.    PEREZ-SANTANA stated, "Uh... um... Down there, if you want to." SANCHEZ-GONZALEZ asked, "When would that, in two (2) hours?" PEREZ-SANTANA answered, "Uh... no because uh, uh... I am going to be busy, but right now, it's ten (10:00)." SANCHEZ-GONZALEZ asked, "Tell me what time so I can go." PEREZ-SANTANA replied, "Uh, do you want to come up here really quick?" SANCHEZ-GONZALEZ asked, "All the way up there?" PEREZ-SANTANA responded, "Yes." SANCHEZ-GONZALEZ answered, "I'm going to stop by the house to get a car. That's fine. I'll stop by." PEREZ-SANTANA asked, "Yes?" SANCHEZ-GONZALEZ responded, "But give me a chance to–or... ...carry it with you. Or better yet, we could see each other at "'El Rey.'" [Pause] Or at El Rey, or right there..." PEREZ-SANTANA interrupted stating, "Yes…Excuse me? Or…" SANCHEZ-GONZALEZ continued, "In the parking lot." PEREZ-SANTANA confirmed, "Uh-huh, alright. So, [Stammers] it has been–give me a chance. Look, it's ten (10:00)... I will head down in about an hour and a half (1/2). Alright?" SANCHEZ-

GONZALEZ confirmed, "Okay. We will meet in an hour and a half (1/2). [Pause] Yes." PEREZ-SANTANA asked, "Alright? [Stammers] Unless [U/I] you before." SANCHEZ-GONZALEZ replied, "No, I'll wait, I'll so I don't have to go all the way up there." PEREZ-SANTANA asked, "It's because, uh... Oh... oh, alright then. So, um, let me [U/I]. I will call you–are you going to be at your house?" SANCHEZ-GONZALEZ answered, "No, I'm over here at the shop." PEREZ-SANTANA asked, "What shop?" SANCHEZ-GONZALEZ answered, "Here with Chapo." PEREZ-SANTANA asked, "Oh, you're working now?" SANCHEZ-GONZALEZ answered, "Yeah, they got me working hard. I have a car." PEREZ-SANTANA stated, "Alright then. Huh? Alright." SANCHEZ-GONZALEZ replied, "Alright. I have a car that I have to deliver and, that's why. But, either way, I can leave at..." [Voices Overlap] PEREZ-SANTANA stated, "That's fine," and SANCHEZ-GONZALEZ continued, "Even around ten (10:00) or eleven (11:00)." PEREZ-SANTANA confirmed, "Oh, alright then. That's fine." SANCHEZ-GONZALEZ repeated, "At eleven (11:00)?" PEREZ-SANTA replied, "Alright then. Uh... yes. What time is it right now?" SANCHEZ-GONZALEZ stated, "Uh, ten (10:00)." PEREZ-SANTANA confirmed, "[Stammers] Yes. Around... [Stammers] let's say, eleven (11:00) is fine." SANCHEZ-GONZALEZ stated, "Alright then. Yeah." PEREZ-SANTANA ended the call stating, "See you."

293.    Based on my training, experience, and knowledge of the investigation, I believe during the intercepted phone calls on February 11, 2025, at 9:33 a.m. and 9:48 a.m., respectively, SANCHEZ-GONZALEZ contacted PEREZ-SANTANA to inquire about purchasing a quantity of illicit substances from PEREZ-SANTANA. I also believe that SANCHEZ-GONZALEZ wanted to purchase drugs for a drug customer, discussed previously in the intercepted call with OSORIO-JARMILLO. PEREZ-SANTANA indicated he was waiting for a drug shipment to arrive from Chicago, and informed SANCHEZ-GONZALEZ that he (PEREZ-SANTANA) currently

145

possessed specific quantities for distribution stating, ["So, [Stammers] I--the car that I had, well, I took it apart." SANCHEZ-GONZALEZ stated, "Right." PEREZ-SANTANA continued, "And I only have [Stammers] I only have around, two (2), three (3) tires..."  I further believe that the reference to "car," is code for a kilogram quantity of controlled substances. Additionally, I further believe that SANCHEZ-GONZALEZ's and PEREZ-SANTANA's reference to "tires," denotes smaller quantities of cocaine obtained from the original kilogram quantity. Furthermore, PEREZ-SANTANA requested that SANCHEZ-GONZALEZ contact QUINONEZ-HERNANDEZ stating, "But... um, if you contact your friend, the one over there...," followed by, "Um... get a full vehicle and uh, [Stammers] you keep one (1) tire and give the other three (3) to me." SANCHEZ-GONZALEZ indicated SANCHEZ-GONZALEZ would call him (QUINONEZ-HERNANDEZ). Both parties agreed to complete the narcotics transaction later that day.

294.    On February 11, 2025, at approximately 10:15 a.m., TARGET TELEPHONE-4, used by SANCHEZ-GONZALEZ, received a call from TARGET TELEPHONE-3, used by QUINONEZ-HERNANDEZ. During the call, the parties greeted each other, and SANCHEZ-GONZALEZ asked, "That's nice. And what's up with you? You forgot about me?" QUINONEZ-HERNANDEZ responded, "No, no, no. Well no, no, no. They haven't said anything, they didn't call or anything. So I said, 'No, well I don't know.'" SANCHEZ-GONZALEZ asked, "Mm-hm. Have you come?" QUINONEZ-HERNANDEZ answered, "No, I haven't gone, man, honestly." SANCHEZ-GONZALEZ stated, "Damn. These men need something urgently." QUINONEZ-HERNANDEZ asked, "Oh, they called you or what?" SANCHEZ-GONZALEZ answered, "Yes." QUINONEZ-HERNANDEZ asked, "With how many?" SANCHEZ-GONZALEZ replied, "Well, I don't know, with [U/I] two (2)." QUINONEZ-HERNANDEZ asked, "Oh, yeah? Who, who, the... …white guy or who?" SANCHEZ-GONZALEZ answered, "No, someone else." QUINONEZ-

HERNANDEZ asked, "Oh yeah?" SANCHEZ-GONZALEZ responded, "Carlitos" (i.e., PEREZ-SANTANA). QUINONEZ-HERNANDEZ stated, "Oh, Carlitos." SANCHEZ-GONZALEZ replied, "Yes," and QUINONEZ-HERNANDEZ advised, "Oh, alright. Let me check and I'll let you know, man." SANCHEZ-GONZAELZ asked, "But when would that be." QUINONEZ-HERNANDEZ replied, "Uh, let's see if it's for Wednesday or Thursday." SANCHEZ-GONZALEZ asked, "Of this week?" QUINONEZ-HERNANDEZ confirmed stating, "Yes." SANCHEZ-GONZALEZ asked, "Oh. So, should I tell him to wait, or will you confirm beforehand?" QUINONEZ-HERNANDEZ answered, "No, he can wait, and I'll see him over there." SANCHEZ-GONZALEZ stated, "Okay, let me tell him. At the... latest, Thursday or Friday?" QUINONEZ-HERNANDEZ confirmed, "Yes, Friday at the latest, uh-huh." SANCHEZ-GONZALEZ advised, "Let me, I'll confirm with you right now because... he called, he called me to see, to see if I could do something for him." QUINONEZ-HERNANDEZ stated, "All, all set." SANCHEZ-GONZALEZ reiterated, "Okay, I'll confirm with you right now."

295.    Based on my training, experience, and knowledge of the investigation, I believe SANCHEZ-GONZALEZ contacted QUINONEZ-HERNANDEZ, seeking illicit substances for both SANCHEZ-GONZALEZ and PEREZ-SANTANA. During the call, QUINONEZ-HERNANDEZ advised he (QUINONEZ-HERNANDEZ) would travel to the Eastern District of Wisconsin in the coming days to distribute narcotics to both SANCHEZ-GONZALEZ and "Carlitos" (i.e., PEREZ-SANTANA).

296.    On February 11, 2025, at approximately 10:17 a.m., TARGET TELEPHONE-4, used by SANCHEZ-GONZALEZ, placed a call to TARGET TELEPHONE-6, used by PEREZ-SANTANA. During the call, SANCHEZ-GONZALEZ stated, "I called this guy but he said he will only do the trip if it's for two (2)."  PEREZ-SANTANA responded, "Oh, he is coming...Oh damn

147

it." SANCHEZ-GONZALEZ stated, "Mm-hmm. He says he will come Friday, for sure. But for two (2), not for one (1)." PEREZ-SANTANA responded, "Uh-huh. Um... Uh...," and SANCHEZ-GONZALEZ continued stating, "I told—told him I would confirm with him." PEREZ-SANTANA replied, "Uh-huh, yes, yes, yes. Damn it, it's that I'm almost going to be out, dude." SANCHEZ-GONZALEZ stated, "Uh-huh." PEREZ-SANTANA asked, "What's the highest you can give them to him, dude?" SANCHEZ-GONZALEZ replied, "Well, it's the same as the other day. I will not be making any profit off you." SANCHEZ-GONZALEZ continued, "Whatever you can give me... and just about one thousand (1,000)." PEREZ-SANTANA replied, "Mm-hmmm." SANCHEZ-GONZALEZ continued, "Pesos that you give me. You get me?" PEREZ-SANTANA confirmed, "Uh-huh." SANCHEZ-GONZALEZ advised, "Uh, we'll talk in a bit, when I go there... at eleven (11:00)." PEREZ-SANTANA responded, "[Stammers] Uh, yes. Uh, okay, but... no, well, it's..." SANCHEZ-GONZALEZ continued, "I will see you right now—right now at Rey's at eleven (11:00)." PEREZ-SANTANA stated, "No, but wait. I need to agree to it... with—with you, dude. Why am I going to be back and forth?" SANCHEZ-GONZALEZ responded, "Oh." PEREZ-SANTANA continued, "I am going to be busy today. I am going over there to go get the wood wet. [U/I]." SANCHEZ-GONZALEZ explained, "One (1). But I'm saying that I want one (1) [Stammers] from this guy from Califas [PH] (California)." PEREZ-SANTANA replied, "Oh, okay, okay, okay. Alright. Okay, okay." SANCHEZ-GONZALEZ confirmed, "You get me know." PEREZ-SANTANA explained, "Oh, it's just that I—I was fucking thinking of something else, dude." SANCHEZ-GONZALEZ confirmed, "I'll see you there at eleven (11:00)."

297.   Based on my training, experience, and knowledge of the investigation, I believe both PEREZ-SANTANA and SANCHEZ-GONZALEZ discussed the receipt of a kilogram quantity of illicit substances from QUINONEZ-HERNANDEZ. Additionally, both SANCHEZ-

GONZALEZ and PEREZ-SANTANA confirmed the narcotics transaction that was going to take place that day, at 11:00 a.m.

298.    On February 11, 2025, at approximately 10:46 a.m., TARGET TELEPHONE-4, used by SANCHEZ-GONZALEZ, received a call from TARGET TELEPHONE-6, used by PEREZ-SANTANA.  After the parties greeted, PEREZ-SANTANA stated, "I'll wait for you at Cermak [PH], dude." This statement was followed by, "Over there at Cermak, in the back parking lot. SANCHEZ-GONZALEZ acknowledged, "All right then."

299.    Based on my training, experience, and knowledge of the investigation, I believe PEREZ-SANTANA advised SANCHEZ-GONZALEZ that the location to conduct the narcotics transaction would now be in the rear parking lot of Cermak, which your affiant knows to be a grocery store located in West Milwaukee, Wisconsin.

300.    Case agents established surveillance at SANCHEZ-GONZALEZ's shop/garage located at 19█ W. North Ave., in Milwaukee, Wisconsin. At approximately 10:48 a.m., case agents observed a black Volkswagen bearing Wisconsin Registration plate AWV-███ parked at 19█ W North Avenue, in front of a roll up door, in the ally.  At that time, E-911/GPS data for TARGET TELEPHONE-4 indicated that SANCHEZ-GONZALEZ was in the area.

301.    On February 11, 2025, at approximately 10:53 a.m., TARGET TELEPHONE-4, used by SANCHEZ-GONZALEZ, called (414) 334-███, used by OSORIO-JARMILLO. During the intercepted call, the parties greeted, and SANCHEZ-GONZALEZ stated, "[U/I] or before. I'm, I'm already going to, I'm going to drop that off." OSORIO-JARMILLO agreed, "All right."

302.    Based on my training, experience, and knowledge of the investigation, I believe that SANCHEZ-GONZALEZ advised OSORIO-JARMILLO that he (SANCHEZ-GONZALEZ)

149

would be delivering illicit substances to OSORIO-JARMILLO. Additionally, SANCHEZ-GONZALEZ was going to first obtain the narcotics from PEREZ-SANTANA.

303.    Case agents established surveillance at Cermak located at 1541 Miller Park Way, Milwaukee, Wisconsin. At approximately 10:59 a.m., case agents observed a black Chevy SUV pull into the south parking lot. At approximately 11:52 a.m., the Volkswagen parked next to the Chevy. Case agents observed SANCHEZ-GONZALEZ exit the passenger door and enter the front passenger door of the Chevy. Shortly thereafter, SANCHEZ-GONZALEZ exited the front door of the Chevy and returned to the Volkswagen. Both vehicles then drove from the area. Based on my training, experience, and familiarity with the investigation, I believe PEREZ-SANTANA provided cocaine to SANCHEZ-GONZALEZ while at the Cermak in Milwaukee.

304.    Case agents established surveillance at 20█ S. 31st Street., Milwaukee, Wisconsin, which is the residence of SANCHEZ-GONZALEZ. At approximately 11:20 a.m., case agents observed the Volkswagen parked at or near 20█ S. 31st Street. Agents observed SANCHEZ-GONZALEZ exit from the front passenger seat of the vehicle and walk towards 20█ S. 31st Street. A few minutes later, a Hispanic male exited the driver seat of the Volkswagen and walked towards 20█ S. 31st Street. A short period of time later, the driver of the Volkswagen returned to the vehicle with an unknown Hispanic male, and subsequently drove from the area. Then, at approximately 11:43 a.m., case agents observed SANCHEZ-GONZALEZ exit the residence at 20█ S. 31st Street. SANCHEZ-GONZALEZ walked to a white Honda Pilot bearing Wisconsin Registration Plate 681-███. SANCHEZ-GONZALAZ then drove from the area northbound, followed by agents. Case agents followed SANCHEZ-GONZALAZ to Pick 'n Save located at 5800 S. 108th Street, Hales Corners, Wisconsin. Once SANCHEZ-GONZALAZ arrived, he parked the Honda behind the Pick 'n Save. SANCHEZ-GONZALEZ exited the Honda and walked

to 10529 W. Forest Homes, Hales Corners, Wisconsin, and agents observed SANCHEZ-GONZALEZ walk to the side door of that location.

305.    On February 11, 2025, at approximately 12:02 p.m., TARGET TELEPHONE-4, used by SANCHEZ-GONZALEZ, called (414) 334-███, used by OSORIO-JARMILLO.  During the intercepted call, SANCHEZ-GONZALEZ stated, "I'm here. I'll be going towards your door." OSORIO-JARMILLO asked, "All right. You going to through the back?" SANCHEZ-GONZALEZ answered, "Yes. I already arrived."

306.    Based on my training, experience, and knowledge of the investigation, I believe SANCHEZ-GONZALEZ informed OSORIO-JARMILLO that he (SANCHEZ-GONZALEZ) was at OSORIO-JARMILLO's residence to drop off the same cocaine PEREZ-SANTANA provided SANCHEZ-GONZALEZ earlier that same day.

307.    At approximately 12:14 p.m., case agents observed SANCHEZ-GONZALEZ walk back to the Honda, where he then drove from the area, returning to his residence located at 20██ S. 31 Street, Milwaukee, Wisconsin.

308.    On February 11, 2025, at approximately 12:49 a.m., TARGET TELEPHONE-4, used by SANCHEZ-GONZALEZ, called TARGET TELEPHONE-6, used by PEREZ-SANTANA. During the call the parties greeted each other, and SANCHEZ-GONZALEZ stated, "I forgot to give you the money." PEREZ-SANTANA asked, "Uh, where are you right now?" SANCHEZ-GONZALEZ replied, "I'm going to... the junkyard and then, afterwards, to get some paint." PEREZ-SANTANA stated, "Go, go... go run your errands, man. I am going to [Stammers] [U/I] and I'll call you when I get out." SANCHEZ-GONZALEZ responded, "Okay. In... in the afternoon... when you come, just call me."

309. Based on my training, experience, and knowledge of the investigation, I believe SANCHEZ-GONZALEZ planned to deliver the payment to PEREZ-SANTANA for the narcotics SANCHEZ-GONZALEZ purchased from PEREZ-SANTANA earlier that day.

310. On February 11, 2025, at approximately 3:10 p.m., TARGET TELEPHONE-3, used by QUINONEZ-HERNANDEZ, placed a call to TARGET TELEPHONE-4, used by SANCHEZ-GONZALEZ. During the call, QUINONEZ-HERNANDEZ asked, "Right on. What did the boss tell you?" SANCHEZ-GONZALEZ replied, "He told me that he would let me know now because he already got a call from a guy." QUINONEZ-HERNANDEZ responded, "Son of a bitch. [Smacks Lips]." QUINONEZ-HERNANDEZ continued, "What was I going to tell you? Listen, buddy, I'm going to go see the guy now and see if he will let me have one (1) so that I can go up there." SANCHEZ-GONZALEZ stated, "Oh." QUINONEZ-HERNANDEZ continued, "[Stammers] To... but I'm going to—I'm going to ask him to give me the—the hand. In case I... if I call you, or something, and ask you—you just tell me, 'Yes, buddy, I have been waiting for you for three (3) weeks, almost a month.'" SANCHEZ-GONZALEZ acknowledged, "Yeah." QUINONEZ-HERNANDEZ stated, "You just keep saying that you are coming, and coming, and then nothing, dude. And then if he asks you, 'How many cars, buddy, to go to the auction.' You say, 'At least a hand, at least five (5), buddy.'" SANCHEZ-GONZALEZ responded, "No, no, no, no, no." QUINONEZ-HERNANDEZ stated, "Just—just so that the guy will give them to me, buddy. Otherwise, the guy is going to say, 'No, no.' Yes, because I know him. He's going to say, 'Let's see, call your friend to see if it's true. Let's see if it's true that he needs that many.' And like that." SANCHEZ-GONZALEZ stated, "Yeah, no, no. If you can't—can't, [Stammers] it's not a problem. We are set." SANCHEZ-GONZALEZ advised, "It's because speaking—speaking with people is rough." QUINONEZ-HERNANDEZ stated, "No. I was just... ...[Stammers] to... no,

152

you're not going to speak with him, buddy. I'm just... well, with me. But he is going to be listening."
SANCHEZ-GONZALEZ replied, "I know."

311.    QUINONEZ-HERNANDEZ commented, "It's because I'm going to see him right
now. I'm coming down to Anaheim." QUINONEZ-HERNANDEZ continued, "But I wanted...
well, in case he asks me, "Listen, [Stammers] and... and this and that. What do you need so many
for." SANCHEZ-GONZALEZ replied, "Um…"   QUINONEZ-HERNANDEZ interrupted stating,
"So I can tell him, 'It's because I'm going up there with this guy.'" And in case I call you, so that
he can see that it's true. Well, that it's true." SANCHEZ-GONZALEZ replied, "Well, we'll see
what's up. Because it's rough, buddy. You know." QUINONEZ-HERNANDEZ responded, "No,
no, no, I'm not put you on. It's just with me. I'm just going to [U/I]." SANCHEZ-GONZALEZ
replied, "Uh-huh."   QUINONEZ-HERNANDEZ continued, "I'll say, 'So then can—can we do
something, buddy?' And you just go, 'Yeah, buddy,' or something. It's the same guy, buddy, that
you were getting the van from." SANCHEZ-HERNANDEZ replied, "Oh," and then stated, "Well,
we are set..." [Voices Overlap] QUINONEZ-HERNANDEZ said, "But, well…" SANCHEZ-
GONZALEZ continued, "Let's see— let see what we can do. Alright, then." QUINONEZ-
HERNANDEZ agreed, "Let me know then."

312.    Based on my training, experience, and knowledge of the investigation, I believe
QUINONEZ-HERNANDEZ asked SANCHEZ-GONZALEZ, if SANCHEZ-GONZALEZ had
spoken with his (SANCHEZ-GONZALEZ's) "boss," believed to be PEREZ-SANTANA.
QUINONEZ-HERNANDEZ advised SANCHEZ-GONZALEZ that he (QUINONEZ-
HERNANDEZ) was travelling to Anaheim, California, to meet with a source-of-supply (UM███)
to obtain five (5) kilogram quantities of an illicit substance for distribution. QUINONEZ-
HERNANDEZ asked SANCHEZ-GONZALEZ to request five kilograms during a phone

153

Case 2:25-cr-00118-PP-NJ    Filed 05/29/25    Page 154 of 191    Document 2

conversation, as QUINONEZ-HERNANDEZZ indicated that the source-of-supply (UM███) would potentially be listening to the conversation.

313.    On February 11, 2025, at approximately 6:04 p.m., TARGET TEELEPHONE-4, used by SANCHEZ-GONZALEZ, placed a call to TARGET TELEPHONE-6, used by PEREZ-SANTANA. During the call, SANCHEZ-GONZALEZ asked, "Where are you?" PEREZ-SANTANA answered, "I'm by Cermack [PH], dude." SANCHEZ-GONZALEZ stated, "Oh, I'm home. Do you want to stop by for your money?" PEREZ-SANTANA replied, "Okay, I'll stop by, dude. Like in ten (10) minutes, alright?" Shortly thereafter, at approximately, 6:12 p.m., PEREZ-SANTANA, using (414) 210-███, placed a call to TARGET TELEPHONE-4. During the call, PEREZ-SANTANA advised, "I'm outside, dude." SANCHEZ-GONZALEZ asked, "In which of the two (2)? The one in front?" PEREZ-SANTANA asked, "Huh?" SANCHEZ-GONZALEZ asked, "Where the pick-up is at?" PEREZ-SANTANA replied, "Look, I turned on the emergency lights." SANCHEZ-GONZALEZ acknowledged, "Oh, yeah. I see it."

314.    Based on my training, experience, and knowledge of the investigation, I believe PEREZ-SANTANA drove to SANCHEZ-GONZALEZ's residence, to retrieve drug proceeds from the narcotics transaction, earlier that day.

### *SANCHEZ-GONZALEZ Sells Drugs to UM███*

315.    On March 1, 2025, at approximately 7:27 p.m., TARGET TELEPHONE-4 received a call from (414) 885-███ (UM███).  During the intercepted call, SANCHEZ-GONZALEZ asked, "What's up?"  UM███ asked, "Where are you?"  SANCHEZ-GONZALEZ replied, "Um, I'm here, man.  I'm waiting for you.  Where are you?"  UM███ said, "Dude!  Sell me a hundred." SANCHEZ-GONZALEZ asked, "Where are you?"  UM███ said, "Right here.   Outside." SANCHEZ-GONZALEZ said, "Come in."   UM███   replied, "But I'm with a friend."

SANCHEZ-GONZALEZ said, "Well, there's no one. Come in." UM███ said, "I'm here with the dog. With Goofy [PH]." SANCHEZ-GONZALEZ uttered, "Hmm." [Voices Overlap] UM6057 asked, "Do I come for it, or what?" SANCHEZ-GONZALEZ replied, "Come in, if you like or…" UM███ said, "No, better if you prepare it for me and I'll give you the hundred." SANCHEZ-GONZALEZ replied, "Alright."

316.    Based on my training, experience, and familiarity with the investigation, I believe UM6057 requested an unknown amount and type of drug from SANCHEZ-GONZALEZ. I believe that when UM███ asked SANCHEZ-GONZALEZ to "prepare it for me and I'll give you the hundred," SANCHEZ-GONZALEZ needed to place the unknown amount and type of drugs in some type of container. A review of E/911/GPS data for March 1, 2025, at approximately 7:32 p.m. over TARGET TELEPHONE-4, placed TARGET TELEPHONE-4 within approximately a 255-meter radius of SANCHEZ-GONZALEZ's residence located at 20██ S. 31st Street in Milwaukee, indicating SANCHEZ-GONZALEZ sold UM███ drugs from SANCHEZ-GONZALEZ's house.

*SANCHEZ-GONZALEZ Discusses Obtaining a Gun from UM███*

317.    On March 22, 2025, at approximately 4:42 p.m., SANCHEZ-GONZALEZ, using TARGET TELEPHONE-4, called (414) 322-███, used by UM███. During the call, SANCHEZ-GONZALEZ asked, "What's good? Hey, when are you coming? When are you coming...." [Voices Overlap] UM███ replied, "Huh?" SANCHEZ-GONZALEZ continued, "...For the thirty-eight (38)?" UM9266 responded, "The thirty-eight (38)? Um..." SANCHEZ-GONZALEZ confirmed," Yeah, for the Perkins." UM███ advised, "Um, I'm out here fishing now, so probably tomorrow." SANCHEZ-GONZALEZ stated, "Yeah, for my... my brother for the..." UM███ stated, "Oh, yeah, yeah. I—I came over there looking for him." UM███ informed SANCHEZ-GONZALEZ

that UM█ would meet up with SANCHEZ-GONZALEZ's brother the following morning at "ten o'clock."

318.     Based on my training, experience, and knowledge of the investigation, SANCHEZ-GONZALEZ called UM█ regarding the procurement of a .38 caliber firearm (i.e., "38"), from UM█, to later provide to SANCHEZ-GONZALEZ's brother.   SANCHEZ-GONZALEZ is illegally present in the United States and therefore prohibited from possessing and/or transferring a firearm.

*SANCHEZ-GONZALEZ Discusses a Drug Transaction with UM█ and PEREZ-SANTANA*

319.     On March 26, 2025, at approximately 4:38 p.m., SANCHEZ-GONZALEZ, using TARGET TELEPHONE-4, received a call from (414) 248-█, used by UM█. During the call, the parties greeted, and UM█ asked, "Hey, brother. Hey, if you want to bring it tomorrow, you can. Okay? But I want... did you get the oily shit?" SANCHEZ-GONZALEZ asked, "When?" UM3526 repeated, "Did... can you get the stuff, the oily stuff?" SANCHEZ-GONZALEZ replied, "I don't understand." UM█ explained in coded language, "Uh, uh, you know... uh, get the good shit, okay? Alright." SANCHEZ-GONZALEZ replied, "Okay," and UM█ continued stating, "You can come tomorrow if you want, or Friday. Either way, it doesn't matter, because I have the money. That's all... that's no problem." SANCHEZ-GONZALEZ asked, "Tomorrow?" UM█ replied, "If you want, you know, or Friday. Which one you wanna do?" SANCHEZ-GONZALEZ responded, "Um, um, let me call. Okay? I'll call you... maybe ten (10) minutes. Bye." UM█ answered, "Yeah, let me know. Alright." SANCHEZ-GONZALEZ confirmed the quantity asking, "Six (6), right?" UM█ confirmed, "Yeah."

320.     Based on my training, experience, and familiarity with this investigation, UM█ requested a quantity of "six" (6) in illicit substances, that UM█ referenced in coded

language as "the oily shit," from SANCHEZ-GONZALEZ. It is unknown what quantity of "six UM███ referred to; i.e. grams, ounces, pounds, or kilograms. Based upon my training and experience, I believe that "the oily shit" is heroin. Heroin can be found in various consistencies such as powder and black tar. Black tar heroin is known to have an oily and/or gummy consistency. Based upon my training and experience, cocaine is not commonly known to be "oily." SANCHEZ-GONZALEZ indicated he would make a call (i.e., call to source-of-supply), and the narcotics transaction was tentatively scheduled for the following day (Thursday) or that upcoming Friday.

321.    On March 26, 2025, approximately nine minutes after the previously described intercepted call between SANCHEZ-GONZALEZ and UM███, at 4:49 p.m., SANCHEZ-GONZALEZ, using TARGET TELEPHONE-4, called TARGET TELEPHONE-6, used by PEREZ-SANTANA.   During the call, SANCHEZ-GONZALEZ asked, "What happened?" PEREZ-SANTANA stated, "Talk to me." SANCHEZ-GONZALEZ explained, "Um, I was calling you, it doesn't go through." PEREZ-SANTANA replied, "I don't know, you have me blocked, dude." SANCHEZ-GONZALEZ stated, "No, [U/I] What I was going to tell you?" PEREZ-SANTANA asked, "What happened?" SANCHEZ-GONALEZ asked, "Um, where can I see you tomorrow?" PEREZ-SANTANA replied, "Uh, [Sighs] well, [Stammers] I'll be working by the South in the morning." SANCHEZ-GONZALEZ repeated, "In the South? Okay." PEREZ-SANTANA directed, "Call me tomorrow morning." SANCHEZ-GONZALEZ responded, "Okay. I will give you a call. I'll stop by tomorrow morning. [U/I]" PEREZ-SANTANA further explained, "There... I'm always there around... [Stammers] from nine-thirty (9:30) to ten (10:00). I'm always there with my dog." SANCHEZ-GONZALEZ confirmed, "Okay," and PEREZ-SANTANA continued, "I'm either at El Rey or at the Cermak, working." SANCHEZ-GONZALEZ confirmed,

"Around nine (9:00), I will see you around nine (9:00)." PEREZ-SANTANA reconsidered the time stating, "No, nine-thirty (9:30)." PEREZ-SANTANA continued, "Because that's the time I go down there. Alright?" SANCHEZ-GONZALEZ confirmed the meet time stating, "Alright then. All set."

322. Based on my training, experience, and familiarity with this investigation, SANCHEZ-GONZALEZ called PEREZ-SANTANA to arrange a meeting with PEREZ-SANTANA to purchase illicit substances, believed to be heroin (i.e., the "oily shit") from PEREZ-SANTANA. Given, first, the proximity of the calls between SANCHEZ-GONZALEZ and UM██, and then the following call between SANCHEZ-GONZALEZ and PEREZ-SANTANA, I believe SANCHEZ-GONZALEZ called PEREZ-SANTANA to request heroin on behalf of UM██. PEREZ-SANTANA advised SANCHEZ-GONZALEZ that PEREZ-SANTANA would meet SANCHEZ-GONZAELZ the following day, on the south side of Milwaukee at 9:30 a.m. PEREZ-SANTANA stated he would be, "working by the South in the morning," referring to (2) two grocery stores, which are Cermak and El Rey. I know that both stores are located on the south side of Milwaukee. Based upon intercepted calls, along with both electronic and physical surveillance, I believe that PEREZ-SANTANA conducts narcotics transactions in the parking lot of the Cermak grocery store located at 1541 Miller Park Way, Milwaukee, along with numerous other locations/parking lots in or around the south side of Milwaukee.

*SANCHEZ-GONZALEZ and OSORIO-JARMILLO Discuss Narcotics Source-of-Supply*

323. On May 6, 2025, at approximately 9:42 p.m., OSORIO-JARMILLO, using (414) 334-██, placed an intercepted call to SANCHEZ-GONZALEZ, using TARGET TELEPHONE-4. During the call, the parties greeted, and OSORIO-JARMILLO asked, "Okay. What did Abuelito tell you?" SANCHEZ-GONZALEZ answered, "Mmm, nothing now. The dude hasn't called me."

158

OSORIO-JARMILLO stated, "Oh, because he had told me that... there was someone around who was offering him for cheaper." SANCHEZ-GONZALEZ asked, "Really?" OSORIO-JARMILLO confirmed, "Uh-huh."

324.    OSORIO-JARMILLO continued, "He told me... that supposedly he wants me to go... [Brief Paus] speak with him." SANCHEZ-GONZALEZ asked, "No, well... but how much cheaper?" OSORIO-JARMILLO advised, "I don't know. I need.... I think he told me to go speak with him. That's what he told me." SANCHEZ-GONZALEZ replied, "Oh." OSORIO-JARMILLO stated, "Because figure... every time that he... that he gets some from you...he notifies me."

325.    SANCHEZ-GONZALEZ replied, "Alright. Well…" OSORIO-JARMILLO continued, "That's why... I don't—don't know, right? But... he was telling me about that." SANCHEZ-GONZALEZ advised, "Mm-hmm. Well, check on that and let me know. It's no problem, in any case." OSORIO-JARMILLO replied, "Yes. l will check into that. Yes, because he told me that... for me to go speak with him. To come to an agreement. He told me to go speak with him. That's what he told me." SANCHEZ-GONZALEZ advised, "Oh, okay. Well, go and let me know."

326.    Based on my training, experience, and knowledge of the investigation, OSORIO-JARMILLO informed SANCHEZ-GONZALEZ that their drug customer, referred to as "Abuelito," had a new source-of-supply, offering the cocaine at a cheaper price. SANCHEZ-GONZALEZ admitted that SANCHEZ-GONZALEZ had not communicated lately with the customer, and OSORIO-JARMILLO advised that the drug customer offered to introduce OSARIO-JARMILLO to the source-of-supply.

*SANCHEZ-GONZALEZ and QUINONEZ-HERNANDEZ Discuss Narcotics*

327.    On May 9, 2025, at approximately 11:42 a.m., TARGET TELEPHONE-4, used by SANCHEZ-GONZALEZ, placed an intercepted call to (747) 724-███ (i.e., TARGET TELEPHONE-3), used by QUINONEZ-HERNANDEZ. During the call, the parties greeted, and QUINONEZ-HERNANDEZ advised, "That's good. I got some cars from the auction, buddy. Just brand-new Camry's." SANCHEZ-GONZALEZ replied, "Okay." QUINONEZ-HERNANDEZ asked, "How are we doing?" SANCHEZ-GONZALEZ replied, "Good, good. And where are you, or what?" QUINONEZ-HERNANDEZ advised, "Uh, over here, but I want to go like... on Wednesday. Be over there by Wednesday, Tuesday." SANCHEZ-GONZALEZ stated, "Okay. Well, let me see—see if... I can put some money together." QUINONEZ-HERNANDEZ stated, Okay. I'll be calling you like on Sunday. "

328.    SANCHEZ-GONZALEZ asked, "But ch-... uh, cheap, as always? Something [U/I]" QUINONEZ-HERNANDEZ confirmed, "Yes, yes, yes, yes." SANCHEZ-GONZALEZ ended the call stating, "All set."

329.    Based on your affiant's training, experience, and knowledge of the investigation, SANCHEZ-GONZALEZ contacted QUINONEZ-HERNANDEZ regarding obtaining kilogram quantities of cocaine. QUINONEZ-HERNANDEZ advised, "Got some cars from the auction, buddy. Just brand-new Camry's," referring to QUINONEZ-HERNANDEZ recent procurement of kilogram bricks of cocaine. QUINONEZ-HERNANDEZ stated he (QUINONEZ-HERNANDEZ) could travel to the Milwaukee area the following Tuesday or Wednesday. Both parties agreed to discuss the potential narcotics transaction that upcoming Sunday.

## Carlos PEREZ-SANTANA (TARGET TELEPHONE – 6)

330.    Carlos PEREZ-SANTANA is a Hispanic male born in Mexico on ███████ 1967.    PEREZ-SANTANA is a citizen and national of Mexico with no current lawful documentation to reside in the United States.  PEREZ-SANTANA resides at 15█ S. 90th Street, West Allis, Wisconsin 53214.  PEREZ-SANTANA listed the aforementioned address on a 2018 Wisconsin Driver's License, which PEREZ-SANTANA updated on December 4, 2023. PEREZ-SANTANA is the user of (414) 210-███ (i.e., TARGET TELEPHONE-6), subscribed to Patricia N. Alanis at ███████ 48th Street, Milwaukee, Wisconsin, 53219. Between January 2019 and May 2024 telephone number (414) 210-███ was listed in approximately 54 money wire transactions with the listed sender as Carlos PEREZ and Carlos PEREZ-SANTANA with associated address of 16██ S. 31st Street, Milwaukee, Wisconsin.   On or about August 28, 2012, PEREZ-SANTANA was placed in the temporary custody of Immigration and Customs Enforcement (ICE) Milwaukee after the Operating Under the Influence arrest on August 25, 2012.

331.    Between approximately March 6, 2025, to May 21, 2025, my review of E911/location data for TARGET TELEPHONE-6 revealed that PEREZ-SANTANA's phone consistently registers in the general area of 15█ S. 90th Street, West Allis, Wisconsin, during nighttime hours.

### Joseph MARINCIC

#### *PEREZ-SANTANA Distributes Cocaine to MARINCIC*

332.    Joseph MARINCIC is a white male born in the United States on ███████, 1984.  MARINCIC resides at N91███████ Oak Center Road, Hartland, Wisconsin. Intercepted communications have revealed that MARINCIC is a cocaine dealer, who obtains ounce quantities

of cocaine from PEREZ-SANTANA. Surveillance activities have identified MARINCIC as the user of (414) 628-███.

333.    On April 1, 2025, at approximately 1:19 p.m., TARGET TELEPHONE-6, used by PEREZ-SANTANA, received an intercepted call from (414) 628-███, used by MARINCIC. During the call, MARINCIC asked, "Are you around?" PEREZ-SANTANA replied, "I take a shower now. What happened?" MARINCIC stated, "I need a big one (1)." PEREZ-SANTANA replied, "Big one (1)?" MARINCIC confirmed, "Yeah." PEREZ-SANTANA replied, "Okay, uh... give me an (1) hour and... [Brief Pause] uh... thirty (30) minutes. Okay? Where?" MARINCIC responded, "Alright, I'm at the chicken place." PEREZ-SANTANA stated, "Okay. Thirty (30) minutes."

334.    On April 7, 2025, at approximately 9:41 a.m., TARGET TELEPHONE-6, used by PEREZ-SANTANA, received an intercepted call from (414) 628-███, used by MARINCIC. During the call, MARINCIC asked, "Hey, buddy. Hey, um... you able to front one (1), or no?" PEREZ-SANTANA replied, "Yeah, man. New one (1)." MARINCIC explained, "Yeah, alright. Can I, uh, give you this other one (1) back? 'Cause nobody wants it." PEREZ-SANTANA replied, "Huh?" MARINCIC continued, "This other one (1) you gave me. It's no good." PEREZ-SANTANA asked, "What do you mean?" MARINCIC stated, "It's... it's not good. The one (1) you— the one (1) I got last time. It's not good." PEREZ-SANTANA explained, "It's the same thing. The... last time, man. What you mean?" MARINCIC responded, "Oh, it is? It's not. It's not." PEREZ-SANTANA stated, "What... yeah, yeah." MARINCIC replied, "It's very, very hard. And it's not good. People are giving it... It's not. I don't want it. It's... fuck it." PEREZ-SANTANA asked, "Okay. So w—what you wanna do?" MARINCIC replied, "don't know. Can I trade it? Can I trade you for something different, for the different one (1)? It's all... pretty much all there."

162

PEREZ-SANTANA responded, "No, man. [Sighs] Because I..." [Voices Overlap] MARINCIC stated, "You said whatever you sell me, if I don't like it, 'You bring it back.'" PEREZ-SANTANA stated, "Yeah, but I don't... [Stammers] how... I don't what kind you—you giving to me, man." MARINCIC responded, "Oh my gosh! [Chuckles]" PEREZ-SANTANA asked, "So [Stammers] how much you have?" MARINCIC replied, "have—I have pretty much everything. I just sold one (1) eighth (8th), and the other guy said he didn't like it. He said it's no good and then I took a little bit. So probably like twenty (20)... twenty-four (24)." PEREZ-SANTANA stated, "Twenty-four (24), what? [U/I]" MARINICIC confirmed, "Twenty-four (24). Yeah." PEREZ-SANTANA responded, "Oh man." MARINCIC noted, "It's the whole— pretty much one (1) piece, too, you know. So... the same that you gave me." PEREZ-SANTANA stated, "No, if I gave you... this one, the next time you call me, "I don't like the [U/I]. No, I don't like it there." MARINCIC responded, "Called you, I did it Friday and then I told you today." PEREZ-SANTANA stated, "Huh? [Chuckles] No, man, [Stammers] when you take it? Three (3), four (4) days ago? One (1) week ago, man." MARINCIC stated, "[U/I] Your phone's been off."

335.    PEREZ-SANTANA advised, "Okay. I see you around eleven o'clock (11:00). Bring that one (1), and, and I give you... have one (1), okay?" MARINCIC replied, "Alright, thanks, bye." PEREZ-SANTANA stated, "Okay? But it's the last time. I don't want [U/I] like this. I want to... you take it first, you—you test it. If you like it,take it, if you don't take it, no problem, okay?" MARINCIC answered, "No, I asked you if it was the same and it wasn't. You know what I mean?" PEREZ-SANTANA asked, "Huh?" MARINCIC stated, "I'll talk to you when I see you, alright?" PEREZ-SANTANA asked, "Okay. Where?" MARINCIC asked, "Uh, what? McDonald's? Ten thirty (10:30)?" PEREZ-SANTANA replied, "No, eleven (11:00), man. No, no, [Mumbles] now I'm here in Southside." MARINCIC agreed stating, "Okay, alright. That's fine." PEREZ-

163

SANTANA clarified stating, "Okay, okay, ten (10:00)... ten forty-five (10:45), maybe." MARINCIC confirmed, "Okay, alright, I'll be there at ten thirty (10:30). Alright, bye."

336.    On April 7, 2025, at approximately 10:15 a.m., TARGET TELEPHONE-6, used by PEREZ-SANTANA, received an intercepted call from (414) 628-███. During the call, MARINCIC advised, "Hey, I'll just [U/I] Starbucks right here." PEREZ-SANTANA asked, "Huh?" MARINCIC stated, "I'll be at Starbucks drinking coffee." PEREZ-SANTANA replied, "Okay, I see you at Starbucks. Okay."

337.    On April 7, 2025, TFO Higgins conducted surveillance at the Starbucks located at 1500 S. 108th Street, West Allis. At approximately 10:42 a.m., TFO Higgins observed the previously documented black Lexus, bearing Wisconsin registration AXG-███. TFO Higgins observed the Lexus circle around the parking lot. TFO Higgins then observed the Lexus exit out of the parking lot, out of view. Traffic in the parking lot was heavy, and TFO Higgins was unable to see the meeting between PEREZ-SANTANA and MARINCIC. Upon reviewing E911/location data for TARGET TELEPHONE-6, TFO Higgins noted that at approximately 10:36 a.m., location data listed a ping radius of 24 meters, on west Greenfield Ave at approximately south 105th Street. TFO Higgins also noted that at approximately 10:45 a.m., location data listed a ping radius of 89 meters, on west Greenfield Avenue at approximately South 98th Street, showing that TARGET TELEPHONE-6 was in the general area during TFO Higgins' observation of the Lexus.

338.    On April 10, 2025, at approximately 3:52 p.m., TARGET TELEPHONE-6, used by PEREZ-SANTANA, received an intercepted call from (414) 628-███, used by Joseph MARINCIC. During the call, MARINCIC asked, "Hey buddy. Did you look at the difference between that? Or..." PEREZ-SANTANA responded, "Yeah, when do you want to pick up?" MARINCIC answered, "Tomorrow it's fine." PEREZ-SANTANA asked, "Tomorrow, what time,

man?" MARINCIC replied, "I don't know, uh...how about eleven (11:00) o'clock)." PEREZ-SANTANA stated, "Because tomorrow, I'm very busy, man. Uh, if it's.." [Voices Overlap] MARINCIC replied, "Eleven (11:00) o'clock, eleven (11:00). Eleven (11:00)." PEREZ-SANTANA stated, "Uh, exactly, okay?" MARNCIC exclaimed, "Oh, wait, wait, wait! Uh [U/I] at ten-thirty (10:30), so how about eleven-thirty (11:30)?"PEREZ-SANTANA asked, "Ten (10:00)...eleven-thirty (11:30)?" MARINCIC confirmed, "Eleven-thirty (11:30), yep." PEREZ-SANTNA advised, "Okay." MARINCIC responded, "I'll call you. I'll call you." PEREZ-SANTANA directed, "Call me before." MARINCIC agreed, "I'll call you at eleven (11:00), yeah." PEREZ-SANTANA advised, "Alright. Okay."

339. On April 11, 2025, at approximately 10:30 a.m., TARGET TELEPHONE-6, used by PEREZ-SANTANA, received an intercepted call from (414) 628-███, used by MARINCIC. During the call, MARINCIC advised, "I am ready when you are." PEREZ-SANTANA asked, "Uh, Southside. Can you come here?" MARINCIC then asked, "Where?" PEREZ-SANTANA answered, "Uh...Cermak?" MARINCIC replied, "Um, yeah, I can be there in fifteen (15) minutes." PEREZ-SANTANA confirmed, "Okay." MARINCIC stated, "I am on my way." PEREZ-SANTANA directed, "Outside the Cermak. Uh, parking lot, okay." MARINCIC responded, "Mm-hmm, yeah. Alright, bye."

340. On April 11, 2025, HSI RAC Milwaukee Special Agent (SA) and HIDTA TFO's conducted surveillance on Carlos PEREZ-SANTANA at Cermak at 1541 Miller Park Way, West Milwaukee, Wisconsin. Approximately at 10:43 a.m., SA Kaur observed the vehicle associated with PEREZ-SANTANA, a Black Lexus SUV bearing Wisconsin plate AXG-███, pull into the parking lot west of Cermak and parked directly in front of Buffalo Wild Wings Go, 1621 Miller Park Way, Milwaukee, Wisconsin.

341.    At approximately 10:47 a.m., TARGET TELEPHONE-6, used by PEREZ-SANTANA, received an intercepted call from (414) 628-███, used by MARINCIC. During the call, PEREZ-SANTANA stated, "I am here already." MARNICIC asked, "I'm at the..where? I am at the Dollar (Dollar Tree), right next to it." PEREZ-SANTANA repeated, "The Dollar?" MARINCIC confirmed, "Yeah." PEREZ-SANTANA stated, "Oh, okay. I'll stop right there." MARINCIC responded, "Okay."

342.    At approximately 10:48 a.m., SA Hepp observed PEREZ-SANTANA's Lexus turn eastbound into the parking lot of the Dollar Tree, 4421 W. Greenfield, Wisconsin.  As the Lexus pulled into the lot, it parked facing eastbound directly next to (north of) a larger black SUV which was already parked in the lot.  This SUV corresponded to Wisconsin registration ASE-███.  A subsequent query of the Wisconsin Department of Transportation revealed this vehicle to be registered to a black, 2021 Lexus GX, VIN: JTJAM7BXXM5300985 listing to J███  A████ M██████ (DOB: ████-89) at N91████ Center Oak Road, Hartland, Wisconsin.

343.    Immediately after PEREZ-SANTANA parked, SA Hepp observed a white male with reddish hair wearing eyeglasses exit the driver's seat of the vehicle bearing Wisconsin plate ASE-███ and he opened the front passenger door of PEREZ-SANTANA's vehicle.  SA Hepp lost sight of the vehicles at this time. Moments later, the white male re-entered the driver's seat of ASE-3820 and departed the area eastbound on west Greenfield Avenue. At approximately 10:51 a.m., PEREZ-SANTANA departed the area southbound through the Target parking lot. SA Hepp later viewed a Wisconsin Department of Transportation photograph of Joseph B. MARINCIC (DOB: ████-84) and confirmed MARINCIC was the driver of larger black Lexus SUV bearing Wisconsin plate ASE-███, who met with PEREZ-SANTANA. Surveillance photographs and video were also obtained, partially capturing MARINCIC's meeting with PEREZ-SANTANA.

166

344.     On May 5, 2025, at approximately 1:27 p.m., TARGET TELEPHONE-6, used by PEREZ-SANTANA, received an intercepted call from (414) 628-█████, used by MARINCIC. During the call, MARINCIC asked, "You wanna do that, or what?" PEREZ-SANTANA stated, "I'm taking shower now. What you need?" MARINCIC related, "Uh... I'm headed by you." PEREZ-SANTANA asked, "Huh?" MARINCIC repeated, "I'll head your way. What we talked about." PEREZ-SANTANA acknowledged, "Okay. I'm not at my house." MARINICIC responded, "Alright, I'll pro—I'll be on my way shortly." PEREZ-SANTANA ended the call stating, "Okay. Call me, okay?"

345.     On May 5, 2025, at approximately 2:06 p.m., TARGET TELEPHONE-6, used by PEREZ-SANTANA, received an intercepted call from (414) 628-█████, used by MARINCIC. MARINCIC stated, "Alright, meet me outside. Meet me at the bank on Seventieth (70th), Seventieth (70th) there." PEREZ-SANTANA asked, "In... what?" MARINCIC responded, "Greenfield. At the bank." PEREZ-SANTANA confirmed asking, "Greenfield?" MARINCIC answered, "Yeah. The [U/I]." PEREZ-SANTANA asked, "Oh... the PNC?" MARINCIC answered, "No, B— BMO." MARINCIC explained, "[U/I] is it Seventieth (70th), Seventieth (70th), yeah, Seventieth (70th), yeah." PEREZ-SANTANA responded, "Oh, it says BMO Harris, yeah?" MARINCIC confirmed, "Yup," and PEREZ asked, "Okay. What do you need?" MARINCIC responded, "No, I already told you." PEREZ-SANTANA asked, 'Hm? Before?" MARINCIC replied, "Yeah, what we talked about. Yep." PEREZ-SANTANA acknowledged, "The - okay, the thirty-two (32), yeah?" MARINCIC replied, "Yup...yeah, yeah, yeah, yeah. Yup [U/I]." PEREZ-SANTANA asked, "Okay, okay. Okay, so, [Stammers] where I - I can see you? By chicken place?" MARINCIC explained, "Uh - uh... no I'm at the bank right now." PEREZ-

SANTANA stated, "Oh, but [Stammers] you gotta wait about twenty (20) minutes over there." MARINCIC replied," Yup, fine, yup."

346.    Based on my training, experience, and knowledge of the investigation, MARINCIC contacted PEREZ-SANTANA to obtain "thirty-two" (32) of an illicit substance, believed to be cocaine. The parties agreed to meet at the BMO Harris Bank located at 7000 W. Greenfield Ave., West Allis, Wisconsin.   A review of positional data revealed that on April 5, 2025, at approximately 2:31 p.m., E911/GPS ping data for TARGET TELEPHONE-6 showed a (38-meter ping) in the area of south 77th Street at West Greenfield Ave., in the general vicinity of the BMO Harris bank location.

### Jesus MEDINA-RODRIGUEZ

*DRUG Transaction Between MEDINA-RODRIGUEZ and PEREZ-SANTANA*

347.    Jesus MEDINA-RODRIGUEZ is a citizen and national of Mexico, born on ███████ 1977. MEDINA-RODRIGUEZ has no legal status in the United States, and is currently in active removal proceedings, in front of an immigration judge. According to law enforcement records, MEDINA-RODRIGUEZ is documented in 2004 as an associate of the Mexican Posse gang, and between 20025-2007, is a documented member of the Mexican Posse (using the name, "Hugo GARCIA," with a date of birth of September 1, 1981).  According to the same law enforcement records, MEDINA-RODRIGUEZ was known at the time to be "Hugo GARCIA."  MEDINA-RODRIGUEZ has been identified as a kilogram level narcotics trafficker and source-of-supply and partner of PEREZ-SANTANA. MEDINA-RODRIGUEZ resides at 22██ S. 58th Street, West Allis, Wisconsin.   On April 30, 2025, case agents conducted surveillance of MEDINA-RODRIGUEZ.  During surveillance, case agents followed MEDINA-RODRIGUEZ, driving a white Scion bearing Wisconsin license plate AUZ-███, to MEDINA-RODRIGUEZ's

house and observed MEDINA-RODRIGUEZ enter the front door of the residence located at 22█

S. 58th Street, West Allis, Wisconsin.[10]

348.    On March 28,2025, at approximately 12:07 p.m., PEREZ-SANTANA, using

TARGET TELEPHONE-6, placed an intercepted call to MEDINA-RODRIGUEZ, using (414)

530-███. During the call PEREZ-SANTANA asked, "Yeah, you're still going to take 30 minutes,

right?" MEDINA-RODRIGUEZ responded in "10 minutes." PEREZ-SANTANA informed

MEDINA-RODRIGUEZ that he (PEREZ-SANTANA) was going to take the "tires once and for

all." MEDIDA asked if PEREZ-SANTANA was going to take them to, "The old man so he could

cut them," for PEREZ-SANTANA. PEREZ-SANTANA replied that he (PEREZ-SANTANA) was

going to take them to a truck driver and that the truck driver, "Has 18 dark ones and one waiting

for her turn." Case agents believe that PEREZ-SANTANA asked MEDINA-RODRIGUEZ how

long it would take MEDINA-RODRIGUEZ to return to his house because PEREZ-SANTANA

wanted to pick up unknown narcotic(tires) from MEDINA-RODRIGUEZ's residence and take

them to a customer (truck driver). MEDINA-RODRIGUEZ asked if PEREZ-SANTANA was

going to "take them" (narcotics) to the "old man," to "cut," (breakdown and mix the drugs with an

inactive ingredient or over the counter drug). PEREZ-SANTANA informed MEDINA-

RODRIGUEZ that the truck driver has 18 dark ones (unknown narcotic/possibly heroin).

349.    According to the E 911 location/ping data for TARGET TELEPHONE-6, at

approximately 12:16 pm, PEREZ-SANTANA (TARGET TELEPHONE-6) was in the area of

---

[10] In fact, on April 15, 2025, at approximately 11:10 a.m., TARGET TELEPHONE-6, used by PEREZ-SANTANA, received a call from MEDINA-RODRIGUEZ, using (414) 530-███. At one point in the intercepted conversation, PEREZ-SANTANA asked, "Um, where are you?" MEDINA-RODRIGUEZ replied, "Huh? Where do I live?" PEREZ-SANTANA repeated, "Where are you?" MEDINA-RODRIGUEZ answered, "On Fifty-Eight (58th)...I live on Fifty-Eight (58th) and Lincoln." Additionally, subscriber information through AT&T, for MEDINA-RODRIGUEZ's telephone number (414) 530-███, lists a subscriber of "JESUS A MEDINA RODRIGUEZ," with a billing address of 22█ S. 58TH St., West Allis, Wisconsin 53219, the identified residence of MEDINA-RODRIGUEZ.

169

2200 block of south 58th Street (22-meter ping). This is in the area of MEDINA-RODRIGUEZ's residence located at 22██ S. 58th Street, West Allis, Wisconsin.

350.    Agents attempted to conduct surveillance at MEDINA-RODRIGUEZ's residence to observe this transaction. Upon arrival at the location, PEREZ-SANTANA was no longer at the location; however, TFO Krenzien observed MEDINA-RODRIGUEZ's vehicle (Black, Jeep Grand Cherokee with no registration plate) parked outside of MEDINA-RODRIGUEZ's residence.

### *PEREZ-SANTANA and MEDINA-RODRIGUEZ Meet to Discuss Narcotics*

351.    On April 15, 2025, at approximately 10:42 a.m., MEDINA-RODRIGUEZ, using (414) 530-██, placed a call to PEREZ-SANTANA, using TARGET TELEPHONE-6. During the call, PEREZ-SANTANA stated, "Let's go have lunch, man!" MEDINA-RODRIGUEZ asked, "Where are we going?" PEREZ-SANTANA answered, "Wherever!" Later in the conversation PEREZ-SANTANA indicated that the two would meet "To talk about…business."

352.    As the conversation progressed, PEREZ-SATANA told MEDINA-RODRIGUEZ, "So then, what was I going to tell you, man? Well, that's one (1), look... I was thinking, uh... call Rey, man. [Stammers] If he will want the car. Right?" MEDINA-RODRIGUEZ responded, "Yeah." PEREZ-SANTANA continued, "Um... [Stammers] to— because I will [Stammers] uh, I will finish painting, I think, tomorrow or the day after tomorrow of this week, you understand me?" MEDINA-RODRIGUEZ replied, "Oh yeah?" PEREZ-SANTANA continued, "Yes. So then I would like to— that [Stammers] I— if you, if you want to work that, whatever you want. I'll give it to you, man." MEDINA-RODRIGUEZ responded, "Yeah?" PEREZ-SANTANA stated, "You understand me? That profit is yours. There's no problem, buddy. You understand me? And you work it with him. Coordinate with him. It wouldn't be worth you to trade the car though. For what?" MEDINA-RODRIGUEZ replied, "Oh no, no, no. It's not worth it, no." PEREZ-SANTANA

170

continued, "Just lower the price and if you want to, uh, lose something like, alright. And take the reins, then alright. Yeah? You understand me?" MEDINA-RODRIGUEZ answered, "Yeah."

353. PEREZ-SANTANA stated, "And you can propose that, 'You know what? Bring me a closed fist, man. And that's all.'" MEDINA-RODRIGUEZ asked, "Eh?" PEREZ-SANTANA continued, "'But don't tell me about the car.' Because if not, let me know, because he's going to be calling and I'm going to throw him out. You understand me?" MEDINA-RODRIGUEZ answered, "Yeah. Alright, yes." PEREZ-SANTANA stated, "Right? Right? So then, I'll-I'll leave up to you, man. But I say this car isn't worth it. Honestly." MEDINA-RODRIGUEZ responded, "That's fine. That's fine, man."

354. In a subsequent conversation MEDINA-RODRIGUEZ and PEREZ-SANTANA agreed to meet on "20th." On April 15, 2025, at approximately 11:40 a.m., Homeland Security Investigations (HSI) Resident-in-Charge (RAC) Milwaukee Special Agent (SA) Kaur, along with HIDTA DEA TFO Rivera conducted physical surveillance at El Tsunami located at 2001 W. Lincoln Avenue, Milwaukee, Wisconsin. Case agents' review of positional data for PEREZ-SANTANA's phone revealed his location on 20th and Lincoln Avenue.

355. SA Kaur observed a Black Lexus SUV, bearing Wisconsin license plate AXG-███, associated with PEREZ-SANTANA parked outside of El Tsunami on 20th street, facing east. SA Kaur and TFO Rivera walked inside the restaurant and observed PEREZ-SANTANA and MEDINA-RODRIGUEZ at the first table located on the left side of the restaurant by the glass windows.

356. SA Kaur observed PEREZ-SANTANA and MEDINA-RODRIGUEZ sit and converse in the restaurant for approximately 30 minutes and then depart from the restaurant. Surveillance terminated at 11:55 a.m.

171

357.    Based on your affiant's training, experience, and knowledge of the investigation, MEDINA-RODRIGUEZ and PEREZ-SANTANA arranged to meet at El Tsunami restaurant to discuss their narcotics trafficking, "business." Furthermore, PEREZ-SANTANA referred to Reynaldo SANCHEZ-GONZALEZ, (i.e., "Rey"), and advised MEDINA-RODRIGUEZ that PEREZ-SANTANA no longer wants to distribute kilogram quantities of cocaine to SANCHEZ-GONZALEZ. PEREZ-SANTANA further related to MEDINA-RODRIGUEZ that MEDINA-RODRIGUEZ could distribute cocaine to SANCHEZ-GONZALEZ, if MEDINA-RODRIGUEZ wished, as PEREZ-SANTANA no longer wanted SANCHEZ-GONZALEZ as a drug customer.

*PEREZ-SANTANA and MEDINA-RODRIGUEZ Discuss Replenishing their Cocaine Supply and Discuss QUINONEZ-HERNANDEZ.*

358.    On April 28, 2025, at approximately 6:13 p.m., (414) 530-███, used by MEDINA-RODRIGUEZ, placed an intercepted call to PEREZ-SANTANA, using TARGET TELEPHONE-6. PEREZ SANTANA asked MEDINA-RODRIGUEZ, "What happened with that dude?" MEDINA-RODRIGUEZ responded, "Uh, listen. He..." PEREZ-SANTANA asked, "Huh?" MEDINA-RODRIGUEZ continued, "He got busy. That his daughter... his daughter, um..." PEREZ SANTANA asked, "So, then? What did you guys agree on? What did he tell you?" MEDINA-RODRIGUEZ answered, "Well, that—that... look. The truth... That—that... what's it called? That if I wanted to go... But that he had to be at the hospital, I don't know what the fuck." PEREZ-SANTANA responded, "Yeah. Okay, so then he is not coming tomorrow?" MEDINA-RODRIGUEZ answered, "Uh, no." PEREZ SANTANA stated, "No? So then not right now?" [Voices Overlap] MEDINA-RODRIGUEZ exclaimed, "Listen!" PEREZ SANTANA directed, "Tell me." MEDINA-RODRIGUEZ stated, "[Stammers] And there another thing. I don't know.... I don't know. Look, [Stammers] it seems like we call them... [Blows Nose] The guy from Califas (California) called me." PEREZ-SANTANA asked, "Uh-huh. And what did he tell you? What did

172

he tell you?" MEDINA-RODRIGUEZ asked, "The one from Califas?" PEREZ-SANTANA answered, "Yeah." MEDINA-RODRIGUEZ stated, "To say hi to you." PEREZ-SANTANA replied, "[Chuckles] For real, man." MEDINA-RODRIGUEZ stated, "No, [Stammers] that when could he come. And I told him, 'No, not right now.' And... and I said, 'It's because your luggage went up a lot.' He said, 'Yes, but I thought that... that it was going up.' Just a bunch of lies, right?" PEREZ SANTANA replied, "Yeah. Well, just lies, man. Well, um... well, tell him to bring two (2), but at sixteen (16). Tell him."

359. MEDINA-RODRIGUEZ replied, "Yes, well, that's—that's what I was going to tell you. Yeah. I said, 'Let me tell Carlitos. I'm going to tell that to Carlitos.'" PEREZ-SANTANA advised, "But—but if he is going to come until next week, he can go to hell, man. Because, um—um... uh-huh. Uh, [Stammers] that one is urgent, dude. And if not, so I can look over here, because even if I pay a bit more, but there is a guy that goes to Chicago, dude." MEDINA-RODRIGUEZ responded, "Yeah." PEREZ-SANTANA replied, "But, well, if I don't—don't have any other way, dude?" MEDINA-RODRIGUEZ stated, "Yeah, yeah, yeah. If not, I will go and I'll get the one thousand (1,000) bucks."

360. PEREZ-SANTANA replied, "There you go, dude. Then why don't you do it?" MEDINA-RODRIGUEZ answered, " Well... let me—let me see. Let me ask the guy from Califas to—to see what he says." PEREZ SANTANA replied, "Well... well... alright then, dude. But—but call me today, dude. If not, so that tomorrow... because I have a lot of pressure, dude. Alright?" MEDINA-RODRIGUEZ responded, "You have high pressure? Dude, take the pill." PEREZ-SANTANA stated, "No, dude, it's that... I should've another number [plug] by now, dude, but it's fucked. Alright? Alright, set. Call me, dude." MEDINA-RODRIGUEZ concluded, "Alright, then,

dude." PEREZ-SANTANA ended the conversation stating, "To see what you resolve. Alright, cool."

361.    Based on my training, experience and familiarity with the investigation, I believe MEDINA-RODRIGUEZ is a source of supply for PEREZ-SANTANA, and that PEREZ-SANTANA and MEDINA-RODRIGUEZ discussed replenishing their cocaine supply for distribution in the Milwaukee area. For example, PEREZ-SANTANA advised, "Yeah. Well, just lies, man. Well, um... well, tell him to bring two (2), but at sixteen (16). Tell him." Your affiant is aware that sixteen thousand dollars ($16,000) is within the current price range for one (1) kilogram of cocaine. I believe that PEREZ-SANTANA and MEDINA-RODRIGUEZ are attempting to replenish their cocaine supply, and that MEDINA-RODRIGUEZ is attempting to find additional sources to supply for himself and for PEREZ-SANTANA. Additionally, MEDINA-RODRIGUEZ referenced, "the guy from Califas" (California) which you affiant believes to be QUINONEZ-HERNANDEZ, based on telephone toll analysis between April 28, 2025, to May 1, 2025, showing approximately three (3) calls between QUINONEZ-HERNANDEZ and MEDINA-RODRIGUEZ, using (414) 530-███.

362.    On April 30, 2025, at approximately 11:58 a.m., MEDINA-RODRIGUEZ, using (414) 530-███, called (414) 210-███, used by PEREZ-SANTANA. During the call, MEDINA-RODRIGUEZ stated to PEREZ-SANTANA, "That dude told me to go over there." PEREZ-SANTANA asked, "who?" MEDINA-RODRIGUEZ replied, "The one from Chicago." PEREZ-SANTANA asked, "And are you going? [Exhales]." MEDINA-RODRIGUEZ replied, "Well, yeah!" PEREZ-SANTANTA asked, "So-so what do you want to do, dude?" MEDINA-RODRIGUEZ replied, "Well, it's up to you." PEREZ-SANTANA asked, "Can you take the

money? [Exhales]." MEDINA-RODRIGUEZ replied, "Yes, and Robertillo is already here. Robertillo, who wanted me to—to buy a ticket from him." PEREZ-SANTANA chuckled.

363.    MEDINA-RODRIGUEZ responded, "I will call you right now." PEREZ-SANTANTA acknowledged, "Alright. [Stammers] Let... I will stop by with the money right now. Are you leaving today?" MEDINA-RODRIGUEZ answered, "All set! Yes, later." PEREZ-SANTANA stated, "Alright, then. Uh, it's good that you called me, dude, so I can cancel on Cholo, then." MEDINA-RODRIGUEZ confirmed, "Alright, then." PEREZ-SANTANA acknowledged, "Yes? Alright." MEDINA-RODRIGUEZ stated, "Alright, dude." PEREZ- SANTANA replied, "I'll be there shortly. Alright."

364.    Based on my training, experience and familiarity with the investigation, I believe that MEDINA-RODRIGUEZ was unable to arrange a narcotics deal with "Califas," and instead arranged to meet with his Chicago contact, who is unknown to law enforcement, to buy narcotics. PEREZ-SANTANA asked MEDINA-RODRIGUEZ to buy narcotics for him for further distribution in the greater Milwaukee area. To this end, PEREZ-SANTANA gave MEDINA-RODRIGUEZ money to purchase narcotics from MEDINA-RODRIGUEZ's contact, presumably residing in Chicago.

365.    On the same day, April 30, 2025, at approximately 12:50 p.m., MEDINA-RODRIGUEZ, using (414) 530-███, placed a call to (414) 210-███, used by PEREZ-SANTANA.  During the call, PEREZ-SANTANA stated, "I'm over here in the back, dude." MEDINA replied, "I was going to tell you to let me park there, but no, no, like that." PEREZ-SANTANA stated, "Uh-huh."

366.    Based on my training, experience, and familiarity with the investigation, I believe that PEREZ-SANTANA drove to an unknown location to meet with MEDINA-RODRIGUEZ, to

further discuss obtaining narcotics for distribution, and possibly provide money to MEDINA-RODRIGUEZ for the Chicago narcotics supplier.

*PEREZ-SANTANA and MEDINA-RODRIGUEZ Discuss Replenishing their Drug Supply*

367.    On May 1, 2025, at approximately 9:50 a.m., MEDINA-RODRIGUEZ, using (414) 530-█, placed a call to TARGET TELEPHONE-6, used by PEREZ-SANTANA. During the call, MEDINA-RODRIGUEZ stated, "That guy lied to me. [Stammers] That he was coming. And look." PEREZ-SANTANA asked, "What?" MEDINA-RODRIGUEZ continued, "Because I told him. 'I am going there,' I said. He said, 'No, it is going to rain tomorrow.' He said, 'I like it when it rains.'" MEDINA-RODRIGUEZ informed PEREZ-SANTANA, "Yeah. And—and... I told him, 'Well, I'll wait for you here.' And look now. He hasn't—hasn't arrived. "

368.    PEREZ-SANTANA asked, "Mm-hmm. And what do you think? Is the guy coming, or not? According to how you saw him." MEDINA-RODRIGUEZ replied, 'Well, he told me yes. That it was a sure thing. But anyway, so... so either way... what's it called?" As the conversation progressed, MEDINA-RODRIGUEZ and PEREZ-SANTANA agreed to wait for the unknown source-of-supply to arrive with the narcotics. PEREZ-SANTANA further discussed the ability to receive narcotics from a different source-of-supply stating, "If not, then with Cholo. But with his brother, man. Just so we don't get that bullshit his friends do." PEREZ-SANTANA explained, "Man. Um, look... um... this is easy, buddy. You know why all that shit happened? Because... well, honestly, I didn't—I didn't want to give the paper to—to his brother, man. He—he was going for the paper, and I told him, "No, first bring everything." Do you understand me? I wanted to make sure, man." PEREZ-SANTANA stated, "But if you are... if you know him well, and all that, we can give him the paper and he can bring the shit back. Do you understand me? Right?" MEDINA-RODRIGUEZ stated, "He said it was a sure thing. Let's give him... let's give him a chance."

PEREZ-SANTANA agreed, "Alright, got it. Um, I will see you over there at eleven (11:00). Alright? Alright."

369.    On May 1, 2025, at approximately 10:35 a.m., MEDINA-RODRIGUEZ, using (414) 530-███, received a call from TARGET TELEPHONE-6, used by PEREZ-SANTANA. During the call, PEREZ-SANTANA stated, "I'm here outside of your house, dude. [Brief Pause]. What are you doing?" MEDINA-RODRIGUEZ replied, "Oh, fuck. I'm sleeping." "PEREZ-SANTANA asked, "What did he tell you, dude?" MEDINA-RODRIGUEZ answered, "[Stammers] That the guy, no, no... that he is not answering him." MEDINA-RODRIGUEZ continued, "So then I told him, "Why the fuck did you assure me then?" I told him." PEREZ-SANTANA responded, "Yeah," and MEDINA-RODRIGUEZ explained, "And—and I told him, 'You should had told me [Stammers] since yesterday.' I said, [Mumbles] 'In the afternoon.'"

370.    MEDINA-RODRIGUEZ advised, "He said, "Yeah, it's fine. Just to..." I told him, "Tell me the truth." He said, "Yeah, it's fine." As the conversation progressed, MEDINA-RODRIGUEZ asked, "Do you want—want me to go outside? I'm going." PEREZ-SANTANA asked, "Here... I'm in the front. Does it work best for you in the back?" MEDINA-RODRIGUEZ replied, "In front, it's fine."

371.    At approximately 10:30 a.m. case agents conducted surveillance at or near 22██ S. 58th Street, West Allis, Wisconsin.  At approximately 10:35 a.m., case agents observed a teal Chevy Equinox bearing Wisconsin plate BAP-███ drive northbound on north 58th Street and park near 22██ S. 58th Street.

372.    At approximately 10:36 a.m. MEDINA-RODRIGUEZ exited 22██ S. 58th Street and walked towards the Chevy Equinox.  MEDINA-RODRIGUEZ entered the front driver seat

where he stayed for approximately 10 minutes. MEDINA-RODRIGUEZ then exited the front passenger seat of the Chevy Equinox and returned to 22█ S 58th Street.

373.    Based on my training, experience, and knowledge of the investigation, MEDINA-RODRIGUEZ and PEREZ-SANTANA were coordinating receiving kilogram quantities of cocaine from one (1) of at least two (2) sources-of-supply. Furthermore, based on their training, experience and familiarity with the investigation, case agents believe that PEREZ-SANTANA travelled to MEDINA-RODRIGUEZ's residence to provide MEDINA-RODRIGUEZ with U.S. currency/drug proceeds that would be used for the purchase of additional cocaine from their sources-of-supply.

### *PEREZ-SANTANA Seeks Cocaine from Mexico Based S.O.S. R████ T████-█*

374.    On April 30, 2025, TARGET TELEPHONE-6, used by PEREZ-SANTANA, sent and received several text messages in Spanish, to and from R████ T████████, using Mexico based telephone number +52-████████. At approximately 10:45 a.m., T████-███ sent a message stating, "What's going on [?] How are you [?] It's Cholo [.]" Then, at approximately 10:46 a.m., T████████ sent a message stating, "Call me when you get a chance [.]" At approximately 10:46 a.m., PEREZ-SANTANA replied in a message stating, "OK."

375.    On April 30, 2025, at approximately 10:51 a.m., PEREZ-SANTANA, using TARGET TELEPHONE-6, placed an intercepted call to +52-████████, used by T████████. During the call, PEREZ-SANTANA asked, "What's going on, Beto? How are you?" T████████ replied, "Good, just here, Carlitos. How are you?" PEREZ-SANTANA asked, "Just here. What was I going to tell you? Um, I just wanted to know if you had a car over here, man."

376.     T███████████ answered, "Yes, um... [Stammers] I am barely working on that. The other—other day, on Friday, Fresa called me. But he didn't come through. And then... and I got them—them out. But, um... the tow truck is barely—barely going to—to get them there." T███████████ asked, "Um... do I call you once... as soon as it's ready?" PEREZ-SANTANA answered, "Yes, man. And if not, um... [Brief Pause] uh, talk about it with your brother. Your brother—your brother knows me, man. He went to my house the other time." T███████████ responded, "Yes, yes, yes, yes." PEREZ-SANTANA continued, "Uh-huh. He left me a car from the auction, man. Are you still with him? With your brother?" T███████████ confirmed, "Yes," and PEREZ-SANTANA advised, "Alright then. Yes, man, [Stammers] and what is the number? It's—it's fine. It—it's fine." T███████████ responded, "Well, the same. You know, I [Stammers] don't go too much." PEREZ-SANTANA commented, "Um, just make sure it runs well, Beto." T███████████ confirmed, "Yes," and PEREZ-SANTANA continued, "That it doesn't fail. That it's good. Alright?"

377.     T███████████ stated, "Yes, yes. Well, yeah... yes, well, especially right now, there are going—going to be new ones right now." PEREZ-SANTANA asked, "Okay. Then—then around when would it be?" T███████████ answered, "They are going to be arriving. They are going to be really good." T███████████ later advised, "Alright, but for sure by the weekend."

378.     On May 1, 2025, at approximately 11:52 p.m., TARGET TELEPHONE-6, used by PEREZ-SANTANA, received a text message in Spanish, from R████ T███████████, using Mexico based telephone number +52████████ stating, "Call me when you can. See if tomorrow we do that like around 10:30 -11 am [.]"

179

379.    On May 3, 2025, at approximately 8:14 p.m., TARGET TELEPHONE-6, used by PEREZ-SANTANA, received text messages in Spanish, from R████ T███████████, using Mexico based telephone number +52-████████ stating, "It can be done early tomorrow [.] It's going to be 17 for the car. Or if you want to wait for my other friend [.] I just don't know how many days will it take for his arrival [.]

380.    On May 8, 2025, at approximately 10:08 a.m., TARGET TELEPHONE-6, used by PEREZ-SANTANA, received a text message in Spanish, from Roberto T███████████, using Mexico based telephone number +52████████ stating, "16.5 for the original paint directly from the dealership. [%] clean, guaranteed [...]it just arrived [.]"

381.    Based on your affiant's training, experience, and knowledge of the investigation, PEREZ-SANTANA is seeking "cars," (i.e., kilogram quantities of cocaine) from T███████ ████████ and T██████████'s unidentified brother. This investigation has revealed that code words such as "cars," and "tires," refer to quantities of cocaine for distribution. Indeed, your affiant knows that "16.5" refers to $16,500, the current market value cost for a kilogram of cocaine. PEREZ-SANTANA discussed the quality of the cocaine and the timeframe when T███████ ████████ would be able to provide the cocaine. T███████████ later advised via text message that the cocaine "just arrived."

### *MEDINA-RODRIGUEZ Supplies PEREZ-SANTANA with Cocaine*

382.    On May 2, 2025, at approximately 9:25 a.m., MEDINA-RODRIGUEZ, using (414) 530-████, placed a call to TARGET TELEPHONE-6, used by PEREZ-SANTANA. During the call, MEDINA-RODRIGUEZ advised PEREZ-SANTANA that MEDINA-RODRIGUEZ received a call from a narcotics source-of-supply referred to as "Cholo." MEDINA-RODRIGUEZ advised that "Cholo's" brother was with a "bunch of assholes." PEREZ-SANTANA stated, "Uh-

180

huh. Um... well, um, if you want, I'll take you the paper." MEDINA-RODRIGUEZ asked, "Yeah?" PEREZ-SANTANA responded, "Yeah, and, um... in any case, [Stammers] you'll make something off of it there." MEDINA-RODRIGUEZ advised, "All set then." PEREZ-SANTANA asked, "Do you understand me? Um, I'm going to take you, um, se-seventeen (17). Alright?" MEDINA-RODRIGUEZ responded, "All set."

383.     Based on your affiant's training, experience, and knowledge of the investigation, MEDINA-RODRIGUEZ advised PEREZ-SANTANA that "Cholo" could provide narcotics to PEREZ-SANTANA, via "Cholo's" brother. PEREZ-SANTANA advised that he (PEREZ-SANTANA) would provide MEDINA-RODRIGUEZ with seventeen (17), (i.e., $17,000) towards the purchase of a kilogram of cocaine.

384.     On May 2, 2025, at approximately 10:41 a.m., MEDINA-RODRIGUEZ, using (414) 530-███, received a call from TARGET TELEPHONE-6, used by PEREZ-SANTANA. PEREZ-SANTANA advised, "What I was going to tell you? Um, I'm here passing by your house, dude. I'm heading up. To, um... do you want to pick up the paper, so you can give it to him? Because I'm going down with [U/I]. [Chuckles]. MEDINA-RODRIGUEZ replied, "Yes, in a little while." MEDINA-RODRIGUEZ asked, "[Stammers] How much did Cholo tell you?" PEREZ-SANTANA answered, "He didn't give me a number, dude." MEDINA-RODRIGUEZ commented, "Yeah. He said, "No, because it's... sent at eigh-- eighteen (18)." And in the end, seventeen (17) five hundred (500)." PEREZ-SANTANA asked, "Oh really? He changed it?" MEDINA-RODRIGUEZ stated, "So I can get motivated, yeah. Because there was not going to be anything." MEDINA-RODRIGUEZ observed, "He's an... like I'm telling you man, they just want to fuck us."

385.     As the conversation progressed, MEDINA-RODRIGUEZ advised that he would wait for the other source-of-supply to obtain the narcotics. PEREZ-SANTANA asked, "So,

[Stammers] I can bring you what you told me. I have... Right?" MEDINA-RODRIGUEZ responded, "Yes, sounds good. Yeah. All set." Based on my training, experience, and knowledge of the investigation, MEDINA-RODRIGUEZ advised PEREZ-SANTANA that MEDINA-RODRIGUEZ would wait for the narcotics shipment from MEDINA-RODRIGUEZ's other source of supply to arrive. PEREZ-SANTANA informed MEDINA-RODRIGUEZ that PEREZ-SANTANA would meet with MEDINA-RODRIGUEZ later, to provide MEDINA-RODRIGUEZ with the U.S. currency, for the purchase of cocaine from MEDINA-RODRIGUEZ and MEDINA-RODRIGUEZ's source-of-supply.

386. At approximately 12:00 p.m., case agents conducted surveillance at or near 22█ S. 58th Street. At approximately 12:16 p.m., PEREZ-SANTANA, using TARGET TELEPHONE-6, called MEDINA-RODRIGUEZ to let him know that he was parked in the ally. At approximately 12:17 p.m., case agents observed a teal Chevy Equinox bearing Wisconsin plate BAP-██ park in the alley behind 22█ S. 58th Street.

387. At approximately 12:19 p.m., case agents observed PEREZ-SANTANA walk from the garage area of 22█ S. 58th Street, approach the driver, and enter the Chevy. PEREZ-SANTANA drove away southbound through the ally out of sight.

388. On May 2, 2025, at approximately 12:44 p.m., MEDINA-RODRIGUEZ, using (414) 530-███, placed a call to TARGET TELEPHONE-6, used by PEREZ-SANTANA. During the call, MEDINA-RODRIGUEZ stated, "I was calling you for something else. I was in such a hurry, just went in and I [Stammers] didn't give you the money. PEREZ-SANTANA replied, "Oh, no. Well, later, man. No problem."

182

389.    On May 2, 2025, at approximately 12:52 p.m., PEREZ-SANTANA, using TARGET TELEPHONE-6, sent a text message, in Spanish, to UM███ stating, "I have work now[.]"

390.    Based on your affiant's training, experience, and knowledge of the investigation, PEREZ-SANTANA was resupplied with a quantity of cocaine, from or through MEDINA-RODRIGUEZ. Indeed, after the aforementioned text message, PEREZ-SANTANA continued his narcotics trafficking activities with multiple drug customers, as evidenced in numerous intercepted communications.[11]

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

391.    As described above and in Attachment B, this application seeks permission to search for records that might be found on the **SUBJECT PREMISES**, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive, cellular telephone, or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

392.    *Probable cause.*  I submit that if a computer, cellular telephone, or storage medium is found on the **SUBJECT PREMISES**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

> a.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored

---

[11] As an example, on May 14, 2025, case agents observed PEREZ-SANTANA conduct what case agents believed to be a drug transaction at Walgreens, 8333 W. Greenfield Ave., West Allis, Wisconsin.  Shortly thereafter, the individual in question who had immediately met with PEREZ-SANTANA was approached by law enforcement officers in the parking lot of Walgreens.  This individual then provided to law enforcement a clear plastic knotted sandwich baggie containing a white powdery substance which subsequently tested positive for the presence of cocaine.

for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

393.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **SUBJECT PREMISES** because:

a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the

184

attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.    As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.      I know that when an individual uses a computer to operate a website that is used for illegal conduct, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

394.     *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or

186

imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage

media, and to prevent the loss of the data either from accidental or intentional destruction. This is

true because of the following:

> a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.
> .
> b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.
>
> c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

395. *Nature of examination.* Based on the foregoing, and consistent with Rule

41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying

storage media that reasonably appear to contain some or all of the evidence described in the

warrant, and would authorize a later review of the media or information consistent with the

warrant. The later review may require techniques, including but not limited to computer-assisted

scans of the entire medium, that might expose many parts of a hard drive to human inspection in

order to determine whether it is evidence described by the warrant.

187

## BIOMETRIC UNLOCK

396.    The warrant I am applying for would permit law enforcement to obtain from the display of physical biometric characteristics (such as fingerprint, thumbprint, facial, or iris characteristics) to unlock devices subject to search and seizure pursuant to this warrant.  I seek this authority based on the following:

397.    I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to use.

398.    If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

399.    If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID."  During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's

facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

400.    If a device is equipped with an iris recognition feature, a user may enable the ability to unlock the device through his or her irises. For example, Samsung offers an Iris Scanner, which uses the biometric information of an individuals' irises to identify the user.

401.    In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

402.    As discussed in this Affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

403.    I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48

189

hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered within a certain period of time. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

404.    Due to the foregoing, with respect to any person who is located in the PREMISES during the execution of the search and who is reasonably believe by law enforcement to be a user of a biometric sensor-enabled device that falls within the scope of this warrant,  it is requested that law enforcement personnel may (1) press or swipe the fingers (including thumbs) of the person to the fingerprint scanner of the device found at the premises; or (2) hold the device in front of the person's face to activate the facial and/or iris recognition features, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## V.    CONCLUSION

405.    Based on the foregoing, I believe there is probable cause to believe that the following individuals are committing violations of federal law, including the Target Offenses: Fernando PALMA-JIMENEZ, Daniel MORALEZ, Carmelo HERNANDEZ-RAMIREZ, Luis QUINONEZ-HERNANDEZ, Reynaldo SANCHEZ-GONZALEZ, Carlos PEREZ-SANTANA, Equiel MARTINEZ, Gerardo OSORIO-JARAMILLO, Jesus MEDINA-RODRIGUEZ, Erik RODRIGUEZ, Andrea ROA, Hector RODRIGUEZ-VILLALOBOS, Osmar VENEJAS-MEJIA, Joseph MARINCIC.  I further believe that there is probable cause to believe that located at and in the SUBJECT PREMISES described in Attachment A, there is evidence of the Target Offenses.